George Hofmann (10005)
Steven C. Strong (6340)
Victor P. Copeland (13511)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, Utah  84111
Telephone: (801) 363-4300
Facsimile:  (801) 363-4378

Proposed attorneys for
Infinia Corporation

Troy J. Aramburu (10444)
Jeff D. Tuttle (14500)
**Snell & Wilmer, LLP**
15 West South Temple
Suite 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile:  (801) 257-1800

Proposed attorneys for
PowerPlay Solar I, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re<br><br>INFINIA CORPORATION,<br><br>Debtor. | Bankruptcy No. 13-30688 (WTT)<br><br>Chapter 11 |
| In re<br><br>POWERPLAY SOLAR I, LLC,<br><br>Debtor. | Bankruptcy No. 13-30690 (WTT)<br><br>Chapter 11 |

**MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POST-PETITION SECURED DIP FINANCING WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND (B) TO USE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION; (II) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

Infinia Corporation ("Infinia") and PowerPlay Solar I, LLC ("PowerPlay"; and

collectively with Infinia, the "Debtors"), debtors and debtors in possession in the above-

captioned bankruptcy cases, through their undersigned proposed counsel and pursuant

to Bankruptcy Code §§ 105, 361, 362, 363, and 364 and Bankruptcy Rules 2002 and

4001, hereby move this Court (the "Motion") (1) to enter an interim order, substantially in

the form attached as Exhibit A (the "Interim Order"), (i) authorizing the Debtors to

(a) obtain post-petition secured DIP financing with priority over all secured indebtedness

and (b) to use cash collateral and provide for adequate protection for any diminution in

value of the Pre-Petition Lender Party's Liens in the Collateral; (ii) granting liens and

providing super-priority administrative expense status; (iii) modifying the automatic stay,

(iv) granting related relief; and (2) subsequently to enter a final order, substantially in the

form attached as Exhibit B (the "Final Order"), (a) granting the relief provided through

the Interim Order on a final basis and (b) authorizing the Debtors to refinance certain

existing secured indebtedness.  In support of the Motion, the Debtors respectfully state

as follows:

## JURISDICTION AND BACKGROUND

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Debtors filed voluntary petitions for relief under chapter 11 of title 11

of the United States Code (the "Bankruptcy Code") on September 17, 2013 (the

"Petition Date").

3.      The Debtors continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.

4.      No examiner or trustee has been appointed in this Case.

5.      Infinia is an energy technology company primarily in the business of developing and manufacturing high-efficiency, free-piston Stirling engines that convert readily available and low cost heat sources such as solar, biogas and natural gas into reliable on- or off-grid electricity.

6.      PowerPlay is a wholly-owned subsidiary of Infinia.  It operates a solar generation project located in Yuma, Arizona, funded in part by a grant from the United States government.

7.      Like many solar companies, the Debtors have faced an extremely challenging business and financing environment due to pricing erosion for photovoltaic panels, and have encountered difficulty in raising sufficient funds to meet its corporate and commercial objectives.

8.      During the weeks and months leading up to Infinia obtaining secured bridge financing (the "Pre-Petition Debt") from Atlas Global Asset Holdings, LP (the "Pre-Petition Lender Party") pursuant to that certain Credit Agreement dated July 26, 2013, Infinia actively engaged in a process of evaluating its funding needs and options and considered and pursued various financing alternatives.

9.      In or about May 2013, Infinia retained John J. McKenna and Hamilton Clark and Co., LLC (collectively, "Hamilton Clark"), an FINRA-member investment banking firm focused exclusively on energy technology companies, in an effort to raise capital or enter into related business transactions, including selling all of the assets of the company.  Among other reasons, Infinia retained Hamilton Clark because of Mr. McKenna's understanding of the energy technology industry and prior experience as

Chief Financial Officer of a leading developer of kinematic Stirling cycle engines for distributed energy production.

10.     During June and July 2013, Hamilton Clark had made contacts with approximately 75 potential investors or purchasers of the company.  As is common in the energy technology sector, all information and materials provided to potential interested parties made clear that in addition to equity investment, Infinia also was available for purchase.  Through its efforts, Hamilton Clark identified a "short-list" of approximately five to six seriously interested parties and approximately 15-20 moderately serious parties.

11.     Throughout this time, Infinia pursued and had discussions with many potential investors, which included domestic and international firms, traditional venture capital investors, hedge funds, utility companies and other strategic investors. Additionally, Infinia held several licensing and partnering discussions for other territories (i.e., China) for its solar and fueled products.  These discussions did not lead to a transaction because of the early stage of Infinia's products or the delay in bringing the 1.5mw solar array at Tooele Army Depot in Utah.

12.     At the time of incurring the Pre-Petition Debt, Infinia required additional funding by no later than July 29, 2013 (the date that it received the funding) in order to continue to operate its business in a commercially reasonable manner, to execute on its business plan.  Absent such funding, Infinia would have been forced to furlough its substantial workforce.  Importantly, at the time of the incurring the Pre-Petition Debt, Infinia had an extremely limited possibility of raising funds from any other source in a timely manner, if at all.  Without the bridge financing Infinia obtained through the Pre-

Petition Debt, the Debtors would not have had sufficient resources of working capital and financing necessary to carry out their business operations while the Debtors considered and pursued various options for restructuring their business.

13.    The Debtors have recently experienced serious cash-flow problems and likely would be unable to continue as going concerns, even after significantly scaling back their operations, without the inflow of debtor-in-possession ("DIP") financing. Moreover, even with scaled-down operations and the new post-petition funds being sought through the debtor-in-possession financing, the Debtors project that they likely will be unable to continue business operations as stand-alone companies beyond early December 2013.  By a separate motion, the Debtors seek approval of proposed sale procedures and the proposed sale of substantially all of their assets.

## RELIEF REQUESTED

14.    The Debtors propose to obtain post-petition DIP financing from Atlas Global Investment Management LLP ("Atlas"), as Administrative Agent[1] and Collateral Agent for various Lenders and such Lenders (collectively, and with Atlas, the "DIP Secured Parties").  As is more fully described below, the Lenders, through Atlas, have agreed to make available to the Debtors a total of approximately $6,000,000, the actual amount of which reflects the payoff of principal and accrued interest and fees the Pre-Petition Debt, plus another $3,000,000 of additional funding.  The amount borrowed is to be treated as a super-priority claim secured by a first position lien against substantially all property of the Debtors' estates (other than Avoidance Actions (except for solely the proceeds of Avoidance Actions brought pursuant to section 549 of the

---

[1]    Unless otherwise noted, capitalized terms shall have the same meaning as in the Interim Order, the Final Order, and the DIP Financing Agreement (defined below).

Bankruptcy Code to recover any post-Petition Date transfer of Collateral), and subject to

a carve-out for (a) Bankruptcy Court and United States Trustee fees, (b) all Court

approved fees of the Debtors' professionals prior to a Termination Date, (c) up to

$50,000 of allowed fees of the Debtors' professionals after the Termination Date and (d)

cash in the amount of $100,000, pursuant to Bankruptcy Code §§ 364(c) and (d).

15.    The Debtors request entry of an Interim Order, in substantially the form

attached as Exhibit A, (a) approving the proposed financing, solely as to the $3,000,000

of additional funding and not as to the repayment of any existing indebtedness, on an

interim basis through and including the date of the final hearing on the Motion,

(b) authorizing the use of cash collateral in which the DIP Secured Parties or Pre-

Petition Lender Party have an interest and providing for adequate protection for any

diminution in value of the Pre-Petition Lender Party's Lien in the Collateral, (c) vacating

and modifying the automatic stay to the extent necessary to implement and effectuate

the terms and provisions of the financing agreements and the Interim Order, and (d)

waiving the fourteen day stay provisions of Bankruptcy Rule 6004(h) and providing that

the Interim Order be effective immediately. The Debtors further request entry of a Final

Order, in substantially the form attached as Exhibit B, (a) granting the relief provided

through the Interim Order on a final basis and (b) authorizing the Debtors to refinance

the Pre-Petition Debt.

## **MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING**

16.    Subject to this Court's approval, the Debtors and Atlas have agreed to the

terms and documentation for post-petition financing, including a Senior, Secured,

Super-Priority Debtor-in-Possession Agreement (the "DIP Financing Agreement"), a

copy of which is attached as Exhibit C.  Bankruptcy Rule 4001 requires that motions

requesting authority to incur post-petition financing begin with a concise statement of

the relief requested that summarizes the material terms and sets forth where the

material terms can be found in the documents.  In compliance with Fed. R. Bankr. P.

4001(c) and Local Rule 4001-2, the Debtors make the following concise statement

about the relief sought through this Motion.  The Debtors believes these terms will

reasonably address the Debtors' near-term funding requirements.

     17.     The significant provisions[2] of the DIP Financing Agreement, and the

proposed Interim Order and Final Order, are as follows:

     a.   <u>Amount</u>. The maximum amount of advances under the DIP Financing Agreement shall be approximately $6,000,000, the actual amount of which reflects the payoff of principal and accrued interest and fees on the Pre-Petition Debt, plus another $3,000,000 of additional funding, provided, however, that the Interim Order will not contemplate the repayment of any existing indebtedness.  <u>See</u> DIP Financing Agreement at § 1.1 (defining "Interim Order" and "Term Loan Commitment") and § 2.1(a); Interim Order at ¶ (ii)(a) and at § 2(b)(i); Final Order at ¶ (ii)(a) and at § 2(b)(i).

     b.   <u>Obligors</u>.  Infinia is the borrower under the DIP Financing Agreement, which obligations are guaranteed by PowerPlay and non-debtors Infinia Technology Corporation and ITC Management Company 2011, Inc.  <u>See</u> DIP Financing Agreement at Preamble and at § 1.1 (defining "Guarantor").

     c.   <u>Payment of Prepetition Debt</u>.  The DIP Financing Agreement provides that approximately $3,000,000 of the post-petition advances under the DIP Financing Agreement are to be used to pay off principal and accrued interest and fees on the Pre-Petition Debt, provided, however, that the Interim Order will not contemplate the repayment of any existing indebtedness.  <u>See</u> DIP Financing Agreement at Recital ¶¶ C-E, at § 1.1 (defining "Interim Order") and at § 6.9; Interim Order at ¶¶ (E)(i)-(vi), (H), (I) and at § 10(b); Final Order at ¶¶ (E)(i)-(vi), (H), (I)

---

[2]    This summary is qualified in its entirety by reference to the provisions of the DIP Financing Agreement and related documents, and any order of this Court relating to the post-petition financing proposed through the Motion.

and at § 10(b).  The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtors, such financing is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and property and the Debtors believe they would be unable to find financing on better terms.

d.  <u>Super-Priority and Secured Status</u>.  Subject to a Carve-Out of (a) Bankruptcy Court and United States Trustee fees, (b) all Court approved fees of the Debtors' professionals, (c) up to $50,000 of allowed fees of the Debtors' professionals after the Termination Date and (d) cash in the amount of $100,000, all amounts advanced under the DIP Financing Agreement shall be deemed to have priority over any or all administrative expenses of the kind specified in Bankruptcy Code §§ 503(b) and 507(b) and shall be secured by a first position lien against all of the property of the Debtors' estate, other than Avoidance Actions (other than the proceeds of any Avoidance Action brought pursuant to Bankruptcy Code § 549 to recover any post-Petition Date transfer of collateral).  Solely to the extent of the Pre-Petition Diminution in Value of the interests of the Pre-Petition Debt Parties in their Collateral, pursuant to Bankruptcy Code §§ 361, 363(e) and 354(d) the Pre-Petition Debt shall be secured by replacement Liens and shall have super-priority status, junior only to the New DIP Liens, Permitted Liens, the DIP Superpriority Claim and the Carve-Out.  After the Petition Date, Atlas required a collateral assignment, subject to Court approval and pursuant to the terms of that certain Collateral Assignment of Note Documents and Allonge, dated September 18, 2013, of a certain debt owed to Infinia by non-filing subsidiary Infinia Technology Corporation in the amount of approximately $500,000.  <u>See</u> DIP Financing Agreement at Recital ¶ D; § 1.1 (defining "Final Order," "Financing Orders" and "Interim Order"); §§ 2.1, 4.16, 6.10(b), 6.13, 7.1, 8.1(h)(xii) and 10.9; Interim Order at ¶¶ (iv) and (v), and at §§ 2(e)(ii), 2(f), 2(i), 4; Final Order at ¶¶ (iv) and (v), and at §§ 2(e)(ii), 2(f), 2(i), 4.  The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtors, such financing is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and property and the Debtors believe they would be unable to find financing on better terms.

e.  <u>Repayment Terms and Maturity Date</u>.  The entire unpaid principal amount of advances under the DIP Financing Agreement, along with all accrued and unpaid interest, fees and charges, shall be paid in full by the Debtors on the Term Loan Maturity Date, which is the earlier of: (i) December 2, 2013, (ii) acceleration of any Obligations under the DIP

Financing Agreement or (iii) the Termination Date.  <u>See</u> DIP Financing Agreement at § 1.1 (defining "Term Loan Maturity Date") and § 2.1(c).

f.   <u>Interest</u>. Interest on the outstanding balance of the amounts advanced under the DIP Financing Agreement accrues from the date that such advance is made until it is repaid at the per annum rate of 5%, with a Post-Default Rate of 7% per annum. <u>See</u> DIP Financing Agreement at § 1.1 (defining "Post-Default Rate") and at § 2.1(b).

g.   <u>Origination Fee</u>.  The Debtor shall pay a non-refundable Origination Fee in the amount of $100,000.  <u>See</u> DIP Financing Agreement at § 2.6.

h.   <u>Indemnified Taxes</u>.  The Debtor shall indemnify the Agent, each Lender and each Affiliate of each Lender for the full amount of any Indemnified Taxes or Other Taxes.  <u>See</u> DIP Financing Agreement at § 1.1 (defining "Indemnified Taxes" and "Other Taxes") and at § 2.8.  The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtors, such financing is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and property and the Debtors believe they would be unable to find financing on better terms.

i.   <u>Minimum Cash Balance</u>.  The Debtor shall maintain a minimum cash balance (after giving effect to the Wind-Down Amount) of not less than $125,000.  <u>See</u> DIP Financing Agreement at § 6.16.

j.   <u>Sale Transaction Benchmarks</u>.  The Debtor shall (a) on the Petition Date, file a motion to approve proposed bidding procedures and a timeline to consummate a sale pursuant to Bankruptcy Code § 363 (b) not later than one business day after the Petition Date, file a motion seeking Court approval of the DIP Financing Agreement, (c) within four business days of the Petition Date, obtain an Interim Order approving the DIP Financing Agreement, (d) within 26 days after the Petition Date, obtain a Final Order approving the DIP Financing Agreement and an Order approving proposed bid procedures and a timeline to consummate a sale pursuant to Bankruptcy Code § 363, (e) within 53 days after the Petition Date, hold a final auction pursuant to the approved bid procedures, (f) within 55 days after the Petition Date, obtain an Order approving the sale pursuant to Bankruptcy Code § 363, and (g) within 60 days after the Petition Date, close on the sale. <u>See</u> DIP Financing Agreement at § 6.20.

k.   <u>Budget</u>.  Among other conditions to each Term Loan, the amount must be permitted by the Debtor's Budget, subject to any Permitted

Variance.  See DIP Financing Agreement at § 1.1 (defining "Budget" and "Permitted Variance") and at § 5.2(f).

l. Expenses.  The Debtors are required to repay the DIP Secured Parties and the Pre-Petition Lender Party for all of its out of pocket expenses and professional fees incurred in connection with the financing, including attorneys' fees incurred in connection with the bankruptcy case.  See DIP Financing Agreement at § 1.1 (defining "Obligations"); Interim Order at § 19(b); Final Order at § 19(b).

m. Events of Default. The following is a general summary of what constitutes an Event of Default under the DIP Financing Agreement: (a) the failure of the Credit Parties to timely pay principal or interest when due and payable under the DIP Financing Agreement, (b) any representation or warranty by a Credit Party in connection with the DIP Financing Agreement that shall prove to have been materially incorrect when made, (c) the failure of the Credit Parties to perform any covenant in the DIP Financing Agreement, (d) the failure of the Credit Parties to timely make payments relating to obligations other than the DIP Financing Agreement, (e) the failure by the Credit Parties to achieve the Sale Transaction Benchmarks, (f) the occurrence of various events in the bankruptcy case, including, among other things, events that are inconsistent with the payment and priority provisions of the DIP Financing Agreement, (f) the assertion of any claim against Atlas or Lenders pursuant to the Financing Orders, (g) the entry of a final judgment against any Credit Party in an amount in excess of $100,000 that is not stayed, (h) an ERISA Event, that reasonably could be expected to result in a Material Adverse Effect, (i) a Change of Control, (j) the cessation of the Liens on Collateral to constitute valid and perfected Liens having a fair market value of $100,000 in the aggregate, (k) the theft, damage or destruction of any Collateral having a fair market value of $100,000 in the aggregate, (l) the assertion by a Guarantor that its obligations are invalid; (m) any Material Adverse Effect, and (n) the occurrence of any event that permits Atlas or the Lenders to exercise remedies under the Financing Orders.  See DIP Financing Agreement at § 8.1.

n. Validity, Perfection or Amount of Pre-Petition Secured Debt.  Without prejudice to the rights of other parties in interest as set forth in Section 5 of the Interim Order, the Debtors stipulate (a) that prior to the entry of the Interim Order, Infinia incurred the Pre-Petition Debt; (b) that as of the Petition Date, the Pre-Petition Debt was in the approximate principal amount of $3,000,000, plus interest, costs, expenses and fees; (c) that the Pre-Petition Debt was extended to Infinia as a protective advance to maintain Infinia's business while it considered restructuring options; (d) that the Pre-Petition Debt was secured by

substantially all of Infinia's assets and personal property; (e) that the liens securing the Pre-Petition Debt are not subject to avoidance, recharacterization or avoidance; (f) that the Pre-Petition Debt obligations are valid and enforceable; (g) that the Pre-Petition Debt constituted allowable secured claims; (h) that the Debtors have waived, discharged and released the Prior Lender Party of any right the Debtors may have to challenge the Pre-Petition Debt or to assert related claims. Interim Order at ¶ (E)(i)-(vi); Final Order at ¶ (E)(i)-(vi). The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtors, such financing is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and property and the Debtors believe they would be unable to find financing on better terms.

o. <u>Bankruptcy Code § 506(c)</u>.  Upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration shall be charged against the Collateral pursuant to Bankruptcy Code § 506(c) without the prior written consent of Atlas.  Interim Order at ¶ (G), §§ 2(f) and 10(a); Final Order at ¶ (G), §§ 2(f) and 10(a).  The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtors, such financing is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and property and the Debtors believe they would be unable to find financing on better terms.

p. <u>Vacation and Modification of the Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code § 362 is vacated and modified to the extent necessary (a) to permit the DIP Secured Parties to exercise, upon occurrence of the Termination Date and upon two business days' prior notice of such occurrence, all rights and remedies provided for in the DIP Financing Agreements (including, without limitation and without prior notice, the right to freeze monies or balances in the Debtors' accounts or set of monies or balances of the Debtors in accounts maintained by any DIP Secured Party, the right to charge the Post-Default Rate, terminate commitments and cease funding under the DIP Agreement) (b) to permit the Debtors to grant the New DIP Liens and the Pre-Petition Lender Party's Replacement Liens and incur all liabilities and obligations to the DIP Secured Parties and the Pre-Petition Lender and (c) to authorize the DIP Secured Parties to retain and apply payments made pursuant to the DIP Financing Agreement and the Interim and Final Orders.  Interim Order at §§ 14 and 16; Final Order at §§ 14 and 16.   The justification for the inclusion of this provision is that no other comparable financing reasonably is available to the Debtors, such financing is necessary, essential and appropriate

for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and property and the Debtors believe they would be unable to find financing on better terms.

q. <u>Bankruptcy Code § 364(e)</u>.  The DIP Secured Parties are entitled to the protections provided in Bankruptcy Code § 364(e) and no modification, amendment or vacation of the Interim Order shall affect the validity and enforceability of any advances made or any Lien or priority authorized or created by the Interim Order.  Interim Order at § 19(a); Final Order at § 19(a).

r. <u>Bankruptcy Code § 552(b)</u>.  The DIP Secured Parties and the Pre-Petition Lender Party are entitled to the benefits of Bankruptcy Code § 552(b) and the "equities of the case" exception under Bankruptcy Code § 552(b) shall not apply.  Interim Order at § 19(g); Final Order at § 19(g).

s. <u>Waiver of 14 Day Stay</u>.  The 14 day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to the Interim Order.  Interim Order at § 19(n); Final Order at § 19(n).

## <u>DISCUSSION</u>

**I.    The Debtors have Properly Exercised their Business Judgment in Entering into the DIP Financing Agreement, Which Should be Approved Under Bankruptcy  Code § 364(c) and (d)**

As described above, it is essential to the success of the Debtors' chapter 11 case that the Debtors immediately obtain access to sufficient post-petition financing.  The preservation of estate assets, the Debtors' continuing viability during this case and its ability to maximize distributions to creditors all depend heavily upon approval of the DIP financing and the related actions requested through this Motion.

Bankruptcy Code § 364 distinguishes between (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or security.  If a debtor in possession cannot obtain post-petition credit on an unsecured basis, pursuant

to Bankruptcy Code § 364(c) a court may authorize the obtaining of credit or the

incurring of debt, repayment of which is entitled to super-priority administrative expense

status or is secured by a senior lien on unencumbered property or a junior lien on

encumbered property, or combination of these protections.  Bankruptcy Code § 364(d)

provides that a court may "prime" a lien only if a debtor in possession "is unable to

obtain such credit otherwise" and "there is adequate protection of the interest of the

holder of the lien on the property of the estate on which such senior or equal lien is

proposed to be granted."

Because the Debtors propose to obtain financing under the DIP Financing

Agreement that is entitled to super-priority administrative expense status and is secured

by a senior lien on property of the Debtors that already is encumbered, approval of the

DIP Financing Agreement is governed by Bankruptcy Code §§ 364(c) and (d).

Bankruptcy courts routinely defer to a debtor-in-possession's business judgment

on most business decisions, including the decision to borrow money.  See Group of

Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re

Simasko Prod, Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be

left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17

(Bankr. S.D. Ohio 1983) (same).  As one court has noted, "[m]ore exacting scrutiny

would slow the administration of the debtor's estate and increase its costs, interfere with

the Bankruptcy Code's provision for private control of administration of the estate, and

threaten the court's ability to control a case impartially."  Richmond Leasing Co. v.

Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, bankruptcy courts often defer to the business judgment of a trustee or a debtor-in-possession regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).  Courts generally will not second-guess a trustee's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R., at 513-14 (footnotes omitted).

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interest of the estate.  See, e.g., In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. SDNY 1990) (observing that with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); In re Simasko Prod. Co., 47 B.R. at 448-449 (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

The statutory requirement for obtaining post-petition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under [Bankruptcy Code] § 503(b)(1) … as an administrative expense.  See Ames Dept. Stores, 15 B.R. at 37-39 (reasoning that a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)).  The statutory requirement for obtaining post-petition credit under Bankruptcy Code § 364(d) is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain such credit

otherwise" and "there is adequate protection of the interest of the holder of the lien on

the property of the estate on which such senior or equal lien is proposed to be granted."

See, e.g., In re Campbell Sod, Inc., 378 B.R. 647, 652 (Bankr. D. Kan. 2007) (applying

"holistic" approach to conclude that financing was appropriate under Bankruptcy Code §

364(d)).

"Some courts apply a three-part test to assess debtor in possession financing

requests under section 364(c), requiring a showing that (1) the debtor cannot obtain

credit unencumbered or without superpriority status under section 364(b), (2) the credit

transactions are necessary to preserve assets of the estate and (3) the terms of the

transaction are fair, reasonable and adequate, given the circumstances of the debtor in

possession-borrower and the proposed lender."   3 Collier on Bankruptcy ¶ 364.04[2]

(Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (collecting cases).  In this case, the

Agreement meets this standard and should be approved.  See id.; In re Aqua Assocs.,

123 B.R. 192, 195-196 (Bankr. E.D. Pa. 1991) (applying test to conclude that

"[o]btaining credit should be permitted not only because it is not available elsewhere, …

but also because the credit acquired is of significant benefit to the debtor's estate and

the terms of the proposed loan are within the bounds of reason").

To show that the credit required is not otherwise available, a debtor need only

demonstrate "by a good faith effort that the credit was not available without" the

protections of Bankruptcy Code § 364(c) and (d).  In re Snowshoe Co., 789 F.2d 1085,

1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every

possible lender before concluding that such credit is unavailable."  Id. at 1088.  Where

few lenders are likely to be able and willing to extend the necessary credit to a debtor,

"it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. D. N.D. Ga. 1988), aff'd sub nom Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga 1989).

In this case, the Debtors and Atlas engaged in arm's-length negotiations in the days leading up to the Petition Date, resulting in the financing proposal discussed in this Motion and proposed for approval by the Court.  At no time did Atlas manifest a willingness to extend the post-petition financing without the protections afforded under Bankruptcy Code §§ 364(c) and (d).  Moreover, based on discussions with Infinia's investment banker and the state of its own assets, the Debtors believe in their reasonable business judgment that they are unable to obtain financing from any capital source without the protections afforded under Bankruptcy Code §§ 364(c) and (d). Accordingly, the Debtors believe that the terms and conditions detailed in the DIP Financing Agreement are reasonable and justified under the circumstances.

The Debtors' business judgment is that the proposed post-petition financing is necessary to preserve the Debtors' assets and personal property and is in the best interests of the Debtors' estates.  It is essential that the Debtors obtain the financing necessary to continue, among other things, the orderly operation of the Debtors' business and these bankruptcy cases, and to otherwise satisfy their working capital requirements.  If the Debtors had not filed their bankruptcy petitions, the Debtors believe that they would have run out of cash within a couple weeks.  Without immediate access to new borrowing relief, the Debtors' business operations and these bankruptcy cases could grind to a halt, which may seriously jeopardize the Debtors' going concern values.

The Debtors submit that the terms of the DIP Financing Agreement are reasonable and should be approved.  The proposed DIP Financing Agreement provides that the security interests and super-priority claims granted to the Lenders are subject to the Carve-Out described above.  Such carve-outs are not only reasonable but are necessary to ensure the Debtors' estate is adequately assisted by counsel and other professionals.  See Ames, 115 B.R. at 40.  Similarly, the Debtors believe that the fees and other charges provided in the DIP Financing Agreement are reasonable and appropriate under the circumstances.  The proposed fees under the DIP Financing Agreement are within the parameters of market fee structures for similar post-petition financing.  See, e.g. In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving debtor in possession financing facility that included a lender "enhancement fee").

Accordingly, the Court should approve the terms and conditions of the DIP Financing Agreement pursuant to Bankruptcy Code § 364(c) and (d).

## II.    The Court Should Authorize the Use of Cash Collateral and the Granting of Adequate Protection Based upon Consent of the Secured Party

A debtor in possession may not use cash collateral without the consent of the secured party or court approval.  Bankruptcy Code § 363(c)(2) and (e).  In this case, Infinia seeks authority to use cash collateral of Atlas Global Asset Holdings, LP, Infinia's pre-petition lender, and the DIP Secured Parties.  The Court should authorize the use of cash collateral because Infinia's pre-petition lender, and the DIP Secured Parties, consent to Infinia's use of collateral pursuant to the terms of the DIP Financing Agreement and the proposed Orders approving the DIP financing.

As a result of the grant of the New DIP Liens, and the use of Cash Collateral

authorized herein, the Pre-Petition Lender Party is entitled to receive adequate

protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code for any

diminution in value resulting from the automatic stay or Debtors' use, sale or lease of

the Pre-Petition Lender Party's Collateral (including Cash Collateral) during these

bankruptcy cases.

**III.    The Court Should Modify the Automatic Stay Consistent with the Terms of the DIP Financing Agreement**

Bankruptcy Code § 362 provides for an automatic stay upon the filing of a

bankruptcy case.  As summarized above, the proposed DIP Financing Agreement

contemplates a modification of the automatic stay (a) to permit the Debtors to grant

certain liens and to perform the Debtors' obligations under the DIP Financing

Agreement, (b) to permit the exercise of remedies by the DIP Secured Parties following

an event of default and (c) to authorize the DIP Secured Parties to retain and apply

payments made pursuant to the DIP Financing Agreement and the Interim and Final

Orders; subject to certain notices required by the Interim and Final Orders, as

applicable.  Upon the occurrence of an event of default, the DIP Lender is entitled to

exercise the rights and remedies as set forth in the DIP Financing Agreement.  The

Debtors submit that, in the Debtors' business judgment, such provisions are reasonable

under the present circumstances.  Accordingly, the Debtors respectfully request the

Court to authorize the modification of the automatic stay in accordance with the DIP

Financing Agreement.

**IV.** **The Lenders Should be Provided the Benefit and Protection of Bankruptcy Code § 364(e)**

The Debtors believe that the terms and conditions of the DIP Financing Agreement are the best possible under the circumstances of this case, and were negotiated in good faith, at arm's length, and with the assistance of counsel on all sides. Accordingly, the DIP Secured Parties should be provided with the benefit and protection of Bankruptcy Code § 364(e), such that if any of the provisions of any order granting this Motion are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the DIP Secured Parties would be fully protected with respect to any amounts advanced before such modification, vacation, stay or termination.

**V.** **Cause Exists to Waive the 14 Day Stay Otherwise Applicable Under Bankruptcy Rule 6004**

Bankruptcy Rule 6004(h) provides that unless the Court orders otherwise, all orders authorizing the sale of property under Bankruptcy Code § 363 are automatically stayed for 14 days after entry of the order.  The Debtors submit that cause exists to waive the automatic 14 day stay otherwise applicable under Bankruptcy Rules 6004(h).  Without an immediate infusion of working capital, the Debtors will run out of cash run within a couple weeks.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (1) enter an Interim Order (i) authorizing the Debtors to (a) obtain post-petition secured DIP financing and (b) to use cash collateral and grant adequate protection to the Pre-Petition Lender Party to the extent of any diminution in value of the Pre-Petition Lender Party's Liens in the Collateral; (ii) granting liens and providing super-priority administrative expense status; (iii) modifying the automatic stay, (iv) granting related relief; and (2) subsequently enter a Final Order (i) granting the relief provided through the Interim Order on a final basis and (b) authorizing the Debtors to refinance the Debtor's pre-petition secured debt.

Dated:    September 18, 2013

PARSONS KINGHORN HARRIS
*A Professional Corporation*

/s/ George Hofmann
GEORGE HOFMANN
STEVEN C. STRONG
VICTOR P. COPELAND

Proposed Attorneys for Infinia

SNELL & WILMER L.L.P.

/s/ Troy J. Aramburu
TROY J. ARAMBURU
JEFF D. TUTTLE

Proposed Attorneys for PowerPlay

# EXHIBIT A

*Prepared and Submitted by:*

George Hofmann (10005)
Steven C. Strong (6340)
Victor P. Copeland (13511)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, Utah  84111
Telephone: (801) 363-4300
Facsimile:  (801) 363-4378

Proposed attorneys for
Infinia Corporation

Troy J. Aramburu (10444)
**SNELL & WILMER L.L.P.**
15 West South Temple
Suite 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile:  (801) 257-1800

Proposed attorneys for
PowerPlay Solar I, LLC

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re<br><br>INFINIA CORPORATION,<br><br>Debtor. | Bankruptcy No. 13-30688 (WTT)<br><br>Chapter 11 |
| In re<br><br>POWERPLAY SOLAR I, LLC,<br><br>Debtor. | Bankruptcy No. 13-30690 (WTT)<br><br>Chapter 11 |

## INTERIM ORDER PURSUANT TO
## 11 U.S.C. SECTIONS 105, 361, 362, 363, 364, 503(b) AND 507(a), RULES 2002, 4001

{00175852.DOC / 2}

**AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND RULE 4001-2 OF THE LOCAL RULES OF PRACTICE FOR THE UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH, CENTRAL DIVISION (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POST-PETITION SECURED DIP FINANCING WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. SECTION 363 AND PROVIDING FOR ADEQUATE PROTECTION; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

THIS MATTER having come before this United States Bankruptcy Court for the District of Utah, Central Division (the "Court") upon the motion (the "DIP Motion") by Infinia Corporation ("Infinia") and PowerPlay Solar I, LLC ("PowerPlay"; and together with Infinia, each a "Debtor" and, collectively, the "Debtors"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Cases"), seeking, among other things, entry of an interim order (this "Interim Order") authorizing the Debtors, as applicable, to:

(i)     Obtain credit and incur debt, pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, on an interim basis for a period (the "Interim Period") from the entry of this Interim Order in these Cases through and including the date of the final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the DIP Motion on a final basis up to the aggregate committed amounts set forth in the Budget (as defined below) for such period (and on terms and conditions more fully described herein), secured by, as set forth in the DIP Financing

{00175852.DOC / 2}                                    2

Agreements (as defined below), first priority, valid, perfected and enforceable Liens (as defined in section 101(37) of chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code")) on all real and personal property of the Debtors' estate pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, subject only to Permitted Liens (as defined in the DIP Financing Agreement), and with priority, over all other administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)      (a) Establish that financing arrangement ("DIP Facility") pursuant to (I) the terms of the Senior, Secured Debtor-in-Possession Credit Agreement (the "DIP Financing Agreement")[1], substantially in the form of **Exhibit "C"** to the DIP Motion, by and among Infinia, as borrower and as a credit party, PowerPlay, as a guarantor and as a credit party, the other credit parties party thereto, Atlas Global Investment Management LLP, as administrative agent and collateral agent (the "DIP Agent") and the Lenders party thereto (collectively, the "DIP Lenders," and, together with the DIP Agent, the "DIP Secured Parties"), and (II) all other agreements, documents, notes, certificates and instruments executed and/or delivered with, to, or in favor of the DIP Secured Parties, including, without limitation, the security agreements, notes, guaranties, mortgages and Uniform Commercial Code ("UCC") financing statements

---

[1]      Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreement.

and all other related agreements, documents, instruments and certificates executed and/or delivered in connection therewith or related thereto (items (I) and (II), collectively, as the same may be amended, modified or supplemented and in effect from time to time, the "DIP Financing Agreements"); and (b) incur the Obligations under and as defined in the DIP Financing Agreement (collectively, the "DIP Obligations");

(iii)    Authorize the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) (subject to the terms and conditions of the DIP Financing Agreements) solely for (a) working capital and general corporate purposes and (b) payment of costs of administration of these Cases, to the extent set forth in the Budget and the DIP Financing Agreements.

(iv)    Grant, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Secured Parties), continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens (the "New DIP Liens"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estate except for Permitted Liens and as otherwise provided in this Interim Order, upon and to all of the Collateral granted under the terms of the DIP Financing Agreements, and, for the avoidance of doubt, Collateral shall expressly include all real and personal property of the Debtors

now owned or hereafter acquired (excluding Avoidance Actions of the Debtors, but including only the proceeds of Avoidance Actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-Petition Date transfer of Collateral) and all other property of whatever kind and nature, in each case, that is pledged as collateral under any Security Document, the Financing Orders or any other order of the Bankruptcy Court in the Cases, and all products, proceeds (cash and non-cash), any deposit or similar payment made pursuant to the terms of an asset purchase agreement or otherwise related to a Sale Transaction, substitutions, and accessions of or to any of the foregoing.  Notwithstanding anything to the contrary in this Interim Order or any DIP Financing Agreements, (a) with respect to the Debtors' non-residential real property leases, no Liens or encumbrances shall be granted on or extend to the Debtors' non-residential real property leases themselves, but rather any Liens or encumbrances granted shall extend only to the proceeds of such non-residential real property leases; and (b) upon the Termination Date, the rights of the DIP Secured Parties to enter onto the Debtors' leases premises to access and/or liquidate any Collateral shall be limited to (x) any such rights agreed to in writing by the applicable landlord prior to entry onto the lease premises, (y) any rights that the DIP Secured Parties have under applicable non-bankruptcy law or (z) such rights as may be granted by this Court on a separate motion with notice to the applicable landlords of the leased premises and an opportunity for such landlord to respond and be heard;

(v)     Grant, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Secured Parties) superpriority administrative claim status in respect of all DIP Obligations, subject only to the Carve-Out as provided herein;

(vi)     Authorize the use of "cash collateral" as such term is used in section 363 of the Bankruptcy Code (the "Cash Collateral"), including in which the DIP Secured Parties and/or the Pre-Petition Lender Party (as defined below) have an interest, in accordance with the terms of this Interim Order and the DIP Financing Agreements;

(vii)     Grant the Pre-Petition Lender Party the Pre-Petition Lender Party's Replacement Liens and Pre-Petition Lender Party's Superpriority Claims (each as defined below) to the extent of any Pre-Petition Diminution in Value (as defined below) of the Pre-Petition Lender Party's interest in the Pre-Petition Lender Party's Collateral (as defined below) as adequate protection for the granting of the New DIP Liens to the DIP Secured Parties, the use of Cash Collateral and for the imposition of the automatic stay;

(viii)     Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Interim Order; and

(ix)     Waive the fourteen (14) day stay provisions of rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the Federal Rules of Bankruptcy Procedure are

referred to herein as the "<u>Bankruptcy Rules</u>") and provide for immediate effectiveness of this Interim Order.

This Court having considered the DIP Motion, the exhibits attached thereto, the DIP Facility and the DIP Financing Agreements, and the evidence submitted at the hearing on this Interim Order (the "<u>Interim Hearing</u>"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), 9014 and Rule 4001-2 of the Local Rules of Practice for the United States Bankruptcy Court, District of Utah, Central Division (the "<u>Local Rules</u>"), due and proper notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing having been held and concluded on September ___, 2013; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     **Petition Date.** On September 17, 2013 (the "<u>Petition Date</u>"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Utah, Central Division.  The Debtors

have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction over this proceeding, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby.  Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for these Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      **Committee Formation**.  A statutory committee of unsecured creditors has not yet been appointed in these Cases.

D.      **Notice**.  The Interim Hearing was held pursuant to the authorization of Bankruptcy Rules 4001 and 6003 and Local Rule 4001-2.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by telecopy, email, overnight courier or hand delivery on September 18, 2013, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Utah, Central Division (the "U.S. Trustee"), Attn: Vincent Cameron, Esq., 405 S Main Street # 300, Salt Lake City, UT 84111-3402; (ii) the Internal Revenue Service; (iii) the Debtors' twenty (20) largest unsecured creditors, (iv) counsel to the Pre-Petition Lender Party, Attn: John F. Storz, Esq., Seven Times Square, New York, New York 10036; (v) counsel to the proposed DIP Agent, Brown

Rudnick LLP, Attn: William R. Baldiga, Esq. Seven Times Square, New York, New York 10036, John F. Storz, Esq., Seven Times Square, New York, New York 10036 and Mary D. Bucci, Esq., One Financial Center, Boston, MA 02111;  (vi) all secured creditors of record; and (vii) those parties who have filed a notice of appearance and request for service of pleadings in these Cases pursuant to Bankruptcy Rule 2002. Under the circumstances, such notice of the Interim Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and Local Rule 4001-2.

E.     **Debtors' Acknowledgements and Agreements.**  Without prejudice to the rights of other parties in interest as set forth in Section 7 below, the Debtors (on behalf of themselves and their estates) admit, stipulate and acknowledge and agree as indicated below that (collectively, subsections E (i) through E (vi) hereof shall be referred to herein as the "Debtors' Stipulations"):

(i)     **Pre-Petition Lender Party's Financing Agreements.**  The Debtors admit, stipulate, acknowledge and agree that prior to the entry of this Interim Order in these Cases, Infinia incurred indebtedness consisting of term loans and other financial accommodations pursuant to (a) that certain Credit Agreement, dated as of July 26, 2013, between Infinia, as borrower, Atlas Global Investment Management LLP, as administrative and collateral agent (in such capacity and not in any other capacity, the "Pre-Petition Agent") and Atlas Global Asset Holdings LP, as lender (in such capacity and not in any other capacity, the "Pre-Petition Lender"; and, collectively, with the "Pre-Petition Agent" the "Pre-Petition Lender

Party"), and (b) all other agreements, documents, notes, certificates and instruments executed and/or delivered with, to, or in favor of the Pre-Petition Lender Party, including, without limitation, all notes, mortgages, UCC financing statements and all other related agreements, documents, notes, certificates and instruments executed and/or delivered in connection therewith or related thereto (collectively, and as the same may be amended, modified or supplemented and in effect from time to time, the "Pre-Petition Lender Party's Financing Agreements").

(ii)    **Pre-Petition Lender Party's Debt Amount.** The Debtors admit, stipulate, acknowledge and agree that as of September 17, 2013, the Infinia was indebted under the Pre-Petition Lender Party's Financing Agreements to the Pre-Petition Lender Party in the approximate principal amount of $3,000,000; plus interest accrued and accruing, costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations (collectively the "Pre-Petition Lender Party's Debt").   The Debtors admit, stipulate, acknowledge and agree that Pre-Petition Lender Party's Debt was extended as a protective advance to maintain Infinia's business operations while Infinia and the other Debtors considered and pursued various options for restructuring their businesses either by filing a Chapter 11 petition, through a sale outside of bankruptcy or otherwise.  Without the Pre-Petition Lender Party's Debt, Infinia would not have had sufficient available sources of working capital and financing to carry on the operation of its business or to seek to restructure the Debtors' businesses.

(iii)    **Pre-Petition Lender Party's Collateral.**   The Debtors admit, stipulate, acknowledge and agree that to secure the Pre-Petition Lender Party's Debt, Infinia granted security interests and Liens (the "Pre-Petition Lender Party's Liens") to the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements on all or substantially all of its assets and personal property (provided, however, that in respect to real property leaseholds, only accounts receivable, payment obligations and/or proceeds arising from a sale, assignment or other disposition thereof were included) (collectively, the "Pre-Petition Lender Party's Collateral").

(iv)    **Pre-Petition Lender Party's Liens**. The Debtors admit, stipulate, acknowledge and agree that as of the Petition Date (i) the Pre-Petition

Lender Party's Liens on the Pre-Petition Lender Party's Collateral were not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and subject only to any Permitted Liens (as defined in the Pre-Petition Lender Party's Financing Agreements), (ii) the Pre-Petition Lender Party's Debt constituted legal, valid and binding obligations of Infinia, enforceable in accordance with the terms of the Pre-Petition Lender Party's Financing Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Lender Party's Debt existed, and no portion of the Pre-Petition Lender Party's Debt was subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Lender Party's Debt constituted allowable secured claims. The Debtors admit, stipulate, acknowledge and agree that on and as of the date that this Interim Order is entered, the Debtors have waived, discharged and released the Pre-Petition Lender Party, together with its affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Pre-Petition Lender Party's Debt, (y) to challenge or object to the security for the Pre-Petition Lender Party's Debt, and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Pre-Petition Lender Party's Financing Agreements or otherwise.

None of the Debtors possess or will assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Lender Party's Financing Agreements or the Pre-Petition Lender Party's Liens, and/or security interests in the Pre-Petition Lender Party's Collateral, or any claim of the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements.

(v)     **Value of Pre-Petition Lender Party's Collateral.** The Debtors acknowledge that after investigation it could be determined that the aggregate value of the Pre-Petition Lender Party's Collateral granted to the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements exceeded the amount of the Pre-Petition Lender Party's Debt as of the Petition Date and, accordingly, that it could be

determined that all of the Pre-Petition Lender Party's Debt constitutes an over-secured claim within the meaning of section 506(b) of the Bankruptcy Code.

(vi)   **Cash Collateral**.   The Pre-Petition Lender Party has a security interest and Lien in Cash Collateral, including on all amounts on deposit in Infinia's banking, checking, or other deposit accounts and all proceeds of the Pre-Petition Lender Party's Collateral to secured the Pre-Petition Lender Party's Debt, to the same extent and order of priority as that which was held by each such party prior to the filing of these Cases.

F.      **Findings Regarding the Post-Petition Financing.**

(i)      **Need for Post-Petition Financing and use of Collateral**.   An immediate need exists for the Debtors (A) to obtain funds from the DIP Facility in order to fund the working capital requirements and other financing needs of the Debtors, and (B) to use the Collateral, including the Cash Collateral.   The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors and their equity holders and the possibility for a successful reorganization or sale of the Debtors' assets as a going concern or otherwise.

(ii)      **No Credit Available on More Favorable Terms**.   The Debtors have been unable to obtain (A) unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, (B) credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, (C) credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien, or (D) additional post-petition liquidity or a consent to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code from or of the Pre-Petition Lender Party under the terms of the Pre-Petition Lender Party's Financing Agreements, in each case, (A) through (C) on more favorable terms and conditions than those provided in the DIP Financing Agreements and this Interim Order, and, in the case of (D),  on terms other than those provided in the DIP Financing Agreements and this Interim Order.

(iii)    **Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any Permitted Liens are valid, senior, perfected and unavoidable.   Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the DIP Secured Parties and any committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection and extent of any such Permitted Lien and or security interest, subject to the time periods set forth in Section 7 of this Interim Order.

G.    **Section 506(c) Waiver.**  Subject to and effective only upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and the Pre-Petition Agent, and no such consent shall be implied from any other action or inaction by the DIP Secured Parties or Pre-Petition Lender Party.

H.    **Roll-Up of Pre-Petition Lender Party's Debt.**  The DIP Secured Parties will request approval to irrevocably repay in full to the Pre-Petition Lender Party an amount equal to the Pre-Petition Lender Party's Debt in full satisfaction and cancellation of the Pre-Petition Lender Party's Debt from the proceeds of the DIP Facility (the "Pre-Petition Lender Party's Debt Payoff") upon entry of the Final Order, which request will be delayed until the Final Hearing on the DIP Facility.  This Court specifically does not

approve such Pre-Petition Lender Party's Debt Payoff as part of the DIP Facility at this time, but will consider the issue at the Final Hearing.

I.    **Use of Proceeds of the DIP Facility**.  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) (subject to the terms and conditions of the DIP Financing Agreements), solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of these Cases, to the extent set forth in the Budget and (c) upon entry of the Final Order, the Pre-Petition Lender Party's Debt Payoff in accordance with the DIP Financing Agreements, which shall constitute a roll-up under the DIP Financing Agreements.

J.    **Adequate Protection for Pre-Petition Lender Party**.  As a result of the grant of the New DIP Liens, and the use of Cash Collateral authorized herein, the Pre-Petition Lender Party is entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code for any Pre-Petition Diminution in Value (as defined below) resulting from the automatic stay or Debtors' use, sale or lease of the Pre-Petition Lender Party's Collateral (including Cash Collateral) during these Cases. As adequate protection, the Pre-Petition Lender Party will receive: (1) the Prior-Lender Party's Replacement Liens and (2) the Pre-Petition Lender Party's Superpriority Claim.

K.  **Extension of Financing**.  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Financing Agreements and subject to (i) the entry of this Interim Order and a Final Order, and (ii) findings by this Court that such financing is essential to the Debtors' estate, that the DIP Lenders are good faith financiers, and that the DIP Secured Parties' claims, superpriority claims, security interests and Liens and other protections granted pursuant to this Interim Order (and the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.  The New DIP Liens (as defined herein) shall not be (i) subject or subordinate to (A) any Lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any Liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

L.  **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The terms and conditions of the DIP Facility and the DIP Financing Agreements, and the fees paid and to be paid thereunder are (i) fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Facility and the use of the Collateral (including, without

limitation, the Cash Collateral) was negotiated in good faith and at arms' length between the Debtors, the DIP Secured Parties and the Pre-Petition Lender Party, and (iii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that the DIP Secured Parties are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

M.     **Relief Essential; Best Interest; Good Cause.**  The relief requested in the DIP Motion (and as provided in this Interim Order), including, without limitation, the establishment of the DIP Facility and the use of the Collateral (including, without limitation, the Cash Collateral), is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and personal property.  It is in the best interest of the Debtors' estates to be allowed to establish the DIP Facility and to use the Collateral (including, without limitation, the Cash Collateral) contemplated by the DIP Financing Agreements. Good cause has been shown for the relief requested in the DIP Motion (and as provided in this Interim Order).

N.     **Entry of Interim Order**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE**, on the DIP Motion of the Debtors and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the DIP Secured Parties and the Pre-Petition Lender Party to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.     **Motion Granted**.   The DIP Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order and the DIP Financing Agreements.

2.     **DIP Financing Agreements**.

(a)     **Approval of Entry Into DIP Financing Agreements.**   The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations, in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreements (including, without limitation, the Budget), and to execute and deliver all instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtors under the DIP Facility (including, without limitation, the Collateral Assignment of Note Documents and Allonge dated September 18, 2013 (the "Collateral Assignment")) and the creation and perfection of the New DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreements.   The Debtors are hereby authorized and directed to do and perform all

acts, pay the principal, interest, fees, expenses and other amounts described in the DIP

Financing Agreement and all other DIP Financing Agreements as such become due,

including, without limitation, closing fees, administrative fees, origination fees, and

reasonable attorneys', financial advisors' and accountants' fees and disbursements as

provided for in the DIP Financing Agreement which amounts shall not otherwise be

subject to approval of this Court; provided, however, that unresolved disputes as to the

reasonableness of any professional fees and expenses may be determined by this

Court.  Upon execution and delivery, the DIP Financing Agreements shall represent

valid and binding obligations of ~~the  Debtors  enforceable~~ against the Debtors in

accordance with their terms.

      (b)    **Authorization to Borrow**.

      (i)    In order to enable the Debtors to continue to operate their business during

the Interim Period and subject to the terms and conditions of this Interim Order, the DIP

Financing Agreement, the other DIP Financing Agreements, and the Budget (as defined

below) (subject to any variances thereto permitted under the terms and conditions of the

DIP Financing Agreement), the Debtors are hereby authorized to borrow under the DIP

Facility, and subject to entry of the Final Order, Debtors shall be authorized under the

DIP Facility to consummate Pre-Petition Lender Party's Debt Payoff, which shall

constitute a roll-up under the DIP Financing Agreements, and in doing all of the

foregoing, to borrow up to a total committed amount of up to $5,318,500.

(ii)    Upon execution and delivery of the DIP Financing Agreements, such DIP Financing Agreements shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against the Debtors in accordance with their respective terms and the terms of this Interim Order for all purposes during these Cases, any subsequently converted cases of the Debtors under chapter 7 of the Bankruptcy Code or after the dismissal of these Cases.    No obligation, payment, assignment or repayment thereof or recovery on or in respect thereof, transfer or grant of security under the DIP Financing Agreements, or this Interim Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(c)    **Application of DIP Proceeds**.  The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreement, and in accordance with the Budget (as defined below) (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreement) solely for  (a) working capital and general corporate purposes, to the extent set forth in the Budget,  (b) payment of costs of

administration of these Cases, to the extent set forth in the Budget, and (c) upon entry of the Final Order, the Pre-Petition Lender Party's Debt Payoff in accordance with the DIP Financing Agreements, which shall constitute a roll-up under the DIP Financing Agreements.

(d)    **Conditions Precedent**.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Financing Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Financing Agreement have been satisfied in full or waived by the DIP Secured Parties in their sole discretion.

(e)    **Liens.**  Effective immediately upon the entry of this Interim Order, the DIP Secured Parties are hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and New DIP Liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estate except for Permitted Liens and as otherwise provided in this Interim Order, upon and to all of the Collateral, and, for the avoidance of doubt, Collateral shall include all real and personal property of the Debtors now owned or hereafter acquired (excluding Avoidance Actions of the Debtors, but including only the proceeds of Avoidance Actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-Petition Date transfer of Collateral) and all other property of whatever kind and

{00175852.DOC / 2}                                            20

nature, in each case, that is pledged as collateral under any Security Document (including, without limitation, the Collateral Assignment), the Financing Orders or any other order of the Bankruptcy Court in these Cases.

(f)     **DIP Lien Priority**.  The New DIP Liens created and granted to the DIP Secured Parties, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to any of the Collateral, subject only to: (x) the Carve-Out, and (y) the Permitted Liens.  The New DIP Liens shall secure all DIP Obligations (including, but not limited to, the advances under the DIP Facility used to effectuate the Pre-Petition Lender Party's Debt Payoff).  The New DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in these Case except for the Permitted Liens and the Carve-Out; and shall be valid and enforceable against any trustee subsequently appointed in these Case, upon the conversion of these Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Case"), and/or upon the dismissal of these Cases.  The New DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, or if approved in the Final Order, section 506(c) of the Bankruptcy Code.  The New DIP Liens (as defined herein) shall not be (i) subject or subordinate to (A) any Lien or security interest that is avoided and preserved

for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any Liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(g)    **Enforceable Obligations**. The DIP Financing Agreements (including, without limitation, the DIP Obligations evidenced thereby) shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors, in accordance with their terms.

(h)    **Budget**.  From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreement and this Interim Order and in accordance with the Budget (subject to the terms and conditions of the DIP Financing Agreement).

(i)    **Superpriority Administrative Claim Status**.  Subject to the Carve-Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Superpriority Claim" and, together with the New DIP Liens, the "DIP Protections") with priority (except as otherwise provided in Section 8 below) in these Cases or any

Successor Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims, adequate protection claims and all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330 of the Bankruptcy Code (except as otherwise provided in Section 8 below), 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code), whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.  Other than the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in this proceeding, or in any Successor Case, and no priority claims are, or will be, senior to, prior to (subject to the Pre-Petition Lender Party's Superpriority Claim as set forth in this Interim Order), or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder.

3.    **Authorization to Use Proceeds of DIP Financing Agreement**.

(a)  The Debtors shall use the DIP Loans and the Collateral (including, without limitation, the Cash Collateral) solely as provided in this Interim Order and the DIP

Financing Agreements, and in accordance with the Budget. Pursuant to the terms and conditions of this Interim Order, the DIP Facility and the DIP Financing Agreement, and in accordance with the budget attached hereto as **Exhibit "A"** (as the same may be modified, supplemented or updated from time to time consistent with the terms of the DIP Financing Agreement and this Interim Order, the "Budget"), the Debtors are authorized to use Collateral (including, without limitation Cash Collateral) and to use the advances under the DIP Financing Agreement (during the period commencing immediately after the entry of the Interim Order and terminating upon termination of the commitment to fund the DIP Facility pursuant to the provisions of this Interim Order). The Budget may be updated (with the consent and/or at the request of the DIP Agent, subject to the provisions of the DIP Financing Agreement), from time to time, provided that such updated Budget shall be in form and substance acceptable to the DIP Agent, in its reasonable discretion, and the Debtors shall be required always to comply with the Budget and the DIP Financing Agreement pursuant to the terms of the DIP Facility. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business or other proceeds resulting therefrom, except as permitted pursuant to the DIP Facility, the DIP Financing Agreement and this Interim Order.

(b)     Neither the advances under the DIP Financing Agreement nor any of the Collateral (including, without limitation, the Cash Collateral) may be used by the

Debtors, and any committee appointed pursuant to section 1102 of the Bankruptcy Code, or any other person or entity to object to or contest in any manner, or raise any defenses to the validity, extent, perfection, priority, or enforceability of the Pre-Petition Lender Party's Debt or any Liens or security interests with respect thereto or any other rights or interests of the Pre-Petition Lender Party, or to assert any claims or causes of action, including, without limitation, any Avoidance Actions, against the Pre-Petition Lender Party.

4.   **Adequate Protection for Pre-Petition Lender Party.**   As adequate protection for the interest of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral (including Cash Collateral) on account of the granting of the New DIP Liens, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay or the Debtors' use, sale, depreciation, or disposition of the Pre-Petition Lender Party's Collateral (the "Pre-Petition Diminution in Value"), the Pre-Petition Lender Party shall receive adequate protection as follows:

(a)   **Pre-Petition Lender Party's Replacement Liens.**   Solely to the extent of the Pre-Petition Diminution in Value of the interests of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral, the Pre-Petition Lender Party shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code additional and replacement security interests and Liens in the Collateral (the "Pre-Petition Lender Party's Replacement Liens"), which

shall be junior only to the New DIP Liens, Permitted Liens and the Carve-Out as provided herein.

(b)     **Pre-Petition Lender Party's Superpriority Claim**.  Solely to the extent of the Pre-Petition Diminution in Value of the interest of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral, the Pre-Petition Lender Party shall have an allowed superpriority administrative expense claim pursuant to Bankruptcy Code section 507(b) (the "Pre-Petition Lender Party's Superpriority Claim") which shall have priority (except with respect to the New DIP Liens, the DIP Superpriority Claim, and the Carve-Out) over any other claims under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses of claims may become secured by a judgment or other non-consensual Lien, levy or attachment.

(c)     **Adequate Protection Upon Sale of Collateral.**  Upon the sale of any Collateral pursuant to section 363 of the Bankruptcy Code, any such Collateral shall be sold free and clear of any Permitted Liens, the Pre-Petition Lender Party's Liens and the

Pre-Petition Lender Party's Replacement Liens; provided, however, that such Liens shall attach to the proceeds of any such sale in the order and priority as established by final order of this Court.

5.    **Section 507(b) Reservation.**  Nothing herein shall impair or modify the Pre-Petition Lender Party's right to seek additional adequate protection in the event that the adequate protection provided to the Pre-Petition Lender Party hereunder is insufficient to compensate for the Pre-Petition Diminution in Value of the interest of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral  during these Cases or any Successor Cases.

6.    **Lien Perfection**.

(a)    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the New DIP Liens and the Pre-Petition Lender Party's Replacement Liens, including, without limitation, perfection of the DIP Secured Parties' interest in any deposit that the Debtors have a right, title or interest in with respect to a Sale Transaction, without the necessity of filing or recording any financing statement, deed of trust, mortgage, assignment or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreements) to validate or perfect the New DIP Liens or the Pre-Petition Lender Party's Replacement Liens or to entitle the New DIP

Liens or the Pre-Petition Lender Party's Replacement Liens to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent may, in its sole discretion, file such financing statements, mortgages, security agreements, assignments, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and with respect to the New DIP Liens, all such financing statements, mortgages, security agreements, assignments, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.  Upon request, the Debtors shall execute and deliver to the DIP Agent and the Pre-Petition Lender Party all such financing statements, mortgages, notices and other documents as the DIP Agent or Pre-Petition Lender Party may reasonably request to evidence, confirm, validate or perfect, or to ensure the contemplated priority of, the New DIP Liens and the Pre-Petition Lender Party's Replacement Liens granted pursuant hereto.  Each of the DIP Agent and the Pre-Petition Lender Party, in its discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

(b) This Interim Order shall be sufficient and conclusive evidence that the DIP Secured Parties shall be, and shall be deemed to be, without any further action or

notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained now or in the future by any of the Debtors which in any way relates to the Collateral.   Notwithstanding the foregoing, the Debtors are authorized and directed to take any actions that the DIP Agent shall request, in its sole and absolute discretion, to have the DIP Agent, on behalf of the DIP Secured Parties, be added as an additional insured and loss payee on each insurance policy.

7.      **Reservation of Certain Third Party Rights and Bar of Challenges and Claims.**   Nothing in this Interim Order or the DIP Financing Agreements, including, without limitation, the Debtors' Stipulations, shall prejudice whatever rights any committee appointed pursuant to section 1102 of the Bankruptcy Code or any other party in interest with requisite standing, including, for the avoidance of doubt, any subsequently appointed chapter 7 and 11 trustee (other than the Debtors) may have (a) to file a contested matter or an adversary proceeding or otherwise to object to or challenge the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection, enforceability or priority of the Pre-Petition Lender Party's Liens in and to the Pre-Petition Lender Party's Collateral, or (ii) the validity, allowability, priority, status or amount of the Pre-Petition Lender Party's Debt, or (b) to bring suit or otherwise assert any claims or causes of action against the Pre-Petition Lender Party in connection with or related to the Pre-Petition Lender Party's Financing Agreements, or the actions or inactions of the Pre-Petition Lender Party arising out of or related to the

Pre-Petition Lender Party's Financing Agreements; provided, however, that, unless any

committee appointed pursuant to section 1102 of the Bankruptcy Code or any other

party in interest with requisite standing commences a contested matter or adversary

proceeding raising such objection or challenge, including, without limitation, any claim

against the Pre-Petition Lender Party in the nature of a setoff, counterclaim or defense

to the Pre-Petition Lender Party's Debt (including, but not limited to, those under

sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of

suit against the Pre-Petition Lender Party), within the earlier of (a) 60 days after the

formation of any committee pursuant to section 1102 of the Bankruptcy Code, or (b) if

no committee is formed pursuant to section 1102 of the Bankruptcy Code, for all other

parties 75 days following entry of the Interim Order or (c) the date upon which a Sale

Transaction is consummated as contemplated by the terms of the DIP Financing

Agreements (collectively, (a), (b) and (c) shall be referred to herein as the "Pre-Petition

Lender Party Challenge Period," and the date that is the next calendar day after the

termination of the Pre-Petition Lender Party Challenge Period shall be referred to herein

as the "Pre-Petition Lender Party Challenge Period Termination Date"), upon the Pre-

Petition Lender Party Challenge Period Termination Date, (i) any and all such contested

matters, adversary proceedings and other objections and challenges by any party

(including, without limitation, all creditors, any committee appointed pursuant to section

1102 of the Bankruptcy Code, any chapter 11 or chapter 7 trustee appointed herein or

in any Successor Cases, receivers, administrators, examiners with expanded powers, responsible officers, other estate representatives appointed in these Cases or any Successor Cases or in any jurisdiction, and all other parties in interest) as to the findings in this Interim Order and/or the Debtors' Stipulations shall be deemed to be forever waived and barred, (ii) the Pre-Petition Lender Party's Debt shall be deemed to be allowed in full and shall be deemed to be allowed as fully secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Cases and any Successor Cases, (iii) the Pre-Petition Lender Party's Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected security interests and Liens, not subject to recharacterization, subordination or otherwise avoidable, and (iv) the Debtors' Stipulations shall be binding on all parties (including, without limitation, all creditors, any committee appointed pursuant to section 1102 of the Bankruptcy Code , any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases, receivers, administrators, examiners with expanded powers, responsible officers, other estate representatives appointed in these Cases or in any Successor Case or in any jurisdiction, and all other parties in interest).  To the extent any such contested matter, adversary proceeding or other objection or challenge is filed, the Pre-Petition Lender Party shall be entitled to include such costs and expenses, including, but not limited to reasonable attorneys' fees, incurred in defending the

objection or complaint as part of the Pre-Petition Lender Party's Debt, in each case, to the extent allowable under section 506(b) of the Bankruptcy Code.

8.    **Carve-Out**.    During the Interim Period and subject to the terms and conditions contained in this Section 8, the New DIP Liens, the DIP Superpriority Claim, the Pre-Petition Lender Party's Liens, the Pre-Petition Lender Party's Replacement Liens and the Pre-Petition Lender Party's Superpriority Claim are subordinate only to the following items (a), (b), (c) and (d) (items (a), (b), (c) and (d), collectively, the "Carve-Out"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 to the extent such interest is awarded by final order of this Court; (b) to the extent allowed fees, expenses and disbursements  of professionals retained by order of this Court by the Debtors or any committee appointed pursuant to section 1102 of the Bankruptcy Code in these Cases (the "Professionals") incurred (i) prior to the entry of this Interim Order and (ii) thereafter, in accordance with the Budget; and (c) up to $50,000 of allowed fees, expenses and disbursements of the Professionals (the "Professional Fee Carve-Out Cap") incurred after the occurrence of the Termination Date (defined in this paragraph below); and (d) the sum of $100,000 (the "Wind-Down Amount"); provided, however, that in each case (a), (b), (c) and (d), such fees and expenses are approved by this Court, or such lesser amount so approved.  To the extent not previously funded in accordance with the terms of this Interim Order, DIP

Secured Parties shall deposit the Carve-Out (including, without limitation, the Wind-Down Amount) into a deposit account specified by the Debtors upon the Termination Date (as defined below).  For the purposes hereof, the "Termination Date" shall occur upon the earliest to occur of: (i) the Term Loan Maturity Date (as defined in the DIP Financing Agreement; (ii)  the occurrence and during the continuance of an Event of Default under the DIP Agreement; (iii) a material breach by the Debtors of this Interim Order; and (iv) the date upon which a Sale Transaction (as defined in the DIP Financing Agreement) is closed as contemplated by the DIP Financing Agreement; and, in each case, (i) through (iv) upon delivery of a written notice thereof by the DIP Agent to the Debtors and their counsel and the counsel for any committee appointed pursuant to section 1102 of the Bankruptcy Code specifying that such notice constitutes a notice that the Termination Date has occurred (a "Termination Notice").  Upon the delivery of a Termination Notice, the right of the Debtors to pay professional fees incurred under clause (b) above without reduction of the Professional Fee Carve-Out Cap in clause (c) above shall terminate and upon receipt of such notice, the Debtors shall provide immediate notice by facsimile and email to all retained professionals informing them that the Termination Date has occurred and that the Debtors' ability to pay professionals is subject to the Professional Fee Carve-Out Cap.  Upon the occurrence of the Termination Date and the full and final funding of the Carve-Out (including, without limitation, the Wind-Down Amount), there shall be no further obligations on the part of

the DIP Secured Parties or the Pre-Petition Lender Party regarding the Carve-Out
(including, without limitation, the Wind-Down Amount), any Professional Fees, any U.S.
Trustee Fees or any other fees and expenses of the Debtors' estates in these cases or
in any Successor Cases or proceedings.  The DIP Secured Parties' obligation to fund or
otherwise pay the Carve-Out (including, without limitation, the Wind-Down Amount),
shall be added to and made a part of the DIP Obligations, secured by the New DIP
Liens, and the DIP Secured Parties shall be entitled to all of the rights, claims Liens,
priorities, and protections under this Interim Order, the DIP Financing Agreements, the
Bankruptcy Code and/or applicable law in connection therewith.   Subject to the
provisions of this Section 8, the Carve-Out (including, without limitation, the Wind-Down
Amount) shall exclude any fees and expenses (x) incurred in connection with the
assertion or joinder in any claim, counterclaim, action, proceeding, application, motion,
objection, defenses or other contested matter, the purpose of which is to seek any
order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding,
or subordinating, in whole or in part, (1) the DIP Obligations, (2) the DIP Secured
Parties' Liens in the Collateral, (3) the Pre-Petition Lender Party's Debt or (4) the Pre-
Petition Lender Party's Liens or (B) preventing, hindering or delaying, whether directly
or indirectly, the DIP Secured Parties' or the Pre-Petition Lender Party's assertions or
enforcement of their Liens, security interests or realization upon any Collateral,
provided, however, that with respect to solely the Pre-Petition Lender Party's Lien in the

Pre-Petition Lender Party's Collateral, such exclusion does not encompass any investigative work, at an aggregate expense not to exceed $10,000, conducted by the Professionals prior to bringing any action relating to the foregoing, (y) related to the proposed sale or the disposition of any other Collateral, or incurrence of indebtedness not permitted under the DIP Financing Agreement, except with the DIP Agent's express written consent or (z) arising after the conversion of these Cases to cases under chapter 7 of the Bankruptcy Code.   The DIP Agent may implement reserves in accordance with the terms and conditions of the DIP Financing Agreement.  Except for a lien obligation to fund the Carve-Out (including, without limitation, the Wind-Down Amount) as set forth in this Interim Order and the DIP Financing Agreement, nothing herein shall be construed to obligate the DIP Secured Parties or the Pre-Petition Lender Party, in any way, to pay the Professionals' fees or U.S. Trustee Fees, or to assure that the Debtors have sufficient funds on hand to pay any Professional Fees, U.S. Trustee Fees or other liabilities or obligations of the Debtors.

9.    **Payment of Compensation.**   Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any committee appointed pursuant to section 1102 of the Bankruptcy Code or of any person or shall affect the right of the DIP Secured Parties or the Pre-Petition Lender Party to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

10.    **Section 506(c) Claims; Roll Up.**

(a)    Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and no such consent shall be implied from any other action or inaction by the DIP Secured Parties or the Pre-Petition Lender Party; and

(b)    Subject to and effective upon entry of the Final Order, the Debtors shall be authorized make payment to the Pre-Petition Lender Party in an amount necessary to accomplish the Pre-Petition Lender Party's Debt Payoff, which shall constitute a roll-up under the DIP Financing Agreements, in accordance with the terms of the Final Order and the DIP Financing Agreements.

11.    **Collateral Rights.**  Unless the DIP Agent has provided its prior written consent or the Pre-Petition Lender Party's Debt and all DIP Obligations have been indefeasibly paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness, if any, described in subparagraph (a) below), all commitments

to lend have terminated, and all indemnity obligations under the DIP Financing Agreement have been cash secured to the reasonable satisfaction of the DIP Agent, there shall not be entered in this proceeding, or in any Successor Case, any order which authorizes any of the following:

(a)     the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Secured Parties or the Pre-Petition Lender Party; or

(b)     the use of Collateral (including, without limitation Cash Collateral) for any purpose other than to pay in full in cash the DIP Obligations or as otherwise permitted in this Interim Order and the DIP Financing Agreement;

(c)     relief from stay by any person other than of the DIP Secured Parties on all or any portion of the Collateral; or

(d)     the Debtors' return of goods constituting Collateral pursuant to section 546(h) of the Bankruptcy Code, except as permitted in the DIP Financing Agreements.

12.     **Proceeds of Subsequent Financing.** Without limiting the provisions and protections of Section 11 above, if at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Secured Parties' obligations to make loans and advances under the DIP Facility, including subsequent to the confirmation of any chapter 11 plan or plans (the "Plan") with respect to the Debtors, and the repayment in

full of the Pre-Petition Lender Party's Debt, the Debtors' estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Financing Agreement or engage in an Asset Sale or Debt Issuance, then all of the cash proceeds derived from such credit or debt or such sale or issuance shall immediately be turned over (a) first, to the Pre-Petition Lender Party for application to the Pre-Petition Lender Party's Debt pursuant to the Pre-Petition Lender Party's Financing Agreements; and (b) second, to the DIP Agent for application to the DIP Obligations outstanding pursuant to the terms of the DIP Financing Agreement, in accordance with the terms of this Interim Order.

13.   **Disposition of Collateral.**  The Debtors shall not (a) sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the DIP Secured Parties (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Secured Parties or an order of this Court), except for sales of the Debtors' services in the ordinary course of business or as permitted by the DIP Financing Agreement and this Interim Order and as approved by this Court, or (b) assume, reject or assign any leasehold interest without the prior consultation with the DIP Agent, except as otherwise permitted by the DIP Financing Agreements.

14.   **Remedies After Event of Default.**

(a)      The automatic stay under section 362 of the Bankruptcy Code is vacated
and modified to the extent necessary to permit the DIP Secured Parties and the Pre-
Petition Lender Party to exercise, upon the occurrence of the Termination Date and at
any time thereafter upon five (5) business days' prior notice to the Debtors, counsel to
the Debtors, counsel for any committee appointed pursuant to section 1102 of the
Bankruptcy Code, the U.S. Trustee and the Pre-Petition Lender Party ("Default Notice
Period") of such occurrence, all rights and remedies provided for in the DIP Financing
Agreements (including, without limitation and without prior notice, the right to freeze
monies or balances in the Debtors' accounts or set off monies or balances of the
Debtors in accounts maintained by any DIP Secured Party, the right to charge the Post-
Default Rate, terminate commitments and cease funding under the DIP Agreement).
Notwithstanding the occurrence of the Termination Date or termination of the
commitments to fund under the DIP Agreement or anything herein, all of the rights,
remedies, benefits, and protections provided to the DIP Secured Parties under the DIP
Financing Agreements and to the DIP Secured Parties and the Pre-Petition Lender
Party under this Interim Order shall survive.   The Debtors and/or any committee
appointed pursuant to section 1102 of the Bankruptcy Code shall be entitled to seek an
expedited hearing regarding an Event of Default or termination of the commitments to
fund under the DIP Agreement(a "Default Pleading"); provided, however, that the only
issue to be determined at such hearing is whether an Event of Default has occurred and

is continuing. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

(b)     Upon the Termination Date, all (i) DIP Obligations of the Debtors to the DIP Secured Parties shall be immediately due and payable, and (ii) authority to use or borrow the proceeds of the DIP Financing Agreements shall cease.  If the DIP Secured Parties or the Pre-Petition Lender Party exercise any of their rights and remedies upon the occurrence of the Termination Date, the DIP Agent may retain one or more agents to sell, lease, or otherwise dispose of the Collateral in accordance with the terms of the DIP Financing Agreements.   In any exercise of their rights and remedies upon the Termination Date, the DIP Secured Parties are authorized to proceed under or pursuant to the DIP Financing Agreements.  Without limiting the foregoing, subject to the terms of the DIP Financing Agreements, in the exercise of the DIP Agent's rights and remedies upon the Termination Date, the DIP Agent may by written notice to the Debtors require the Debtors to file a motion seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the DIP Agent (the cost of which shall be funded by the DIP Facility in accordance with the Budget).  The Debtors shall file such motion within ten (10) days of the DIP Agent's request and shall diligently prosecute such motion.  If the Debtors fail to so file the motion, the DIP Agent may file

and prosecute such a motion in the name of the Debtors.  Subject to the rights, if any, of the holders of any Permitted Liens and/or of Professionals under Section 8 hereof, all proceeds realized from any of the foregoing shall be turned to the DIP Agent for application to the DIP Obligations pursuant to the DIP Financing Agreements.

(c)     If the DIP Secured Parties exercise their rights under the DIP Financing Agreements to foreclose upon the Collateral, in connection with such foreclosure the Debtors will be deemed to have assumed and assigned to the DIP Secured Parties (or their assigns) all executory contracts and leases to which the Debtors are a party, other than executory contracts or leases specifically excepted by the DIP Secured Parties or their assigns by written notice.  The Court shall retain jurisdiction to adjudicate any disputes relating to assumption and assignment, including, inter alia, disputes as to the assignability of such contracts and leases, required cure amounts and/or the provision of adequate assurances of future performance under the assigned contracts and leases.

15.     **Transaction Proceeds; Survival of Protections**  Any and all Net Cash Payments received from the consummation of an asset sale, debt issuance, mandatory prepayment event pursuant to Section 2.9(b) of the DIP Financing Agreement or any Sale Transaction shall be remitted directly to the DIP Agent upon Debtors' receipt thereof for application to the unpaid Pre-Petition Lender Party's Debt and the DIP Obligations (in that order) in accordance with the terms of the DIP Financing Agreement

and this Interim Order.  Unless and until the Pre-Petition Lender Party's Debt and the

DIP Obligations are irrevocably repaid in full or have been cash secured to the

reasonable satisfaction of the Pre-Petition Lender Party and the DIP Agent, as

applicable, all commitments under the DIP Financing Agreements to lend have

irrevocably terminated, the protections afforded to the Pre-Petition Lender Party and the

DIP Secured Parties pursuant to this Interim Order or the DIP Financing Agreement, as

applicable, and any actions taken pursuant thereto, shall survive the entry of any order

confirming a Plan or converting this into a Successor Case, and the New DIP Liens, the

DIP Superpriority Claim and the Pre-Petition Lender Party's Superpriority Claim shall

continue in this proceeding and in any Successor Case, and such Liens, the DIP

Superpriority Claim and the Pre-Petition Lender Party's Superpriority Claim shall

maintain their priority as provided by this Interim Order.

16.    **Modification of Automatic Stay.**   The automatic stay imposed under

Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP

Financing Agreement as necessary to (a) permit the Debtors to grant the New DIP

Liens and the Pre-Petition Lender Party's Replacement Liens and to incur all liabilities

and obligations to the DIP Secured Parties and the Pre-Petition Lender Party under the

DIP Financing Agreements, the DIP Facility, and this Interim Order, as applicable, and

(b) authorize the DIP Secured Parties and the Pre-Petition Lender Party to retain and

apply payments hereunder.

17. **Credit Bid.** The DIP Secured Parties, directly or through a designee, shall have the unqualified right to credit bid up to the full amount of the DIP Obligations, as a stalking horse bidder or otherwise, in any sale of any portion of the Collateral, whether pursuant to an action or a Reorganization Plan or otherwise.

18. **Proofs of Claim.** The DIP Secured Parties and the Pre-Petition Lender Party will not be required to file proofs of claim in these Cases or Successor Cases. This Interim Order shall constitute a proof of claim on behalf of the DIP Secured Parties and the Pre-Petition Lender Party in these Cases. The Pre-Petition Lender Party is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as they see fit) aggregate proofs of claim in these Cases or any Successor Cases. Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by the Pre-Petition Lender Party.

19. **Other Rights and Obligations**.

(a) **Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of this Interim Order**. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such

modification, amendment or vacation shall affect the validity and enforceability of any

advances made hereunder or Lien or priority authorized or created hereby.

Notwithstanding any such modification, amendment or vacation, any claim granted to

the DIP Secured Parties hereunder arising prior to the effective date of such

modification, amendment or vacation of any DIP Protections granted to the DIP Secured

Parties shall be governed in all respects by the original provisions of this Interim Order,

and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges

and benefits, including the DIP Protections granted herein, with respect to any such

claim.  Since the loans made pursuant to the DIP Financing Agreement are made in

reliance on this Interim Order, the obligations owed the DIP Secured Parties prior to the

effective date of any stay, modification or vacation of this Interim Order cannot, as a

result of any subsequent order in this, or in any Successor Case, be subordinated, lose

their Lien priority or superpriority administrative expense claim status, or be deprived of

the benefit of the status of the Liens and claims granted to the DIP Secured Parties

under this Interim Order and/or the DIP Financing Agreements.

(b)  **Expenses**.  As provided in the DIP Financing Agreements, all costs and

expenses of the DIP Secured Parties and the Pre-Petition Lender Party in connection

with the DIP Financing Agreements and the Pre-Petition Lender Party's Financing

Agreements, as applicable, whether incurred prior to or after the commencement of

these Cases, including, without limitation, reasonable, documented legal, accounting,

collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Debtors; provided, however, that such costs and expenses shall be paid only after each relevant professional has provided copies of its fee and expense statements to the U.S. Trustee and counsel to any committee appointed pursuant to section 1102 of the Bankruptcy Code reasonably contemporaneously with the delivery of such fee and expense statements to the Debtors (which may be done no more frequently than monthly). Such statements need not be submitted in the form of a fee application or comply with U.S. Trustee fee guidelines, but shall contain reasonable detail as to the number of hours worked and applicable hourly rates, but may be redacted to the extent necessary to delete any information subject to attorney-client privilege, any information constituting attorney work product or any other confidential information and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. The U.S. Trustee, any committee appointed pursuant to section 1102 of the Bankruptcy Code or any other party in interest may object to the reasonableness of the fees, costs and expenses included in any professional fee invoice submitted hereunder, provided that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on counsel to the parties seeking reimbursement no later than ten (10) days after the objecting parties

receiving such applicable professional fee invoice, and (ii) it describes with particularity the items and categories of fees, costs and expenses that are subject to the objection and it provides for a specific basis for the objection to each such item of category of fees, costs and expenses; provided, however, further that the Debtors shall pay all amounts that are not subject of any objection within ten (10) days of the objection deadline.  Any hearing on an objection to any payment of any fees, costs and expenses of such professionals shall be limited to the reasonableness of the particular items or categories of fees, costs, and expenses which are the subject to such objection. Except as provided in this subsection (b), the Debtors shall not make any payment in respect to attorneys' or other professional fees incurred by the Pre-Petition Lender Party.  Under no circumstances shall professionals for the DIP Secured Parties or the Pre-Petition Lender Party be required to comply with the U.S. Trustee fee guidelines.

(c)    **Binding Effect.**  The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Pre-Petition Lender Party and the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 cases; provided, however, that, except to the extent expressly set forth in this Interim Order, the DIP Secured Parties shall have no obligation to permit the use of the DIP Facility or the Collateral

(including, without limitation, the Cash Collateral) or extend and financing to any

including any trustee or other fiduciary hereinafter appointed as a legal representative of

the Debtors or with respect to the property of the estates of the Debtors.

(d)   **No Waiver**.   The failure of the DIP Secured Parties or the Pre-Petition

Lender Party to seek relief or otherwise exercise their rights and remedies under the

DIP Financing Agreements, the DIP Facility, or this Interim Order, as applicable, shall

not constitute a waiver of any of the DIP Secured Parties' or Pre-Petition Lender Party's

rights hereunder.   Notwithstanding anything herein, the entry of this Interim Order is

without prejudice to, and does not constitute a waiver of, expressly or implicitly, or

otherwise impair the DIP Secured Parties or the Pre-Petition Lender Party under the

Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of

the DIP Secured Parties or the Pre-Petition Lender Party to (i) request conversion of

these Cases to cases under chapter 7, dismissal of these Cases, or the appointment of

a trustee in these Cases, or (ii) propose, subject to the provisions of section 1121 of the

Bankruptcy Code, a Plan or (iii) any of the rights, claims or privileges (whether legal,

equitable or otherwise) of the DIP Secured Parties or the Pre-Petition Lender Party.

(e)   **No Third Party Rights**.   Except as explicitly provided for herein, this

Interim Order does not create any rights for the benefit of any third party, creditor, equity

holder or any direct, indirect, or incidental beneficiary.

(f) **No Marshaling**. None of the DIP Secured Parties nor the Pre-Petition Lender Party shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

(g) **Section 552(b)**. The DIP Secured Parties and the Pre-Petition Lender Party shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Pre-Petition Lender Party, product, offspring or profits of any of the Collateral.

(h) **Amendment**. The Debtors and the DIP Agent may amend, modify, supplement or waive any provision of the DIP Financing Agreements, provided that such amendment, modification, supplement or waiver, in the judgment of the Debtors and the DIP Agent, is either nonprejudicial to the rights of third parties or is not material; provided, however that, the Debtor and the DIP Secured Parties may agree (in their respective sole discretion) to extend the Maturity Date for up to 60 days without consent of any committee appointed pursuant to section 1102 of the Bankruptcy Code). Otherwise, such waiver, modification, or amendment of any of the provisions hereof shall be effective only if (a) set forth in writing, signed by or on behalf of the Debtors and the DIP Agent (after having obtained the approval of the DIP Secured Parties as provided in the DIP Financing Agreements), and (b) approved by this Court.

(i)     **Survival of Interim Order**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in these Cases, (ii) converting these Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing these Cases, (iv) withdrawing of the reference of these Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of these Cases in this Court, and the terms and provisions of this Interim Order as well as the DIP Protections granted pursuant to this Interim Order and the DIP Financing Agreements, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtors to the DIP Secured Parties pursuant to the DIP Financing Agreements and all obligations of the Debtors to the Pre-Petition Lender Party are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.  The Debtors shall not propose or support any Plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Commitment Termination Date.

(j)     **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Interim Order, the provisions of this Interim Order shall govern and control.

(k)     **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the filing of the DIP Motion immediately upon execution of the DIP Financing Agreement.

(l)     **Objections Overruled**.  All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(m)     **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent.

(n)     **Waiver of the Fourteen (14) Day Stay Under Bankruptcy Rule 6004(h)**. The fourteen (14) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to this Interim Order.

(o)     **Preservation of Rights Granted Under the Order**. No claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order to the DIP Agent shall be granted or allowed while any portion of the DIP Obligations remain outstanding, and the New DIP Liens shall not be subject or junior to any lien or security

interest that is avoided and preserved for the benefit of the Debtors' estate under section 551 of the Bankruptcy Code or, except as set forth in this Interim Order, subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(1)    Unless all DIP Obligations shall have been indefeasibly paid in full in cash in accordance with the terms of the DIP Agreement (or, as appropriate, cash secured to the reasonable satisfaction of the DIP Agent), in the case of clause (i) below, the Debtors shall not seek, and in the case of clauses (i) and (ii) below, it shall constitute an Event of Default under the DIP Agreement and a termination of the right to use Collateral (including, without limitation, Cash Collateral) if the Debtors seek, or if there is entered, (i) any modification of this Interim Order without the prior written consent of the DIP Agent, as applicable, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent, or (ii) an order converting or dismissing any of these Cases.

(2)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall, to the extent provided in section 364(e) of the Bankruptcy Code, not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the New DIP Liens.    Notwithstanding any such reversal, stay,

modification or vacatur, any use of the Collateral (including, without limitation, the Cash Collateral), any DIP Obligations incurred by the Debtors to the DIP Agent and the DIP Lenders prior to the effective date of such reversal, stay, modification or vacatur shall, to the extent provided in section 364(e) of the Bankruptcy Code, be governed in all respects by the original provisions of this Interim Order, and the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Financing Agreements (with respect to all DIP Obligations) and uses of the Collateral (including, without limitation, the Cash Collateral).

(3)    Except as expressly provided in this Interim Order or in the DIP Financing Agreements, the New DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Agent and the DIP Lenders granted by this Interim Order and the DIP Financing Agreements shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of these Cases to a case under chapter 7 of the Bankruptcy Code, dismissing these Cases, or (ii) the entry of an order confirming a plan of reorganization in these Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this Interim Order and the DIP Financing Agreements shall continue in these Cases or in any superseding chapter 7 cases or other cases under the Bankruptcy Code and/or following dismissal of this or any

subsequent case, and the New DIP Liens, the DIP Obligations, and the Superpriority

Claims, and all other rights and remedies of the DIP Agent and the DIP Lenders granted

by this Interim Order and the DIP Financing Agreements shall continue in full force and

effect until all DIP Obligations are indefeasibly paid in full in cash.

(p)    **Payments Free and Clear**.  Any and all payments or proceeds remitted to

the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of this Interim

Order or any subsequent order of this Court shall be received free and clear of any

claim, charge, assessment or other liability.

(q)    **Information.**  The Debtors shall promptly provide to the DIP Agent and

counsel to any committee appointed pursuant to section 1102 of the Bankruptcy Code

written financial information or periodic reporting as required by the DIP Financing

Agreement.

(j)    **Limitation of Liability**.  In determining to make any loan under the DIP

Financing Agreement, permitting the use of Collateral (including Cash Collateral), or in

exercising any rights or remedies as and when permitted pursuant to this Interim Order

or the DIP Financing Agreements, the DIP Agent, the DIP Lenders and the Pre-Petition

Lender Party shall, subject to and effective upon entry of the Final Order, not be

deemed to be in control of the operations of the Debtors or to be acting as a

"responsible person" or "owner or operator" with respect to the operation or

management of the Debtors (as such terms, or any similar terms, are used in the United

States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Financing Agreements shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Pre-Petition Lender Party of any liability for any claims arising from the pre-petition or post-petition activities of the Debtors.

-- END OF ORDER --

# EXHIBIT A

(Budget)

Attached.

61406766 v8--029680/0003

**Infinia Corporation**
*Cash Budget from September 16, 2013 - December 16, 2013*

| | Week Beginning: | | | | | | | | | | | | |
| --- | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: |
| | 9/16/2013 | 9/23/2013 | 9/30/2013 | 10/7/2013 | 10/14/2013 | 10/21/2013 | 10/28/2013 | 11/4/2013 | 11/11/2013 | 11/18/2013 | 11/25/2013 | 12/2/2013 | 12/9/2013 |
| **Beginning Cash Balance** | $ 350,000 | $ 237,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| **Cash Inflows (Income)** | | | | | | | | | | | | | |
| DIP Financing | | 185,000 | 236,000 | 3,396,000 | 58,000 | 246,000 | 147,000 | 273,000 | 17,000 | 191,000 | 74,000 | 255,500 | 145,000 |
| Contract Revenue | | | 114,000 | | | | 75,000 | | | | 75,000 | | |
| **Total Cash Inflows** | - | 185,000 | 350,000 | 3,396,000 | 58,000 | 246,000 | 222,000 | 273,000 | 17,000 | 191,000 | 149,000 | 255,500 | 145,000 |
| **Cash Outflows (Expenses)** | | | | | | | | | | | | | |
| Payment of secured debt | | | | 3,090,000 * | | | | | | | | | |
| Payroll & benefits | | 194,000 | | 186,000 | | 178,000 | | 222,000 | | 135,000 | | 216,000 | |
| Administrative Professional Fees | | | | | | 45,000 | | | | 45,000 | | | 65,000 ** |
| Investment Banker (Hamilton Clark) | | | 15,000 | | | | 15,000 | | | | 15,000 | | 7,500 |
| Financial Advisor (RMA) | | | 20,000 | | | | 20,000 | | | | 20,000 | | 10,000 |
| Infinia Legal Counsel (PKH) | | | 10,000 | | | | 10,000 | | | | 10,000 | | 5,000 |
| Infinia Special Advisor (Fenwick) | | | 175,000 | | | | 75,000 | | | | 50,000 | | |
| Atlas Legal Counsel (Brown Rudnick et al) | | | 10,000 | | | | 10,000 | | | | 5,000 | | |
| Atlas Legal Counsel (DJP) | 42,000 | 32,000 | 41,000 | 73,000 | 24,000 | 7,000 | 20,000 | 15,000 | 2,000 | - | 3,000 | 18,000 | 2,000 |
| Materials & Supplies | 14,000 | 19,000 | 14,000 | 5,000 | 14,000 | 5,000 | 28,000 | 2,500 | 2,500 | 6,000 | 6,000 | 2,500 | 2,500 |
| Subcontractors | 26,000 | | | 26,000 | | | | 20,000 | | | | 10,000 | |
| Facilities | | | | | | | 30,000 | | | | 30,000 | | |
| Insurance | 26,000 | | | 2,000 | 9,000 | 3,000 | 3,000 | 2,000 | 4,000 | 2,000 | 4,000 | 2,000 | 2,000 |
| IT & Software Maintenance | | 15,000 | 18,000 | 6,000 | 6,000 | 4,000 | 4,000 | 4,000 | 4,000 | 1,000 | 1,000 | 1,000 | - |
| Travel & Meals | | 45,000 | | 3,000 | | | | 3,000 | | | | 5,000 | |
| Utilities | | 12,000 | | 3,000 | 2,000 | 1,000 | 1,000 | 3,000 | 2,000 | 1,000 | | 1,000 | 1,000 |
| Phone & Internet | 5,000 | 5,000 | | 2,000 | 1,000 | 1,000 | 1,000 | 500 | | | | | |
| Freight & Postage | | | 5,000 | | 1,000 | 1,000 | 5,000 | 1,000 | 1,000 | | 5,000 | | |
| Property & Misc. Taxes | | | 5,000 | | 1,000 | 1,000 | | | 1,000 | 1,000 | | | |
| Other | | | 5,000 | | | | 1,000 | 1,000 | | | | | |
| **Total Cash Outflows** | 113,000 | 322,000 | 350,000 | 3,396,000 | 58,000 | 246,000 | 222,000 | 273,000 | 17,000 | 191,000 | 149,000 | 255,500 | 95,000 |
| **Net Cash Flow** | (113,000) | (137,000) | - | - | - | - | - | - | - | - | - | - | 50,000 |
| **Ending Cash Balance** | $ 237,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 150,000 |

\* Payment amount is an estimate and is subject to change. The Debtor is awaiting payoff information from Atlas.

\*\* If there is no competing bid, a $200,000 minimum fee will be due, a $45,000 retainer was paid pre-petition. Otherwise this amount will be paid from proceeds of the sale and would not be included as part of this budget

**Power Play Solar 1**
*Cash Budget from September 16, 2013 - December 16, 2013*

| | Week Beginning: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9/16/2013 | 9/23/2013 | 9/30/2013 | 10/7/2013 | 10/14/2013 | 10/21/2013 | 10/28/2013 | 11/4/2013 | 11/11/2013 | 11/18/2013 | 11/25/2013 | 12/2/2013 | 12/9/2013 |
| Beginning Cash Balance | 18,900 | 18,900 | 18,900 | 13,900 | 13,900 | 13,900 | 13,900 | 10,400 | 10,400 | 10,400 | 10,400 | 5,400 | 5,400 |
| Cash Inflows (Income) | | | | | | | | | | | | | |
| Revenue - power generation | | | | | | | 1,500 | | | | | | |
| Total Cash Inflows | - | - | - | - | - | - | 1,500 | - | - | - | - | - | - |
| Cash Outflows (Expenses) | | | | | | | | | | | | | |
| Adminstrative Professional Fees | | | | | | | | | | | | | |
| PPS1 Legal Counsel (SW) | | | 5,000 | | | | 5,000 | | | | 5,000 | | 2,500 |
| Property & Misc Taxes | | | | | | | | | | | | | 250 |
| Total Cash Outflows | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 2,750 |
| Net Cash Flow | - | - | (5,000) | - | - | - | (3,500) | - | - | - | (5,000) | - | (2,750) |
| Ending Cash Balance | 18,900 | 18,900 | 13,900 | 13,900 | 13,900 | 13,900 | 10,400 | 10,400 | 10,400 | 10,400 | 5,400 | 5,400 | 2,650 |

# EXHIBIT B

**Prepared and Submitted by:**

George Hofmann (10005)
Steven C. Strong (6340)
Victor P. Copeland (13511)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, Utah  84111
Telephone: (801) 363-4300
Facsimile:  (801) 363-4378

Proposed attorneys for
Infinia Corporation

Troy J. Aramburu (10444)
**SNELL & WILMER L.L.P.**
15 West South Temple
Suite 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile:  (801) 257-1800

Proposed attorneys for
PowerPlay Solar I, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re<br><br>INFINIA CORPORATION,<br><br>Debtor. | Bankruptcy No. 13-30688 (WTT)<br><br>Chapter 11 |
| In re<br><br>POWERPLAY SOLAR I, LLC,<br><br>Debtor. | Bankruptcy No. 13-30690 (WTT)<br><br>Chapter 11 |

## FINAL ORDER PURSUANT TO
## 11 U.S.C. SECTIONS 105, 361, 362, 363, 364, 503(b) AND 507(a), RULES 2002, 4001

{00175858.DOC / 2}

**AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND RULE 4001-2 OF THE LOCAL RULES OF PRACTICE FOR THE UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH, CENTRAL DIVISION (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POST-PETITION SECURED DIP FINANCING WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. SECTION 363 AND PROVIDING FOR ADEQUATE PROTECTION; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

THIS MATTER having come before this United States Bankruptcy Court for the District of Utah, Central Division (the "Court") upon the motion (the "DIP Motion") by Infinia Corporation ("Infinia") and PowerPlay Solar I, LLC ("PowerPlay"; and together with Infinia, each a "Debtor" and, collectively, the "Debtors"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Cases"), seeking, among other things, entry of a final order (this "Final Order") authorizing the Debtors, as applicable, to:

(i)      Obtain credit and incur debt, pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, on a final basis up to the aggregate committed amounts set forth in the Budget (as defined below) for such period (and on terms and conditions more fully described herein), secured by, as set forth in the DIP Financing Agreements (as defined below), first priority, valid, perfected and enforceable Liens (as defined in section 101(37) of chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code")) on all real and personal property of the Debtors' estate pursuant to

2

sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, subject only to Permitted Liens (as defined in the DIP Financing Agreement), and with priority, over all other administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)     (a) Establish that financing arrangement ("DIP Facility") pursuant to (I) the terms of the Senior, Secured Debtor-in-Possession Credit Agreement (the "DIP Financing Agreement")[1], substantially in the form of **Exhibit "C"** to the DIP Motion, by and among Infinia, as borrower and as a credit party, PowerPlay, as a guarantor and as a credit party, the other credit parties party thereto, Atlas Global Investment Management LLP, as administrative agent and collateral agent (the "DIP Agent") and the Lenders party thereto (collectively, the "DIP Lenders," and, together with the DIP Agent, the "DIP Secured Parties"), and (II) all other agreements, documents, notes, certificates and instruments executed and/or delivered with, to, or in favor of the DIP Secured Parties, including, without limitation, the security agreements, notes, guaranties, mortgages and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, instruments and certificates executed and/or delivered in connection therewith or related thereto (items (I) and (II), collectively, as the same may be amended, modified or supplemented and in effect from time to

---

[1]     Capitalized terms used in this Final Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreement.

time, the "DIP Financing Agreements"); and (b) incur the Obligations under and as defined in the DIP Financing Agreement (collectively, the "DIP Obligations");

(iii)    Authorize the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) (subject to the terms and conditions of the DIP Financing Agreements) solely for (a) working capital and general corporate purposes; (b) payment of costs of administration of these Cases, to the extent set forth in the Budget and the DIP Financing Agreements; and (c) immediately upon entry of this Final Order, the Pre-Petition Lender Party's Debt Payoff (as defined below).

(iv)    Grant, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Secured Parties), continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens (the "New DIP Liens"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estate except for Permitted Liens and as otherwise provided in this Final Order, upon and to all of the Collateral granted under the terms of the DIP Financing Agreements, and, for the avoidance of doubt, Collateral shall expressly include all real and personal property of the Debtors now owned or hereafter acquired (excluding Avoidance Actions of the Debtors, but

4

{00175858.DOC / 2}

including only the proceeds of Avoidance Actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-Petition Date transfer of Collateral) and all other property of whatever kind and nature, in each case, that is pledged as collateral under any Security Document, the Financing Orders or any other order of the Bankruptcy Court in the Cases, and all products, proceeds (cash and non-cash), any deposit or similar payment made pursuant to the terms of an asset purchase agreement or otherwise related to a Sale Transaction, substitutions, and accessions of or to any of the foregoing.   Notwithstanding anything to the contrary in this Final Order or any DIP Financing Agreements, (a) with respect to the Debtors' non-residential real property leases, no Liens or encumbrances shall be granted on or extend to the Debtors' non-residential real property leases themselves, but rather any Liens or encumbrances granted shall extend only to the proceeds of such non-residential real property leases; and (b) upon the Termination Date, the rights of the DIP Secured Parties to enter onto the Debtors' leases premises to access and/or liquidate any Collateral shall be limited to (x) any such rights agreed to in writing by the applicable landlord prior to entry onto the lease premises, (y) any rights that the DIP Secured Parties have under applicable non-bankruptcy law or (z) such rights as may be granted by this Court on a separate motion with notice to the applicable landlords of the leased premises and an opportunity for such landlord to respond and be heard;

{00175858.DOC / 2}

(v)     Grant, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Secured Parties) superpriority administrative claim status in respect of all DIP Obligations, subject only to the Carve-Out as provided herein;

(vi)     Authorize the use of "cash collateral" as such term is used in section 363 of the Bankruptcy Code (the "Cash Collateral"), including in which the DIP Secured Parties and/or the Pre-Petition Lender Party (as defined below) have an interest, in accordance with the terms of this Final Order and the DIP Financing Agreements;

(vii)     Grant the Pre-Petition Lender Party the Pre-Petition Lender Party's Replacement Liens and Pre-Petition Lender Party's Superpriority Claims (each as defined below) to the extent of any Pre-Petition Diminution in Value (as defined below) of the Pre-Petition Lender Party's interest in the Pre-Petition Lender Party's Collateral (as defined below) as adequate protection for the granting of the New DIP Liens to the DIP Secured Parties, the use of Cash Collateral and for the imposition of the automatic stay;

(viii)     Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements, the Interim Order (as defined below) and this Final Order; and

6

(ix)    Waive the fourteen (14) day stay provisions of rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the Federal Rules of Bankruptcy Procedure are referred to herein as the "Bankruptcy Rules") and provide for immediate effectiveness of this Final Order.

This Court having considered the DIP Motion, the exhibits attached thereto, the DIP Facility and the DIP Financing Agreements, and the evidence submitted at the hearings on the Interim Order (defined below) (such hearing, the "Interim Hearing") and this Final Order (such hearing, the "Final Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), 9014 and Rule 4001-2 of the Local Rules of Practice for the United States Bankruptcy Court, District of Utah, Central Division (the "Local Rules"), due and proper notice of the DIP Motion, the Interim Hearing and the Final Hearing having been given; the Interim Hearing having been held and concluded on September ___, 2013 and the Final Hearing having been held and concluded on _____, 2013; this Court having entered the Interim Order Pursuant to sections 105, 361, 362, 363, 364, 503(b) and 507(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2 (I) Authorizing The Debtors (A) To Obtain Post-Petition Secured DIP Financing With Priority Over All Secured Indebtedness And (B) To Use Cash Collateral Pursuant To section 363 And Providing For Adequate Protection; (II) Granting Liens And Providing For Superpriority Administrative Expense Status; (III) Modifying The Automatic Stay; And (IV) Granting Related Relief (the

7

"Interim Order"); and it appearing that approval of the interim and final relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and to further the successful administration of the Cases and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date**.  On September 17, 2013 (the "Petition Date"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Utah, Central Division.  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

B.    **Jurisdiction and Venue**.  This Court has jurisdiction over this proceeding, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby.  Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for these Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

{00175858.DOC / 2}

C.     **Committee Formation**.  A statutory committee of unsecured creditors has

not yet been appointed in these Cases.

D.     **Notice**.   The Interim Hearing and the Final Hearing were each held

pursuant to the authorization of Bankruptcy Rules 4001 and 6003 and Local Rule 4001-

2.  Notice of (a) the Interim Hearing and the emergency relief requested in the DIP

Motion has been provided by the Debtors, whether by telecopy, email, overnight courier

or hand delivery on September 18, 2013 and (b) the Final Hearing has been provided

by the Debtors, whether by telecopy, email, overnight courier or hand delivery on

September 18, 2013, in each case, to certain parties in interest, including: (i) the Office

of the United States Trustee for the District of Utah, Central Division (the "U.S.

Trustee"), Attn: Vincent Cameron, Esq., 405 S Main Street # 300, Salt Lake City, UT

84111-3402; (ii) the Internal Revenue Service; (iii) the Debtors' twenty (20) largest

unsecured creditors, (iv) counsel to the Pre-Petition Lender Party, Attn: John F. Storz,

Esq., Seven Times Square, New York, New York 10036; (v) counsel to the proposed

DIP Agent, Brown Rudnick LLP, Attn: William R. Baldiga, Esq. Seven Times Square,

New York, New York 10036, John F. Storz, Esq., Seven Times Square, New York, New

York 10036 and Mary D. Bucci, Esq., One Financial Center, Boston, MA 02111;  (vi) all

secured creditors of record; and (vii) those parties who have filed a notice of

appearance and request for service of pleadings in these Cases pursuant to Bankruptcy

Rule 2002.  Under the circumstances, such notice of the Interim Hearing, the Final

{00175858.DOC / 2}

Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and Local Rule 4001-2.

E.   **Debtors' Acknowledgements and Agreements.**   Without prejudice to the rights of other parties in interest as set forth in Section 7 below, the Debtors (on behalf of themselves and their estates) admit, stipulate and acknowledge and agree as indicated below that (collectively, subsections E (i) through E (vi) hereof shall be referred to herein as the "Debtors' Stipulations"):

(i)   **Pre-Petition Lender Party's Financing Agreements.**   The Debtors admit, stipulate, acknowledge and agree that prior to the entry of the Interim Order in these Cases, Infinia incurred indebtedness consisting of term loans and other financial accommodations pursuant to (a) that certain Credit Agreement, dated as of July 26, 2013, between Infinia, as borrower, Atlas Global Investment Management LLP, as administrative and collateral agent (in such capacity and not in any other capacity, the "Pre-Petition Agent") and Atlas Global Asset Holdings LP, as lender (in such capacity and not in any other capacity, the "Pre-Petition Lender"; and, collectively, with the "Pre-Petition Agent" the "Pre-Petition Lender Party"), and (b) all other agreements, documents, notes, certificates and instruments executed and/or delivered with, to, or in favor of the Pre-Petition Lender Party, including, without limitation, all notes, mortgages, UCC financing statements and all other related agreements, documents, notes, certificates and instruments executed and/or delivered in connection therewith or related thereto (collectively, and as the same may be amended, modified or supplemented and in effect from time to time, the "Pre-Petition Lender Party's Financing Agreements").

(ii)   **Pre-Petition Lender Party's Debt Amount.**   The Debtors admit, stipulate, acknowledge and agree that as of September 17, 2013, the Infinia was indebted under the Pre-Petition Lender Party's Financing

10

Agreements to the Pre-Petition Lender Party in the approximate principal amount of $3,000,000; plus interest accrued and accruing, costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations (collectively the "<u>Pre-Petition Lender Party's Debt</u>").   The Debtors admit, stipulate, acknowledge and agree that Pre-Petition Lender Party's Debt was extended as a protective advance to maintain Infinia's business operations while Infinia and the other Debtors considered and pursued various options for restructuring their businesses either by filing a Chapter 11 petition, through a sale outside of bankruptcy or otherwise.  Without the Pre-Petition Lender Party's Debt, Infinia would not have had sufficient available sources of working capital and financing to carry on the operation of its business or to seek to restructure the Debtors' businesses.

(iii)   **Pre-Petition Lender Party's Collateral.**   The Debtors admit, stipulate, acknowledge and agree that to secure the Pre-Petition Lender Party's Debt, Infinia granted security interests and Liens (the "<u>Pre-Petition Lender Party's Liens</u>") to the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements on all or substantially all of its assets and personal property (provided, however, that in respect to real property leaseholds, only accounts receivable, payment obligations and/or proceeds arising from a sale, assignment or other disposition thereof were included) (collectively, the "<u>Pre-Petition Lender Party's Collateral</u>").

(iv)   **Pre-Petition Lender Party's Liens**.  The Debtors admit, stipulate, acknowledge and agree that as of the Petition Date (i) the Pre-Petition Lender Party's Liens on the Pre-Petition Lender Party's Collateral were not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and subject only to any Permitted Liens (as defined in the Pre-Petition Lender Party's Financing Agreements), (ii) the Pre-Petition Lender Party's Debt constituted legal, valid and binding obligations of Infinia, enforceable in accordance with the terms of the Pre-Petition Lender Party's Financing Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Lender Party's Debt existed, and no portion of the Pre-Petition Lender Party's Debt was subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy

11

Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Lender Party's Debt constituted allowable secured claims. The Debtors admit, stipulate, acknowledge and agree that on and as of the date that the Interim Order was entered and as of the date that this Final Order is entered, the Debtors have waived, discharged and released the Pre-Petition Lender Party, together with its affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Pre-Petition Lender Party's Debt, (y) to challenge or object to the security for the Pre-Petition Lender Party's Debt, and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Pre-Petition Lender Party's Financing Agreements or otherwise.

None of the Debtors possess or will assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Lender Party's Financing Agreements or the Pre-Petition Lender Party's Liens, and/or security interests in the Pre-Petition Lender Party's Collateral, or any claim of the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements.

(v)      **Value of Pre-Petition Lender Party's Collateral**. The Debtors acknowledge that after investigation it could be determined that the aggregate value of the Pre-Petition Lender Party's Collateral granted to the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements exceeded the amount of the Pre-Petition Lender Party's Debt as of the Petition Date and, accordingly, that it could be determined that all of the Pre-Petition Lender Party's Debt constitutes an over-secured claim within the meaning of section 506(b) of the Bankruptcy Code.

(vi)     **Cash Collateral**. The Pre-Petition Lender Party has a security interest and Lien in Cash Collateral, including on all amounts on deposit in Infinia's banking, checking, or other deposit accounts and all proceeds of the Pre-Petition Lender Party's Collateral to secure the Pre-Petition Lender Party's Debt, to the same extent and order of priority as that which was held by each such party prior to the filing of these Cases.

{00175858.DOC / 2}

F.      **Findings Regarding the Post-Petition Financing.**

(i)      **Need for Post-Petition Financing and use of Collateral**.  An immediate need exists for the Debtors (A) to obtain funds from the DIP Facility in order to fund the working capital requirements and other financing needs of the Debtors, and (B) to use the Collateral, including the Cash Collateral.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors and their equity holders and the possibility for a successful reorganization or sale of the Debtors' assets as a going concern or otherwise.

(ii)      **No Credit Available on More Favorable Terms**.  The Debtors have been unable to obtain (A) unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, (B) credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, (C) credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien, or (D) additional post-petition liquidity or a consent to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code from or of the Pre-Petition Lender Party under the terms of the Pre-Petition Lender Party's Financing Agreements, in each case, (A) through (C) on more favorable terms and conditions than those provided in the DIP Financing Agreements, the Interim Order and this Final Order, and, in the case of (D),  on terms other than those provided in the DIP Financing Agreements, the Interim Order and this Final Order.

(iii)      **Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any Permitted Liens are valid, senior, perfected and unavoidable.   Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the DIP Secured Parties and any committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection and extent of any such Permitted Lien and or security interest, subject to the time periods set forth in Section 7 of this Final Order.

{00175858.DOC / 2}

G.      **Section 506(c) Waiver.**   Upon entry of this Final Order, except to the extent of the Carve-Out, no expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and the Pre-Petition Agent, and no such consent shall be implied from any other action or inaction by the DIP Secured Parties or Pre-Petition Lender Party.

H.      **Roll-Up of Pre-Petition Lender Party's Debt**.   Upon entry of this Final Order, the DIP Secured Parties are authorized and directed to irrevocably repay in full to the Pre-Petition Lender Party an amount equal to the Pre-Petition Lender Party's Debt in full satisfaction and cancellation of the Pre-Petition Lender Party's Debt from the proceeds of the DIP Facility (the "Pre-Petition Lender Party's Debt Payoff").

I.      **Use of Proceeds of the DIP Facility**.   Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) (subject to the terms and conditions of the DIP Financing Agreements), solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of these Cases, to the extent set forth in the Budget and (c) upon entry of

14

this Final Order, the Pre-Petition Lender Party's Debt Payoff in accordance with the DIP Financing Agreements, which shall constitute a roll-up under the DIP Financing Agreements.

J.      **Adequate Protection for Pre-Petition Lender Party.**  As a result of the grant of the New DIP Liens, and the use of Cash Collateral authorized herein, the Pre-Petition Lender Party is entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code for any Pre-Petition Diminution in Value (as defined below) resulting from the automatic stay or Debtors' use, sale or lease of the Pre-Petition Lender Party's Collateral (including Cash Collateral) during these Cases. As adequate protection, the Pre-Petition Lender Party will receive: (1) the Prior-Lender Party's Replacement Liens and (2) the Pre-Petition Lender Party's Superpriority Claim.

K.      **Extension of Financing.**  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Financing Agreements and subject to (i) the entry of the Interim Order and this Final Order, and (ii) findings by this Court that such financing is essential to the Debtors' estate, that the DIP Lenders are good faith financiers, and that the DIP Secured Parties' claims, superpriority claims, security interests and Liens and other protections granted pursuant to the Interim Order and this Final Order and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of the Interim Order, this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.  The

15

New DIP Liens (as defined herein) shall not be (i) subject or subordinate to (A) any Lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any Liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

L.     **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The terms and conditions of the DIP Facility and the DIP Financing Agreements, and the fees paid and to be paid thereunder are (i) fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Facility and the use of the Collateral (including, without limitation, the Cash Collateral) was negotiated in good faith and at arms' length between the Debtors, the DIP Secured Parties and the Pre-Petition Lender Party, and (iii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that the DIP Secured Parties are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

M.     **Relief Essential; Best Interest; Good Cause.**  The relief requested in the DIP Motion (and as provided in the Interim Order and this Final Order), including, without limitation, the establishment of the DIP Facility and the use of the Collateral

16

(including, without limitation, the Cash Collateral), is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and personal property. It is in the best interest of the Debtors' estates to be allowed to establish the DIP Facility and to use the Collateral (including, without limitation, the Cash Collateral) contemplated by the DIP Financing Agreements. Good cause has been shown for the relief requested in the DIP Motion (and as provided in the Interim Order and this Final Order).

N. **Entry of Final Order**. For the reasons stated above, the Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE**, on the DIP Motion of the Debtors and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the DIP Secured Parties and the Pre-Petition Lender Party to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1. **Motion Granted**. The DIP Motion is granted on a final basis in accordance with the terms and conditions set forth in the Interim Order, this Final Order and the DIP Financing Agreements.

2. **DIP Financing Agreements**.

(a) **Approval of Entry Into DIP Financing Agreements.** The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver

17

the DIP Financing Agreements and to incur and to perform the DIP Obligations, in accordance with, and subject to, the terms of the Interim Order, this Final Order and the DIP Financing Agreements (including, without limitation, the Budget), and to execute and deliver all instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtors under the DIP Facility (including, without limitation, the Collateral Assignment of Note Documents and Allonge dated September 18, 2013) and the creation and perfection of the New DIP Liens described in and provided for by the Interim Order, this Final Order and the DIP Financing Agreements.   The Debtors are hereby authorized and directed to do and perform all acts, pay the principal, interest, fees, expenses and other amounts described in the DIP Financing Agreement and all other DIP Financing Agreements as such become due, including, without limitation, closing fees, administrative fees, origination fees, and reasonable attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Financing Agreement which amounts shall not otherwise be subject to approval of this Court; provided, however, that unresolved disputes as to the reasonableness of any professional fees and expenses may be determined by this Court.   Upon execution and delivery, the DIP Financing Agreements shall represent valid and binding obligations of the Debtors enforceable against the Debtors in accordance with their terms.

{00175858.DOC / 2}

(b)   **Authorization to Borrow**.

(i)      In order to enable the Debtors to continue to operate their business and subject to the terms and conditions of the Interim Order, this Final Order, the DIP Financing Agreement, the other DIP Financing Agreements, and the Budget (as defined below) (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreement), the Debtors are hereby authorized to borrow under the DIP Facility, and immediately upon entry of this Final Order, Debtors are authorized under the DIP Facility to consummate Pre-Petition Lender Party's Debt Payoff, which shall constitute a roll-up under the DIP Financing Agreements, and in doing all of the foregoing, to borrow up to a total committed amount of up to $5,318,500.

(ii)     The DIP Financing Agreements constitute valid, binding and non-avoidable obligations of the Debtors enforceable against the Debtors in accordance with their respective terms and the terms of the Interim Order and this Final Order for all purposes during these Cases, any subsequently converted cases of the Debtors under chapter 7 of the Bankruptcy Code or after the dismissal of these Cases.  No obligation, payment, assignment or repayment thereof or recovery on or in respect thereof, transfer or grant of security under the DIP Financing Agreements, the Interim Order or this Final Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state

19

Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(c)     **Application of DIP Proceeds**.  The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreement, and in accordance with the Budget (as defined below) (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreement) solely for  (a) working capital and general corporate purposes, to the extent set forth in the Budget,  (b) payment of costs of administration of these Cases, to the extent set forth in the Budget, and (c) immediately upon entry of this Final Order, the Pre-Petition Lender Party's Debt Payoff in accordance with the DIP Financing Agreements, which shall constitute a roll-up under the DIP Financing Agreements.

(d)     **Conditions Precedent**.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Financing Agreement unless the conditions precedent to make such loan under the DIP Financing Agreement have been satisfied in full or waived by the DIP Secured Parties in their sole discretion.

(e)     **Liens.**  Effective immediately upon the entry of the Interim Order and this Final Order, the DIP Secured Parties are hereby granted pursuant to sections 361, 362,

20

364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and New DIP Liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estate except for Permitted Liens and as otherwise provided in this Final Order, upon and to all of the Collateral, and, for the avoidance of doubt, Collateral shall include all real and personal property of the Debtors now owned or hereafter acquired (excluding Avoidance Actions of the Debtors, but including only the proceeds of Avoidance Actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-Petition Date transfer of Collateral) and all other property of whatever kind and nature, in each case, that is pledged as collateral under any Security Document (including, without limitation, the Collateral Assignment), the Financing Orders or any other order of the Bankruptcy Court in these Cases.

(f)     **DIP Lien Priority**.  The New DIP Liens created and granted to the DIP Secured Parties, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to any of the Collateral, subject only to: (x) the Carve-Out, and (y) the Permitted Liens.  The New DIP Liens shall secure all DIP Obligations (including, but not limited to, the advances under the DIP Facility used to effectuate the Pre-Petition Lender Party's Debt Payoff).  The New DIP Liens shall not be made subject to or *pari passu* with any

21

Lien or security interest by any court order heretofore or hereafter entered in these Case except for the Permitted Liens and the Carve-Out; and shall be valid and enforceable against any trustee subsequently appointed in these Case, upon the conversion of these Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Case"), and/or upon the dismissal of these Cases.  The New DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, or upon entry of this Final Order, section 506(c) of the Bankruptcy Code.  The New DIP Liens (as defined herein) shall not be (i) subject or subordinate to (A) any Lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any Liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(g)    **Enforceable Obligations**. The DIP Financing Agreements (including, without limitation, the DIP Obligations evidenced thereby) shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors, in accordance with their terms.

22

(h)  **Budget**.  From and after the Petition Date and until the Termination Date,

the Debtors shall use the proceeds of the extensions of credit under the DIP Facility

only for the purposes specifically set forth in the DIP Financing Agreement, the Interim

Order and this Final Order and in accordance with the Budget (subject to the terms and

conditions of the DIP Financing Agreement).

(i)  **Superpriority Administrative Claim Status**.  Subject to the Carve-Out,

all DIP Obligations shall be an allowed superpriority administrative expense claim (the

"DIP Superpriority Claim" and, together with the New DIP Liens, the "DIP Protections")

with priority (except as otherwise provided in Section 8 below) in these Cases or any

Successor Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code

and otherwise over all administrative expense claims, adequate protection claims and

all other claims against the Debtors and their estates, now existing or hereafter arising,

of any kind or nature whatsoever including, without limitation, administrative expenses

of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330 of

the Bankruptcy Code (except as otherwise provided in Section 8 below), 331, 503(a),

503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy

Code), whether or not such expenses or claims may become secured by a judgment

Lien or other non-consensual Lien, levy or attachment.  Other than the Carve-Out, no

costs or expenses of administration, including, without limitation, professional fees

allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in this proceeding, or in any Successor Case, and no priority claims are, or will be, senior to, prior to (subject to the Pre-Petition Lender Party's Superpriority Claim as set forth in the Interim Order and this Final Order), or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder.

3.    **Authorization to Use Proceeds of DIP Financing Agreement**.

(a)  The Debtors shall use the DIP Loans and the Collateral (including, without limitation, the Cash Collateral) solely as provided in the Interim Order, this Final Order and the DIP Financing Agreements, and in accordance with the Budget.  Pursuant to the terms and conditions of the Interim Order, this Final Order, the DIP Facility and the DIP Financing Agreement, and in accordance with the budget attached hereto as **Exhibit "A"** (as the same may be modified, supplemented or updated from time to time consistent with the terms of the DIP Financing Agreement, the Interim Order and this Final Order, the "Budget"), the Debtors are authorized to use Collateral (including, without limitation Cash Collateral) and to use the advances under the DIP Financing Agreement (during the period commencing immediately after the entry of the Final Order and terminating upon termination of the commitment to fund the DIP Facility pursuant to the provisions of this Final Order).  The Budget may be updated (with the

consent and/or at the request of the DIP Agent, subject to the provisions of the DIP Financing Agreement), from time to time, provided that such updated Budget shall be in form and substance acceptable to the DIP Agent, in its reasonable discretion, and the Debtors shall be required always to comply with the Budget and the DIP Financing Agreement pursuant to the terms of the DIP Facility.  Nothing in the Interim Order or this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business or other proceeds resulting therefrom, except as permitted pursuant to the DIP Facility, the DIP Financing Agreement, the Interim Order and this Final Order.

(b)     Neither the advances under the DIP Financing Agreement nor any of the Collateral (including, without limitation, the Cash Collateral) may be used by the Debtors, and any committee appointed pursuant to section 1102 of the Bankruptcy Code, or any other person or entity to object to or contest in any manner, or raise any defenses to the validity, extent, perfection, priority, or enforceability of the Pre-Petition Lender Party's Debt or any Liens or security interests with respect thereto or any other rights or interests of the Pre-Petition Lender Party, or to assert any claims or causes of action, including, without limitation, any Avoidance Actions, against the Pre-Petition Lender Party.

4.     **Adequate Protection for Pre-Petition Lender Party.**   As adequate protection for the interest of the Pre-Petition Lender Party in the Pre-Petition Lender

25

Party's Collateral (including Cash Collateral) on account of the granting of the New DIP Liens, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay or the Debtors' use, sale, depreciation, or disposition of the Pre-Petition Lender Party's Collateral (the "<u>Pre-Petition Diminution in Value</u>"), the Pre-Petition Lender Party shall receive adequate protection as follows:

(a)      **Pre-Petition Lender Party's Replacement Liens.**  Solely to the extent of the Pre-Petition Diminution in Value of the interests of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral, the Pre-Petition Lender Party shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code additional and replacement security interests and Liens in the Collateral (the "<u>Pre-Petition Lender Party's Replacement Liens</u>"), which shall be junior only to the New DIP Liens, Permitted Liens and the Carve-Out as provided herein.

(b)      **Pre-Petition Lender Party's Superpriority Claim**.  Solely to the extent of the Pre-Petition Diminution in Value of the interest of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral, the Pre-Petition Lender Party shall have an allowed superpriority administrative expense claim pursuant to Bankruptcy Code section 507(b) (the "<u>Pre-Petition Lender Party's Superpriority Claim</u>") which shall have priority (except with respect to the New DIP Liens, the DIP Superpriority Claim, and the Carve-Out) over any other claims under sections 364(c)(1), 503(b) and 507(b) of the

26

Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code, whether or not such expenses of claims may become secured by a judgment or other non-consensual Lien, levy or attachment.

(c)    **Adequate Protection Upon Sale of Collateral.**   Upon the sale of any Collateral pursuant to section 363 of the Bankruptcy Code, any such Collateral shall be sold free and clear of any Permitted Liens, the Pre-Petition Lender Party's Liens and the Pre-Petition Lender Party's Replacement Liens; provided, however, that such Liens shall attach to the proceeds of any such sale in the order and priority as established by final order of this Court.

5.    **Section 507(b) Reservation.**   Nothing herein shall impair or modify the Pre-Petition Lender Party's right to seek additional adequate protection in the event that the adequate protection provided to the Pre-Petition Lender Party hereunder is insufficient to compensate for the Pre-Petition Diminution in Value of the interest of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral  during these Cases or any Successor Cases.

6.    **Lien Perfection**.

27

(a)     The Interim Order and this Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the New DIP Liens and the Pre-Petition Lender Party's Replacement Liens, including, without limitation, perfection of the DIP Secured Parties' interest in any deposit that the Debtors have a right, title or interest in with respect to a Sale Transaction, without the necessity of filing or recording any financing statement, deed of trust, mortgage, assignment or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreements) to validate or perfect the New DIP Liens or the Pre-Petition Lender Party's Replacement Liens or to entitle the New DIP Liens or the Pre-Petition Lender Party's Replacement Liens to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent may, in its sole discretion, file such financing statements, mortgages, security agreements, assignments, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and with respect to the New DIP Liens, all such financing statements, mortgages, security agreements, assignments, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Final Order.  Upon request, the Debtors shall execute and deliver to the DIP Agent and the Pre-Petition Lender Party all such financing statements, mortgages, notices and other documents as the

{00175858.DOC / 2}

DIP Agent or Pre-Petition Lender Party may reasonably request to evidence, confirm, validate or perfect, or to ensure the contemplated priority of, the New DIP Liens and the Pre-Petition Lender Party's Replacement Liens granted pursuant hereto.  Each of the DIP Agent and the Pre-Petition Lender Party, in its discretion, may file a photocopy of the Interim Order and this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of the Interim Order and this Final Order.

(b) The Interim Order and this Final Order shall be sufficient and conclusive evidence that the DIP Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained now or in the future by any of the Debtors which in any way relates to the Collateral.   Notwithstanding the foregoing, the Debtors are authorized and directed to take any actions that the DIP Agent shall request, in its sole and absolute discretion, to have the DIP Agent, on behalf of the DIP Secured Parties, be added as an additional insured and loss payee on each insurance policy.

7.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims.**    Nothing in the Interim Order, this Final Order or the DIP Financing Agreements, including, without limitation, the Debtors' Stipulations, shall prejudice

whatever rights any committee appointed pursuant to section 1102 of the Bankruptcy

Code or any other party in interest with requisite standing, including, for the avoidance

of doubt, any subsequently appointed chapter 7 and 11 trustee (other than the Debtors)

may have (a) to file a contested matter or an adversary proceeding or otherwise to

object to or challenge the findings herein, including, but not limited to, those in relation

to (i) the validity, extent, perfection, enforceability or priority of the Pre-Petition Lender

Party's Liens in and to the Pre-Petition Lender Party's Collateral, or (ii) the validity,

allowability, priority, status or amount of the Pre-Petition Lender Party's Debt, or (b) to

bring suit or otherwise assert any claims or causes of action against the Pre-Petition

Lender Party in connection with or related to the Pre-Petition Lender Party's Financing

Agreements, or the actions or inactions of the Pre-Petition Lender Party arising out of or

related to the Pre-Petition Lender Party's Financing Agreements; provided, however,

that, unless any committee appointed pursuant to section 1102 of the Bankruptcy Code

or any other party in interest with requisite standing commences a contested matter or

adversary proceeding raising such objection or challenge, including, without limitation,

any claim against the Pre-Petition Lender Party in the nature of a setoff, counterclaim or

defense to the Pre-Petition Lender Party's Debt (including, but not limited to, those

under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by

way of suit against the Pre-Petition Lender Party), within the earlier of (a) 60 days after

the formation of any committee pursuant to section 1102 of the Bankruptcy Code, or (b)

30

if no committee is formed pursuant to section 1102 of the Bankruptcy Code, for all other

parties 75 days following entry of this Final Order or (c) the date upon which a Sale

Transaction is consummated as contemplated by the terms of the DIP Financing

Agreements (collectively, (a), (b) and (c) shall be referred to herein as the "Pre-Petition

Lender Party Challenge Period," and the date that is the next calendar day after the

termination of the Pre-Petition Lender Party Challenge Period shall be referred to herein

as the "Pre-Petition Lender Party Challenge Period Termination Date"), upon the Pre-

Petition Lender Party Challenge Period Termination Date, (i) any and all such contested

matters, adversary proceedings and other objections and challenges by any party

(including, without limitation, all creditors, any committee appointed pursuant to section

1102 of the Bankruptcy Code, any chapter 11 or chapter 7 trustee appointed herein or

in any Successor Cases, receivers, administrators, examiners with expanded powers,

responsible officers, other estate representatives appointed in these Cases or any

Successor Cases or in any jurisdiction, and all other parties in interest) as to the

findings in the Interim Order, this Final Order and/or the Debtors' Stipulations shall be

deemed to be forever waived and barred, (ii) the Pre-Petition Lender Party's Debt shall

be deemed to be allowed in full and shall be deemed to be allowed as fully secured

claims within the meaning of section 506 of the Bankruptcy Code for all purposes in

connection with these Cases and any Successor Cases, (iii) the Pre-Petition Lender

Party's Liens shall be deemed to have been, as of the Petition Date, legal, valid,

binding, perfected security interests and Liens, not subject to recharacterization, subordination or otherwise avoidable, and (iv) the Debtors' Stipulations shall be binding on all parties (including, without limitation, all creditors, any committee appointed pursuant to section 1102 of the Bankruptcy Code , any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases, receivers, administrators, examiners with expanded powers, responsible officers, other estate representatives appointed in these Cases or in any Successor Cases or in any jurisdiction, and all other parties in interest). To the extent any such contested matter, adversary proceeding or other objection or challenge is filed, the Pre-Petition Lender Party shall be entitled to include such costs and expenses, including, but not limited to reasonable attorneys' fees, incurred in defending the objection or complaint as part of the Pre-Petition Lender Party's Debt, in each case, to the extent allowable under section 506(b) of the Bankruptcy Code.

8.    **Carve-Out**.  Subject to the terms and conditions contained in this Section 8, the New DIP Liens, the DIP Superpriority Claim, the Pre-Petition Lender Party's Liens, the Pre-Petition Lender Party's Replacement Liens and the Pre-Petition Lender Party's Superpriority Claim are subordinate only to the following items (a), (b), (c) and (d) (items (a), (b), (c) and (d), collectively, the "Carve-Out"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 to the extent such interest is awarded by final order of this Court; (b) to the extent allowed fees, expenses and

{00175858.DOC / 2}

disbursements of professionals retained by order of this Court by the Debtors or any

committee appointed pursuant to section 1102 of the Bankruptcy Code in these Cases

(the "Professionals") incurred (i) prior to the entry of this Final Order and (ii) thereafter,

in accordance with the Budget; and (c) up to $50,000 of allowed fees, expenses and

disbursements of the Professionals (the "Professional Fee Carve-Out Cap") incurred

after the occurrence of the Termination Date (defined in this paragraph below); and (d)

the sum of $100,000 (the "Wind-Down Amount"); provided, however, that in each case

(a), (b), (c) and (d), such fees and expenses are approved by this Court, or such lesser

amount so approved.  To the extent not previously funded in accordance with the terms

of the Interim Order or this Final Order, DIP Secured Parties shall deposit the Carve-Out

(including, without limitation, the Wind-Down Amount) into a deposit account specified

by the Debtors upon the Termination Date (as defined below).  For the purposes hereof,

the "Termination Date" shall occur upon the earliest to occur of: (i) the Term Loan

Maturity Date (as defined in the DIP Financing Agreement; (ii)  the occurrence and

during the continuance of an Event of Default under the DIP Agreement; (iii) a material

breach by the Debtors of the Interim Order or this Final Order; and (iv) the date upon

which a Sale Transaction (as defined in the DIP Financing Agreement) is closed as

contemplated by the DIP Financing Agreement; and, in each case, (i) through (iv) upon

delivery of a written notice thereof by the DIP Agent to the Debtors and their counsel

and the counsel for any committee appointed pursuant to section 1102 of the

{00175858.DOC / 2}

Bankruptcy Code specifying that such notice constitutes a notice that the Termination Date has occurred (a "Termination Notice").  Upon the delivery of a Termination Notice, the right of the Debtors to pay professional fees incurred under clause (b) above without reduction of the Professional Fee Carve-Out Cap in clause (c) above shall terminate and upon receipt of such notice, the Debtors shall provide immediate notice by facsimile and email to all retained professionals informing them that the Termination Date has occurred and that the Debtors' ability to pay professionals is subject to the Professional Fee Carve-Out Cap.  Upon the occurrence of the Termination Date and the full and final funding of the Carve-Out (including, without limitation, the Wind-Down Amount), there shall be no further obligations on the part of the DIP Secured Parties or the Pre-Petition Lender Party regarding the Carve-Out (including, without limitation, the Wind-Down Amount), any Professional Fees, any U.S. Trustee Fees or any other fees and expenses of the Debtors' estates in these cases or in any Successor Cases or proceedings.  The DIP Secured Parties' obligation to fund or otherwise pay the Carve-Out (including, without limitation, the Wind-Down Amount), shall be added to and made a part of the DIP Obligations, secured by the New DIP Liens, and the DIP Secured Parties shall be entitled to all of the rights, claims Liens, priorities, and protections under the Interim Order, this Final Order, the DIP Financing Agreements, the Bankruptcy Code and/or applicable law in connection therewith.  Subject to the provisions of this Section 8, the Carve-Out (including, without limitation, the Wind-Down Amount) shall

34

exclude any fees and expenses (x) incurred in connection with the assertion or joinder

in any claim, counterclaim, action, proceeding, application, motion, objection, defenses

or other contested matter, the purpose of which is to seek any order, judgment,

determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating,

in whole or in part, (1) the DIP Obligations, (2) the DIP Secured Parties' Liens in the

Collateral, (3) the Pre-Petition Lender Party's Debt or (4) the Pre-Petition Lender Party's

Liens or (B) preventing, hindering or delaying, whether directly or indirectly, the DIP

Secured Parties' or the Pre-Petition Lender Party's assertions or enforcement of their

Liens, security interests or realization upon any Collateral, provided, however, that with

respect to solely the Pre-Petition Lender Party's Lien in the Pre-Petition Lender Party's

Collateral, such exclusion does not encompass any investigative work, at an aggregate

expense not to exceed $10,000, conducted by the Professionals prior to bringing any

action relating to the foregoing, (y) related to the proposed sale or the disposition of any

other Collateral, or incurrence of indebtedness not permitted under the DIP Financing

Agreement, except with the DIP Agent's express written consent or (z) arising after the

conversion of these Cases to cases under chapter 7 of the Bankruptcy Code.  The DIP

Agent may implement reserves in accordance with the terms and conditions of the DIP

Financing Agreement.  Except for a lien obligation to fund the Carve-Out (including,

without limitation, the Wind-Down Amount) as set forth in the Interim Order, this Final

Order and the DIP Financing Agreement, nothing herein shall be construed to obligate

{00175858.DOC / 2}

the DIP Secured Parties or the Pre-Petition Lender Party, in any way, to pay the Professionals' fees or U.S. Trustee Fees, or to assure that the Debtors have sufficient funds on hand to pay any Professional Fees, U.S. Trustee Fees or other liabilities or obligations of the Debtors.

9.      **Payment of Compensation.**   Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any committee appointed pursuant to section 1102 of the Bankruptcy Code or of any person or shall affect the right of the DIP Secured Parties or the Pre-Petition Lender Party to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

10.     **Section 506(c) Claims; Roll Up.**

(a)     Except to the extent of the Carve-Out, no expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and no such consent shall be implied from any other action or inaction by the DIP Secured Parties or the Pre-Petition Lender Party; and

(b)     The Debtors are authorized and directed make payment to the Pre-Petition Lender Party in an amount necessary to accomplish the Pre-Petition Lender

36

Party's Debt Payoff, which shall constitute a roll-up under the DIP Financing

Agreements, in accordance with the terms of the Interim Order, this Final Order and the

DIP Financing Agreements.  Moreover, effective immediately upon the entry of this Final

Order and funding of the Pre-Petition Lender Party's Debt Payoff: (i) the Pre-Petition

Lender Party's Financing Agreements are terminated, except for provisions that survive

termination and payoff in accordance with their respective terms, including, without

limitation, Sections 2.7, 2.8, and 10.3 of the Prior Credit Agreement and Section 8.9 of

the Security Agreement (as defined in the Prior Credit Agreement), (ii) the Debtors shall

release, waive and discharge (and shall be deemed to have released, waived and

discharged) the Pre-Petition Lender Party (in both prepetition and postpetition

capacities), together with its respective officers, directors, employees, agents, attorneys,

professionals, affiliates, subsidiaries, assigns and/or successors, from any and all

claims and causes of action arising out of, based upon or related to, in whole or in part,

the Pre-Petition Lender Party's Debt and/or the Pre-Petition Lender Party's Financing

Agreements and (iii) the Pre-Petition Lender Party shall release, waive and discharge

(and shall be deemed to have released, waived and discharged) the Debtors, together

with their respective officers, directors, employees, agents, attorneys, professionals,

affiliates, subsidiaries, assigns and/or successors from any and all claims and causes of

action arising out of, based upon or related to, in whole or in part, the Pre-Petition

Lender Party's Debt and/or the Pre-Petition Lender Parties Financing Agreements.  For

{00175858.DOC / 2}

the avoidance of doubt, the release described in this Section 10(b)(iii) shall not extend in any manner whatsoever to the DIP Obligations or the DIP Financing Agreements.

11.     **Collateral Rights**.  Unless the DIP Agent has provided its prior written consent or the Pre-Petition Lender Party's Debt and all DIP Obligations have been indefeasibly paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness, if any, described in subparagraph (a) below), all commitments to lend have terminated, and all indemnity obligations under the DIP Financing Agreement have been cash secured to the reasonable satisfaction of the DIP Agent, there shall not be entered in this proceeding, or in any Successor Case, any order which authorizes any of the following:

(a)     the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Secured Parties or the Pre-Petition Lender Party; or

(b)     the use of Collateral (including, without limitation Cash Collateral) for any purpose other than to pay in full in cash the DIP Obligations or as otherwise permitted in the Interim Order, this Final Order and the DIP Financing Agreement;

(c)     relief from stay by any person other than of the DIP Secured Parties on all or any portion of the Collateral; or

{00175858.DOC / 2}

(d)     the Debtors' return of goods constituting Collateral pursuant to section 546(h) of the Bankruptcy Code, except as permitted in the DIP Financing Agreements.

12.     **Proceeds of Subsequent Financing.**  Without limiting the provisions and protections of Section 11 above, if at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Secured Parties' obligations to make loans and advances under the DIP Facility, including subsequent to the confirmation of any chapter 11 plan or plans (the "Plan") with respect to the Debtors, and the repayment in full of the Pre-Petition Lender Party's Debt, the Debtors' estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Financing Agreement or engage in an Asset Sale or Debt Issuance, then all of the cash proceeds derived from such credit or debt or such sale or issuance shall immediately be turned over (a) first, to the Pre-Petition Lender Party for application to the Pre-Petition Lender Party's Debt pursuant to the Pre-Petition Lender Party's Financing Agreements; and (b) second, to the DIP Agent for application to the DIP Obligations outstanding pursuant to the terms of the DIP Financing Agreement, in accordance with the terms of this Final Order.

13.     **Disposition of Collateral.**  The Debtors shall not (a) sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the DIP Secured Parties (and no such consent shall be implied, from any

39

other action, inaction or acquiescence by the DIP Secured Parties or an order of this Court), except for sales of the Debtors' services in the ordinary course of business or as permitted by the DIP Financing Agreement, the Interim Order and this Final Order and as approved by this Court, or (b) assume, reject or assign any leasehold interest without the prior consultation with the DIP Agent, except as otherwise permitted by the DIP Financing Agreements.

       14.    **Remedies After Event of Default.**

       (a)    The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Secured Parties and the Pre-Petition Lender Party to exercise, upon the occurrence of the Termination Date and at any time thereafter upon five (5) business days' prior notice to the Debtors, counsel to the Debtors, counsel for any committee appointed pursuant to section 1102 of the Bankruptcy Code, the U.S. Trustee and the Pre-Petition Lender Party ("Default Notice Period") of such occurrence, all rights and remedies provided for in the DIP Financing Agreements (including, without limitation and without prior notice, the right to freeze monies or balances in the Debtors' accounts or set off monies or balances of the Debtors in accounts maintained by any DIP Secured Party, the right to charge the Post-Default Rate, terminate commitments and cease funding under the DIP Agreement). Notwithstanding the occurrence of the Termination Date or termination of the commitments to fund under the DIP Agreement or anything herein, all of the rights,

40

remedies, benefits, and protections provided to the DIP Secured Parties under the DIP Financing Agreements and to the DIP Secured Parties and the Pre-Petition Lender Party under the Interim Order and this Final Order shall survive.  The Debtors and/or any committee appointed pursuant to section 1102 of the Bankruptcy Code shall be entitled to seek an expedited hearing regarding an Event of Default or termination of the commitments to fund under the DIP Agreement(a "Default Pleading"); provided, however, that the only issue to be determined at such hearing is whether an Event of Default has occurred and is continuing. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

(b)      Upon the Termination Date, all (i) DIP Obligations of the Debtors to the DIP Secured Parties shall be immediately due and payable, and (ii) authority to use or borrow the proceeds of the DIP Financing Agreements shall cease.  If the DIP Secured Parties or the Pre-Petition Lender Party exercise any of their rights and remedies upon the occurrence of the Termination Date, the DIP Agent may retain one or more agents to sell, lease, or otherwise dispose of the Collateral in accordance with the terms of the DIP Financing Agreements.   In any exercise of their rights and remedies upon the Termination Date, the DIP Secured Parties are authorized to proceed under or pursuant to the DIP Financing Agreements.  Without limiting the foregoing, subject to the terms of

41

the DIP Financing Agreements, in the exercise of the DIP Agent's rights and remedies upon the Termination Date, the DIP Agent may by written notice to the Debtors require the Debtors to file a motion seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the DIP Agent (the cost of which shall be funded by the DIP Facility in accordance with the Budget).  The Debtors shall file such motion within ten (10) days of the DIP Agent's request and shall diligently prosecute such motion.  If the Debtors fail to so file the motion, the DIP Agent may file and prosecute such a motion in the name of the Debtors.  Subject to the rights, if any, of the holders of any Permitted Liens and/or of Professionals under Section 8 hereof, all proceeds realized from any of the foregoing shall be turned to the DIP Agent for application to the DIP Obligations pursuant to the DIP Financing Agreements.

(c)      If the DIP Secured Parties exercise their rights under the DIP Financing Agreements to foreclose upon the Collateral, in connection with such foreclosure the Debtors will be deemed to have assumed and assigned to the DIP Secured Parties (or their assigns) all executory contracts and leases to which the Debtors are a party, other than executory contracts or leases specifically excepted by the DIP Secured Parties or their assigns by written notice.  The Court shall retain jurisdiction to adjudicate any disputes relating to assumption and assignment, including, inter alia, disputes as to the assignability of such contracts and leases, required cure amounts and/or the provision

42

of adequate assurances of future performance under the assigned contracts and leases.

15.   **Transaction Proceeds; Survival of Protections**   Any and all Net Cash Payments received from the consummation of an asset sale, debt issuance, mandatory prepayment event pursuant to Section 2.9(b) of the DIP Financing Agreement or any Sale Transaction shall be remitted directly to the DIP Agent upon Debtors' receipt thereof for application to the unpaid Pre-Petition Lender Party's Debt and the DIP Obligations (in that order) in accordance with the terms of the DIP Financing Agreement, the Interim Order and this Final Order.   Unless and until the Pre-Petition Lender Party's Debt and the DIP Obligations are irrevocably repaid in full or have been cash secured to the reasonable satisfaction of the Pre-Petition Lender Party and the DIP Agent, as applicable, all commitments under the DIP Financing Agreements to lend have irrevocably terminated, the protections afforded to the Pre-Petition Lender Party and the DIP Secured Parties pursuant to the Interim Order, this Final Order or the DIP Financing Agreement, as applicable, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting this into a Successor Case, and the New DIP Liens, the DIP Superpriority Claim and the Pre-Petition Lender Party's Superpriority Claim shall continue in this proceeding and in any Successor Case, and such Liens, the DIP Superpriority Claim and the Pre-Petition Lender Party's

{00175858.DOC / 2}

Superpriority Claim shall maintain their priority as provided by the Interim Order and this Final Order.

16.    **Modification of Automatic Stay.**   The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Financing Agreement as necessary to (a) permit the Debtors to grant the New DIP Liens and the Pre-Petition Lender Party's Replacement Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Pre-Petition Lender Party under the DIP Financing Agreements, the DIP Facility, the Interim Order and this Final Order, as applicable, and (b) authorize the DIP Secured Parties and the Pre-Petition Lender Party to retain and apply payments hereunder.

17.    **Credit Bid.**   The DIP Secured Parties, directly or through a designee, shall have the unqualified right to credit bid up to the full amount of the DIP Obligations, as a stalking horse bidder or otherwise, in any sale of any portion of the Collateral, whether pursuant to an action or a Reorganization Plan or otherwise.

18.    **Proofs of Claim.**  The DIP Secured Parties and the Pre-Petition Lender Party will not be required to file proofs of claim in these Cases or Successor Cases. The Interim Order and this Final Order shall constitute a proof of claim on behalf of the DIP Secured Parties and the Pre-Petition Lender Party in these Cases.   The Pre-Petition Lender Party is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as they see fit) aggregate proofs of

44

{00175858.DOC / 2}

claim in these Cases or any Successor Cases. Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by the Pre-Petition Lender Party.

19.    **Other Rights and Obligations**.

(a)    **Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of the Interim Order or this Final Order**. Based on the findings set forth in the Interim Order and this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by the Interim Order and this Final Order, in the event any or all of the provisions of the Interim Order or this Final Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or Lien or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Secured Parties shall be governed in all respects by the original provisions of the Interim Order and this Final Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim.

45

{00175858.DOC / 2}

Since the loans made pursuant to the DIP Financing Agreement are made in reliance on the Interim Order and this Final Order, the obligations owed the DIP Secured Parties prior to the effective date of any stay, modification or vacation of the Interim Order or this Final Order cannot, as a result of any subsequent order in this, or in any Successor Case, be subordinated, lose their Lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the Liens and claims granted to the DIP Secured Parties under the Interim Order, this Final Order and/or the DIP Financing Agreements.

(b)     **Expenses**.  As provided in the DIP Financing Agreements, all costs and expenses of the DIP Secured Parties and the Pre-Petition Lender Party in connection with the DIP Financing Agreements and the Pre-Petition Lender Party's Financing Agreements, as applicable, whether incurred prior to or after the commencement of these Cases, including, without limitation, reasonable, documented legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Debtors; provided, however, that such costs and expenses shall be paid only after each relevant professional has provided copies of its fee and expense statements to the U.S. Trustee and counsel to any committee appointed pursuant to section 1102 of the Bankruptcy Code reasonably contemporaneously with the delivery of such fee and expense

46

statements to the Debtors (which may be done no more frequently than monthly).  Such

statements need not be submitted in the form of a fee application or comply with U.S.

Trustee fee guidelines, but shall contain reasonable detail as to the number of hours

worked and applicable hourly rates, but may be redacted to the extent necessary to

delete any information subject to attorney-client privilege, any information constituting

attorney work product or any other confidential information and the provision of such

invoices shall not constitute any waiver of the attorney-client privilege or any benefits of

the attorney work product doctrine.   The U.S. Trustee, any committee appointed

pursuant to section 1102 of the Bankruptcy Code or any other party in interest may

object to the reasonableness of the fees, costs and expenses included in any

professional fee invoice submitted hereunder, provided that, any such objection shall be

forever waived and barred unless (i) it is filed with this Court and served on counsel to

the parties seeking reimbursement no later than ten (10) days after the objecting parties

receiving such applicable professional fee invoice, and (ii) it describes with particularity

the items and categories of fees, costs and expenses that are subject to the objection

and it provides for a specific basis for the objection to each such item of category of

fees, costs and expenses; provided, however, further that the Debtors shall pay all

amounts that are not subject of any objection within ten (10) days of the objection

deadline.  Any hearing on an objection to any payment of any fees, costs and expenses

of such professionals shall be limited to the reasonableness of the particular items or

47

categories of fees, costs, and expenses which are the subject to such objection. Except as provided in this subsection (b), the Debtors shall not make any payment in respect to attorneys' or other professional fees incurred by the Pre-Petition Lender Party.  Under no circumstances shall professionals for the DIP Secured Parties or the Pre-Petition Lender Party be required to comply with the U.S. Trustee fee guidelines.

(c)      **Binding Effect.**  The provisions of the Interim Order and this Final Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Pre-Petition Lender Party and the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 cases; provided, however, that, except to the extent expressly set forth in the Interim Order or this Final Order, the DIP Secured Parties shall have no obligation to permit the use of the DIP Facility or the Collateral (including, without limitation, the Cash Collateral) or extend and financing to any including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors.

(d)      **No Waiver.**  The failure of the DIP Secured Parties or the Pre-Petition Lender Party to seek relief or otherwise exercise their rights and remedies under the DIP Financing Agreements, the DIP Facility, the Interim Order or this Final Order, as

48

applicable, shall not constitute a waiver of any of the DIP Secured Parties' or Pre-Petition Lender Party's rights hereunder. Notwithstanding anything herein, the entry of the Interim Order and this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Secured Parties or the Pre-Petition Lender Party under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Secured Parties or the Pre-Petition Lender Party to (i) request conversion of these Cases to cases under chapter 7, dismissal of these Cases, or the appointment of a trustee in these Cases, or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan or (iii) any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Pre-Petition Lender Party.

(e)    **No Third Party Rights**.  Except as explicitly provided for therein or herein, neither the Interim Order nor this Final Order shall create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f)    **No Marshaling**.  None of the DIP Secured Parties nor the Pre-Petition Lender Party shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

(g)    **Section 552(b)**.  The DIP Secured Parties and the Pre-Petition Lender Party shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy

49

Code shall not apply to the DIP Secured Parties or the Pre-Petition Lender Party, product, offspring or profits of any of the Collateral.

(h)     **Amendment**.   The Debtors and the DIP Agent may amend, modify, supplement or waive any provision of the DIP Financing Agreements, provided that such amendment, modification, supplement or waiver, in the judgment of the Debtors and the DIP Agent, is either nonprejudicial to the rights of third parties or is not material; provided, however that, the Debtor and the DIP Secured Parties may agree (in their respective sole discretion) to extend the Maturity Date for up to 60 days without consent of any committee appointed pursuant to section 1102 of the Bankruptcy Code). Otherwise, such waiver, modification, or amendment of any of the provisions hereof shall be effective only if (a) set forth in writing, signed by or on behalf of the Debtors and the DIP Agent (after having obtained the approval of the DIP Secured Parties as provided in the DIP Financing Agreements), and (b) approved by this Court.

(i)     **Survival of Interim Order and Final Order**.   The provisions of the Interim order and this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in these Cases, (ii) converting these Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing these Cases, (iv) withdrawing of the reference of these Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of these Cases in this Court, and the terms and provisions of the Interim Order and this Final Order as well as the DIP

50

Protections granted pursuant to the Interim Order and this Final Order and the DIP Financing Agreements, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by the Interim Order and this Final Order until all the obligations of the Debtors to the DIP Secured Parties pursuant to the DIP Financing Agreements and all obligations of the Debtors to the Pre-Petition Lender Party are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.  The Debtors shall not propose or support any Plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Commitment Termination Date.

(j)      **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements, the Interim Order and of this Final Order, the provisions of this Final Order shall govern and control.

(k)      **Enforceability**.  The Interim Order and this Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the filing of the DIP Motion immediately upon execution of the DIP Financing Agreement.

51

{00175858.DOC / 2}

(l) **Objections Overruled**. All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(m) **No Waivers or Modification of Interim Order or Final Order**. The Debtors irrevocably waive any right to seek any modification or extension of the Interim Order or this Final Order without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent.

(n) **Waiver of the Fourteen (14) Day Stay Under Bankruptcy Rule 6004(h)**. The fourteen (14) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to the Interim Order or this Final Order.

(o) **Preservation of Rights Granted Under the Order**. No claim or lien having a priority senior to or *pari passu* with those granted by the Interim Order or this Final Order to the DIP Agent shall be granted or allowed while any portion of the DIP Obligations remain outstanding, and the New DIP Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estate under section 551 of the Bankruptcy Code or, except as set forth in the Interim Order or this Final Order, subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(1) Unless all DIP Obligations shall have been indefeasibly paid in full in cash in accordance with the terms of the DIP Agreement (or, as appropriate, cash secured to the reasonable satisfaction of the DIP Agent), in the case of clause (i) below,

52

the Debtors shall not seek, and in the case of clauses (i) and (ii) below, it shall constitute an Event of Default under the DIP Agreement and a termination of the right to use Collateral (including, without limitation, Cash Collateral) if the Debtors seek, or if there is entered, (i) any modification of the Interim order or this Final Order without the prior written consent of the DIP Agent, as applicable, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent, or (ii) an order converting or dismissing any of these Cases.

(2)     If any or all of the provisions of the Interim Order or this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall, to the extent provided in section 364(e) of the Bankruptcy Code, not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the New DIP Liens.    Notwithstanding any such reversal, stay, modification or vacatur, any use of the Collateral (including, without limitation, the Cash Collateral), any DIP Obligations incurred by the Debtors to the DIP Agent and the DIP Lenders prior to the effective date of such reversal, stay, modification or vacatur shall, to the extent provided in section 364(e) of the Bankruptcy Code, be governed in all respects by the original provisions of the Interim Order or this Final Order, and the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, the Interim Order, this Final

53

Order and the DIP Financing Agreements (with respect to all DIP Obligations) and uses of the Collateral (including, without limitation, the Cash Collateral).

(3)    Except as expressly provided in the Interim Order, this Final Order or in the DIP Financing Agreements, the New DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Agent and the DIP Lenders granted by the Interim Order, this Final Order and the DIP Financing Agreements shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of these Cases to cases under chapter 7 of the Bankruptcy Code, dismissing these Cases, or (ii) the entry of an order confirming a plan of reorganization in these Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations.  The terms and provisions of the Interim Order, this Final Order and the DIP Financing Agreements shall continue in these Cases or in any superseding chapter 7 cases or other cases under the Bankruptcy Code and/or following dismissal of this or any subsequent case, and the New DIP Liens, the DIP Obligations, and the Superpriority Claims, and all other rights and remedies of the DIP Agent and the DIP Lenders granted by the Interim Order, this Final Order and the DIP Financing Agreements shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash.

(p)    **Payments Free and Clear**.  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of the Interim

54

Order, this Final Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability.

(q)  **Information.**  The Debtors shall promptly provide to the DIP Agent and counsel to any committee appointed pursuant to section 1102 of the Bankruptcy Code written financial information or periodic reporting as required by the DIP Financing Agreement.

(j)  **Limitation of Liability**.  In determining to make any loan under the DIP Financing Agreement, permitting the use of Collateral (including Cash Collateral), or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order or the DIP Financing Agreements, the DIP Agent, the DIP Lenders and the Pre-Petition Lender Party shall, subject to and effective upon entry of the Final Order, not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in the Interim Order, the Final Order or in the DIP Financing Agreements shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Pre-Petition Lender Party of any

55

liability for any claims arising from the pre-petition or post-petition activities of the

Debtors.

-- END OF ORDER --

# EXHIBIT A

(Budget)

Attached.

61430822 v2--029680/0003

{00175858.DOC / 2}

**Infinia Corporation**
*Cash Budget from September 16, 2013 - December 16, 2013*

| | Week Beginning: 9/16/2013 | 9/23/2013 | 9/30/2013 | 10/7/2013 | 10/14/2013 | 10/21/2013 | 10/28/2013 | 11/4/2013 | 11/11/2013 | 11/18/2013 | 11/25/2013 | 12/2/2013 | 12/9/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $ 350,000 | $ 237,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| **Cash Inflows (Income)** | | | | | | | | | | | | | |
| DIP Financing | | 185,000 | 236,000 | 3,396,000 | 58,000 | 246,000 | 147,000 | 273,000 | 17,000 | 191,000 | 74,000 | 255,500 | 145,000 |
| Contract Revenue | | | 114,000 | | | | 75,000 | | | | 75,000 | | |
| **Total Cash Inflows** | - | 185,000 | 350,000 | 3,396,000 | 58,000 | 246,000 | 222,000 | 273,000 | 17,000 | 191,000 | 149,000 | 255,500 | 145,000 |
| **Cash Outflows (Expenses)** | | | | | | | | | | | | | |
| Payment of secured debt | | | | 3,090,000 * | | | | | | | | | |
| Payroll & benefits | | 194,000 | | 186,000 | | 178,000 | | 222,000 | | 135,000 | | 216,000 | |
| **Administrative Professional Fees** | | | | | | | | | | | | | |
| Investment Banker (Hamilton Clark) | | | | | 45,000 | | | | | 45,000 | | | 65,000 ** |
| Financial Advisor (RMA) | | | 15,000 | | | | 15,000 | | | | 15,000 | | 7,500 |
| Infinia Legal Counsel (FKH) | | | 20,000 | | | | 20,000 | | | | 20,000 | | 10,000 |
| Infinia Special Advisor (Fenwick) | | | 10,000 | | | | 10,000 | | | | 10,000 | | 5,000 |
| Atlas Legal Counsel (Brown Rudnick et al) | | | 175,000 | | | | 75,000 | | | | 50,000 | | |
| Atlas Legal Counsel (DJP) | | | 10,000 | | | | 10,000 | | | | 5,000 | | |
| Materials & Supplies | 42,000 | 32,000 | 41,000 | 73,000 | 24,000 | 7,000 | 20,000 | 15,000 | 2,000 | - | 3,000 | 18,000 | 2,000 |
| Subcontractors | 14,000 | 19,000 | 14,000 | 5,000 | 14,000 | 5,000 | 28,000 | 2,500 | 2,500 | 6,000 | 6,000 | 2,500 | 2,500 |
| Facilities | 26,000 | | | 26,000 | | | | 20,000 | | | | 10,000 | |
| Insurance | | | 30,000 | | | | 30,000 | | | | 30,000 | | |
| IT & Software Maintenance | 26,000 | | 2,000 | | 9,000 | 3,000 | 3,000 | 2,000 | 4,000 | 2,000 | 4,000 | 2,000 | 2,000 |
| Travel & Meals | | 15,000 | 18,000 | 6,000 | 6,000 | 4,000 | 4,000 | 4,000 | 4,000 | 1,000 | 1,000 | 1,000 | |
| Utilities | | 45,000 | | 3,000 | | | | 3,000 | | | | 5,000 | |
| Phone & Internet | | 12,000 | | 3,000 | 2,000 | 1,000 | | 3,000 | 2,000 | 1,000 | | 1,000 | 1,000 |
| Freight & Postage | 5,000 | 5,000 | 5,000 | 2,000 | 1,000 | 1,000 | 1,000 | | 500 | 500 | - | | |
| Property & Misc. Taxes | | | 5,000 | | 1,000 | 1,000 | 5,000 | | | 1,000 | 5,000 | | |
| Other | | | 5,000 | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | | | | |
| **Total Cash Outflows** | 113,000 | 322,000 | 350,000 | 3,396,000 | 58,000 | 246,000 | 222,000 | 273,000 | 17,000 | 191,000 | 149,000 | 255,500 | 95,000 |
| **Net Cash Flow** | (113,000) | (137,000) | - | - | - | - | - | - | - | - | - | - | 50,000 |
| **Ending Cash Balance** | $ 237,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 150,000 |

\* Payment amount is an estimate and is subject to change. The Debtor is awaiting payoff information from Atlas.

\*\* If there is no competing bid, a $200,000 minimum fee will be due, a $45,000 retainer was paid pre-petition. Otherwise this amount will be paid from proceeds of the sale and would not be included as part of this budget

**Power Play Solar 1**
*Cash Budget from September 16, 2013 - December 16, 2013*

| Week Beginning: | 9/16/2013 | 9/23/2013 | 9/30/2013 | 10/7/2013 | 10/14/2013 | 10/21/2013 | 10/28/2013 | 11/4/2013 | 11/11/2013 | 11/18/2013 | 11/25/2013 | 12/2/2013 | 12/9/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 18,900 | 18,900 | 18,900 | 13,900 | 13,900 | 13,900 | 13,900 | 10,400 | 10,400 | 10,400 | 10,400 | 5,400 | 5,400 |
| Cash Inflows (Income) | | | | | | | | | | | | | |
| Revenue - power generation | | | | | | | 1,500 | | | | | | |
| Total Cash Inflows | - | - | - | - | - | - | 1,500 | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| Cash Outflows (Expenses) | | | | | | | | | | | | | |
| Adminstrative Professional Fees | | | | | | | | | | | | | |
| PPS1 Legal Counsel (SW) | | | 5,000 | | | | 5,000 | | | | 5,000 | | 2,500 |
| Property & Misc Taxes | | | | | | | | | | | | | 250 |
| Total Cash Outflows | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 2,750 |
| | | | | | | | | | | | | | |
| Net Cash Flow | - | - | (5,000) | - | - | - | (3,500) | - | - | - | (5,000) | - | (2,750) |
| Ending Cash Balance | 18,900 | 18,900 | 13,900 | 13,900 | 13,900 | 13,900 | 10,400 | 10,400 | 10,400 | 10,400 | 5,400 | 5,400 | 2,650 |

Page 1 of 1

# EXHIBIT C

EXECUTION COPY

$5,318,500

**SENIOR, SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

dated as of September 17, 2013

among

INFINIA CORPORATION, as borrower,

THE GUARANTORS PARTY HERETO FROM TIME TO TIME, IF ANY,

THE LENDERS PARTY HERETO FROM TIME TO TIME,

and

ATLAS GLOBAL INVESTMENT MANAGEMENT LLP,

as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

Page

**ARTICLE 1      DEFINITIONS** ........................................................................................................ 2
    1.1    Defined Terms ......................................................................................................... 2
    1.2    Terms Generally. .................................................................................................. 16
    1.3    Accounting Terms; GAAP ................................................................................... 17
    1.4    Joint and Several Obligations; Designated Financial Officers. ........................... 17

**ARTICLE 2      THE CREDITS** ..................................................................................................... 17
    2.1    Term Loans ........................................................................................................... 17
    2.2    Borrowing Procedure ........................................................................................... 18
    2.3    Loans and Funding of Loans ............................................................................... 19
    2.4    Payments Generally; Pro Rata Treatment; Sharing of Set-Offs; Collection ....... 19
    2.5    Prepayment of Loans ........................................................................................... 21
    2.6    Fees ....................................................................................................................... 22
    2.7    Increased Costs ..................................................................................................... 22
    2.8    Taxes .................................................................................................................... 23
    2.9    Mitigation Obligations; Replacement of Lenders ............................................... 24
    2.10   Lenders' Evidence of Indebtedness ..................................................................... 25

**ARTICLE 3      GUARANTEE BY GUARANTORS** ....................................................................... 25
    3.1    The Guarantee ...................................................................................................... 25
    3.2    Obligations Unconditional ................................................................................... 25
    3.3    Reinstatement ....................................................................................................... 26
    3.4    Subrogation .......................................................................................................... 26
    3.5    Remedies ............................................................................................................... 26
    3.6    Instrument for the Payment of Money .................................................................. 26
    3.7    Continuing Guarantee .......................................................................................... 26
    3.8    General Limitation on Amount of Obligations Guaranteed .................................. 26

**ARTICLE 4      REPRESENTATIONS AND WARRANTIES** ......................................................... 27
    4.1    Organization; Powers ........................................................................................... 27
    4.2    Authorization; Enforceability .............................................................................. 27
    4.3    Governmental Approvals; No Conflicts .............................................................. 27
    4.4    Financial Condition; No Material Adverse Change .............................................. 27
    4.5    Properties .............................................................................................................. 28
    4.6    Litigation and Environmental Matters ................................................................. 29
    4.7    Compliance with Laws and Agreements .............................................................. 29
    4.8    Investment and Holding Company Status ............................................................ 29
    4.9    Taxes .................................................................................................................... 29
    4.10   ERISA .................................................................................................................. 29
    4.11   Disclosure ............................................................................................................ 30
    4.12   Capitalization ....................................................................................................... 30
    4.13   Subsidiaries .......................................................................................................... 30
    4.14   Material Indebtedness, Liens and Agreements .................................................... 31
    4.15   Federal Reserve Regulations ............................................................................... 31
    4.16   Legality; Validity and Enforceability of Liens ................................................... 31
    4.17   Force Majeure ...................................................................................................... 31
    4.18   Labor and Employment Matters .......................................................................... 31
    4.19   Bank Accounts ..................................................................................................... 32
    4.20   OFAC ................................................................................................................... 32
    4.21   Patriot Act ............................................................................................................ 32
    4.22   Trade Relations .................................................................................................... 32

**ARTICLE 5      CONDITIONS** ................................................................................... **33**
    5.1    Conditions to Funding of the Closing Date Term Loan Advance and the Closing ..................... 33
    5.2    Conditions to each Term Loan ............................................................................. 35

**ARTICLE 6      AFFIRMATIVE COVENANTS** ...................................................... **36**
    6.1    Financial Statements and Other Information ........................................................ 36
    6.2    Notices of Material Events .................................................................................. 36
    6.3    Existence; Conduct of Business ........................................................................... 37
    6.4    Payment of Obligations ...................................................................................... 37
    6.5    Maintenance of Properties; Insurance .................................................................. 37
    6.6    Books and Records; Inspection Rights ................................................................. 38
    6.7    Fiscal Year ........................................................................................................ 38
    6.8    Compliance with Laws ....................................................................................... 38
    6.9    Use of Proceeds ................................................................................................. 38
    6.10   Certain Obligations Respecting Subsidiaries ....................................................... 38
    6.11   ERISA ............................................................................................................... 39
    6.12   Environmental Matters; Reporting ...................................................................... 39
    6.13   Matters Relating to Additional Real Property Collateral ....................................... 39
    6.14   Cash Deposits; Bank Accounts and Securities Accounts ....................................... 40
    6.15   Compliance with Budget; Budget Reporting; Carve-Out ....................................... 40
    6.16   Minimum Cash Balance] ..................................................................................... 41
    6.17   Certain Deliverables .......................................................................................... 41
    6.18   Additional Deliverables ...................................................................................... 41
    6.19   Cooperation with Advisors ................................................................................. 42
    6.20   Sale Transaction ................................................................................................ 42

**ARTICLE 7      NEGATIVE COVENANTS** .............................................................. **43**
    7.1    Indebtedness ...................................................................................................... 43
    7.2    Liens ................................................................................................................. 44
    7.3    Contingent Liabilities ........................................................................................ 45
    7.4    Fundamental Changes; Asset Sales ..................................................................... 46
    7.5    Investments; Hedging Agreements; Subsidiary Cash ............................................ 47
    7.6    Restricted Junior Payments ................................................................................. 48
    7.7    Transactions with Affiliates ................................................................................ 48
    7.8    Restrictive Agreements ...................................................................................... 48
    7.9    Sale-Leaseback Transactions .............................................................................. 49
    7.10   Intentionally Omitted ......................................................................................... 49
    7.11   Lines of Business ............................................................................................... 49
    7.12   Other Indebtedness ............................................................................................ 49
    7.13   Modifications of Certain Documents and Financing Orders ................................... 49
    7.14   Critical Vendor and Other Payments ................................................................... 50
    7.15   Pre-Petition Indebtedness ................................................................................... 50

**ARTICLE 8      EVENTS OF DEFAULT** .................................................................... **50**
    8.1    Events of Default ............................................................................................... 50

**ARTICLE 9      THE AGENT** ....................................................................................... **54**
    9.1    Appointment and Authorization .......................................................................... 54
    9.2    Agent's Rights as Lender .................................................................................... 54
    9.3    Duties As Expressly Stated ................................................................................. 54
    9.4    Reliance By Agent ............................................................................................. 55
    9.5    Action Through Sub-Agents ............................................................................... 55
    9.6    Resignation of Agent and Appointment of Successor Agent ................................. 55
    9.7    Lenders' Independent Decisions .......................................................................... 56
    9.8    Indemnification .................................................................................................. 56
    9.9    Consents Under Other Loan Documents ............................................................. 56

**ARTICLE 10   MISCELLANEOUS** ................................................................................................ 57
    10.1    Notices ................................................................................................................ 57
    10.2    Waivers; Amendments; Voting Rights ............................................................... 57
    10.3    Expenses; Indemnity; Damage Waiver ............................................................... 58
    10.4    Successors and Assigns ...................................................................................... 59
    10.5    Survival ............................................................................................................... 60
    10.6    Counterparts; Integration; References to Agreement; Effectiveness .................. 61
    10.7    Severability ........................................................................................................ 61
    10.8    Right of Setoff ................................................................................................... 61
    10.9    Subordination by Credit Parties ......................................................................... 62
    10.10   Governing Law; Jurisdiction; Consent to Service of Process ............................ 62
    10.11   Waiver of Jury Trial ........................................................................................... 62
    10.12   Headings ............................................................................................................. 63
    10.13   Confidentiality .................................................................................................... 63
    10.14   Interest Rate Limitation ...................................................................................... 63
    10.15   Obligations Absolute .......................................................................................... 63
    10.16   Parties including the Trustees; Bankruptcy Court Proceedings .......................... 64

## SCHEDULES & EXHIBITS

**Schedules:**

| | |
|---|---|
| Schedule 1.1 | Principals |
| Schedule 2.1 | Lenders and Commitments |
| Schedule 4.4(b) | Material Adverse Change Exceptions To Specified Financial Statements |
| Schedule 4.5 | Properties; Registered Proprietary Rights; Real Property Assets |
| Schedule 4.6 | Litigation and Environmental Matters |
| Schedule 4.12 | Capitalization |
| Schedule 4.13 | Subsidiaries |
| Schedule 4.14 | Material Indebtedness, Liens and Agreements |
| Schedule 7.1 | Existing Indebtedness |
| Schedule 7.7 | Transactions with Affiliates |
| Schedule 7.8 | Restrictive Agreements |

**Exhibits:**

| | |
|---|---|
| Exhibit 1 | Form of Borrowing Request |
| Exhibit 6.15 | Budget |
| Exhibit A | Form of Term Note |
| Exhibit B-1 | Form of Pledge and Security Agreement |
| Exhibit B-2 | Form of Patent Security Agreement |
| Exhibit B-3 | Form of Trademark Security Agreement |
| Exhibit C | Form of Section 6.1 Compliance Certificate |
| Exhibit D | Form of Budget Compliance Certificate |

# SENIOR, SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS SENIOR, SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of September 17, 2013 (this "Agreement") is by and among INFINIA CORPORATION, a Delaware corporation, as borrower (the "Borrower"), THE GUARANTORS FROM TIME TO TIME PARTY HERETO, IF ANY, THE LENDERS FROM TIME TO TIME PARTY HERETO, and ATLAS GLOBAL INVESTMENT MANAGEMENT LLP, as Administrative Agent and Collateral Agent.

  **A.** On September 17, 2013 (the "Petition Date"), the Borrower and its wholly owned subsidiary, PowerPlay Solar I, LLC, a Delaware limited liability company ("PowerPlay") (the Borrower and PowerPlay, each a "Debtor" and, collectively, the "Debtors"), commenced Chapter 11 Case Nos. 13-_____(__) and 13-_____(__) (collectively, the "Chapter 11 Case") by filing voluntary petitions for reorganization under Chapter 11, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court").

  **B.** From and after the Petition Date, Debtors have continued to operate their businesses and manage their properties as debtors and a debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

  **C.** Prior to the date of this Agreement, Atlas Global Asset Holdings LP (in such capacity, "Pre-Petition Lender") provided financing to the Borrower pursuant to that certain Credit Agreement dated as of July 26, 2013, between Borrower, as borrower, and the Pre-Petition Lender, as lender (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "Pre-Petition Credit Agreement").

  **D.** The Borrower has requested that the Lenders provide a senior, secured, super priority debtor-in-possession credit facility to the Borrower in an aggregate principal amount of $5,318,500: (i) to fund the working capital requirements and other financing needs of Borrower during the pendency of the Chapter 11 Case; (ii) upon entry of the Final Order (as defined herein), to repay in full certain existing Indebtedness (as defined herein); and (iii) to be otherwise used in accordance with Section 6.9 of this Agreement.

  **E.** The Lenders are willing to provide such financing subject to the terms and conditions hereof, including, without limitation, that: (i) upon entry of the Final Order a portion of such new loans are used to pay off and fully satisfy the loans and other obligations outstanding under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents (as defined herein); and (ii) upon entry of the Final Order (as defined herein), the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents (as defined in the Pre-Petition Credit Agreement) shall be terminated and released, except for provisions therein that survive repayment of obligations, termination and release in accordance with their respective terms.

  **NOW, THEREFORE,** in consideration of the foregoing, and for other good and valuable consideration, the receipt, sufficient and adequacy of which hereby are acknowledged, the parties hereto hereby agree as follows:

# ARTICLE 1

## Definitions

**1.1     Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"363 Sale" means a sale of all or substantially all of the assets of the Borrower pursuant to Section 363 of the Bankruptcy Code.

"Accepted Bid" has the meaning assigned to such term in Section 6.20.

"Advisors" shall mean outside legal counsel (including local counsel), auditors, accountants, consultants, appraisers and/or other advisors of the Agent.

"Affiliate" means, with respect to a specified Person, another Person that Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means Atlas Global Investment Management LLP in its capacities as administrative agent and collateral agent for the Lenders hereunder.

"Applicable Percentage" means, with respect to any Lender, the percentage of the total Term Loan Commitments hereunder represented by the aggregate amount of such Lender's Term Loan Commitments hereunder.

"Applicable Recipient" has the meaning assigned to such term in Section 2.4(d).

"Approved Fund" means, with respect to any Lender that is a fund that invests in commercial loans, any other fund that invests in commercial loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.4), and accepted by the Agent, in the form approved by the Agent which complies with the provisions of Section 10.4.

"Atlas" means Atlas Global Investment Management LLP or Atlas Global Asset Holdings LP as the context may require.

"Availability Period" means the period from and including the Closing Date to but excluding the earlier of: (a) the Term Loan Maturity Date; and (b) the date of termination of the Commitments of all Lenders as set forth in this Agreement.

"Avoidance Actions" shall mean any and all claims or causes of action arising under Chapter 5 (other than Section 506(c) or Section 724(a)) of the Bankruptcy Code to avoid transfers, preserve or transfer liens or otherwise recover property of the estate and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.  "Avoidance Actions" do not include claims or causes of action pursuant to Section 549 of the Bankruptcy Code and the proceeds thereof, to the extent the transfer avoided was of an asset otherwise constituting Collateral.

"Bankruptcy Code" has the meaning assigned to such term in the preamble hereof.

- 2 -

"Bankruptcy Court" has the meaning assigned to such term in the preamble hereof.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the introductory paragraph hereof.

"Borrowing" means, individually and collectively, as the context may require, each advance of a portion of the Term Loans hereunder.

"Borrowing Availability" means (a) prior to the entry of a Final Order, the Interim Amount, or (b) upon and after entry of the Final Order, the Commitments then in effect; less, the sum of (i) in the case of each of clause (a) and (b), the Loan Exposure plus (ii) in the case of clause (b) the Carve-Out Reserve, subject to any limitations contained in the Financing Orders.

"Borrowing Request" shall mean a request by the Borrower in accordance with the terms of Section 2.2 and substantially in the form of Exhibit 1, or such other form as shall be approved by the Agent.

"Budget" means that certain statement of sources and uses of the Credit Parties, broken down by week, commencing with the week ended as of September 20, 2013, including the anticipated uses of the facility for such period, which is attached hereto as Exhibit 6.15 in form and substance satisfactory to the Agent.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning assigned to such term in the Interim Order or, upon entry of the Final Order, in the Final Order, and for the avoidance of doubt, the Carve-Out includes the Wind-Down Amount.

"Carve-Out Reserve" means, as of any date of determination, a reserve in an amount equal to the unpaid portion of the Carve-Out.

"Casualty Event" means, with respect to any Property of any Person, any loss of or damage to, or any condemnation or other taking of, such Property for which such Person or any of its Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation.

"Change in Law" means (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change after the Closing Date in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority or (c) compliance by any Lender (or, for purposes of Section 2.7(b), by any lending office of the Lender, by an Affiliate of the Lender or by the Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law), other than a request or directive to comply with any law, rule or regulation in effect on the Closing Date, of any Governmental Authority made or issued after the Closing Date.

"Change of Control" means (a) the consummation of any transaction (including without limitation, any merger) the result of which is that any "person" (as such term is used in Rule 13(d)-5(b)(1) under the Exchange Act), other than the Principals, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-

5 under the Exchange Act) of more than 50% of the outstanding Total Voting Power of Borrower on a fully diluted basis; *provided, however,* that no Person shall be deemed to beneficially own securities in Borrower beneficially owned by other parties to the Shareholders Agreement except to the extent of its pecuniary interest therein; or (b) any event, transaction or occurrence as a result of which a majority of the seats (other than vacant seats) on the board of directors of Borrower shall be occupied by Persons who were neither (i) nominated by the board of directors of such Credit Party, (ii) appointed by directors so nominated nor (iii) designated by one or more of the Principals; or (c) the failure of the Borrower, to own directly or indirectly through one or more Subsidiaries, 100% of the outstanding capital stock or other equity interests of each of the other Credit Parties; or (d) the sale of all or substantially all of the business or assets of any Credit Party (other than any such sale permitted by Section 7.4(c)(i) through (ii) or any other sale approved by the Required Lenders).

"Chapter 11 Case" has the meaning assigned to such term in the preamble hereof.

"Closing Date" means the date during which the Effective Time shall occur as specified by the Agent. For the avoidance of doubt, the Closing Date shall not occur prior to the time when the Interim Order has been entered by the Bankruptcy Court, in form and substance satisfactory to the Agent, as more fully described in Section 5.1.

"Closing Date Term Loan Advance" has means the portion of the Term Loans funded on the Closing Date.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means, collectively, all of the Property in which Liens are purported to be granted under the Security Documents as security for the Obligations of the Credit Parties hereunder, and for the avoidance of doubt, shall include all real and personal property of the Borrower now owned or hereafter acquired and all other property of whatever kind and nature, in each case, that is pledged as collateral under any Security Document, any Financing Order or any other order of the Bankruptcy Court in the Chapter 11 Cases.

"Commitments" means (a) for all Lenders, the aggregate Term Loan Commitments of all Lenders, and (b) for each Lender, such Lender's Term Loan Commitment.

"Committee" means the official committee of unsecured creditors formed in the Chapter 11 Case.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. A Person who owns or holds capital stock, beneficial interests or other securities representing ten percent (10%) or more of the Total Voting Power of another Person shall be deemed, for purposes of this Agreement, to "control" such other Person.

"Copyrights" means all copyrights, whether statutory or common law, owned by or assigned to the Credit Parties, and all exclusive and nonexclusive licenses to the Credit Parties from third parties or rights to use copyrights owned by such third parties, including the registrations, applications and licenses listed on Schedule 4.5, along with any and all (a) renewals and extensions thereof, (b) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (c) rights to sue for past, present and future infringements thereof, and (d) foreign copyrights and any other rights corresponding thereto throughout the world.

"Credit Parties" the Borrower and the Guarantors.

"Debtor" and "Debtors" each has the meaning assigned to such term in the preamble hereof.

- 4 -

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Designated Financial Officer" means any person who is the chief executive officer, chief financial officer, treasurer or president of Borrower and also holds one or more of the following offices with each of the other Credit Parties: chief executive officer, chief financial officer, chief operating officer or treasurer.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 4.6.

"Disposition" means any sale, assignment, transfer or other disposition of any property (whether now owned or hereafter acquired) by any Credit Party to any Person excluding (a) the granting of Liens permitted hereunder and (b) any sale, assignment, transfer or other disposition of (i) any property sold or disposed of in the ordinary course of business and on ordinary business terms, (ii) any property no longer used or useful in the business of the Credit Parties and (iii) any Collateral pursuant to an exercise of remedies by the Agent hereunder or under any other Loan Document.

"Domestic Credit Party" means a Credit Party organized under the laws of one of the United States and having its chief executive office and principal place of business in the United States.

"Domestic Subsidiary" means any Subsidiary of Borrower other than a Foreign Subsidiary.

"Effect of Bankruptcy" means, with respect to any obligation, contract or agreement to which any of the Credit Parties is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Case, as applicable (including the implementation of any stay), or the rejection of any such obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"Effective Time" means the time specified in a written notice from the Agent when the conditions specified in Article 5.1 are satisfied (or waived in accordance with Section 10.2).

"Environmental Laws" means all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Credit Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Rights" means, with respect to any Person, any subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including any stockholders' or voting trust agreements) for the issuance or sale of, or securities convertible into, any additional shares of capital stock of any class, or partnership or other ownership interests of any type in, such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Credit Parties, is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code. Notwithstanding the foregoing, for purposes of any liability related to a Multiemployer Plan under Title IV of ERISA, the term "ERISA Affiliate" means any trade or business that, together with the Credit Parties, is treated as a single employer within the meaning of Section 4001(b) of ERISA.

"ERISA Event" means (a) a "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder for which the notice requirement has not been waived with respect to any Pension Plan, (b) the existence with respect to any Pension Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, (d) the incurrence by any Credit Party or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, (e) the receipt by any Credit Party or any ERISA Affiliate from the PBGC or plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan, (f) the receipt by any Credit Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Credit Party or any ERISA Affiliate of any notice of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or (g) the incurrence by any Credit Party, Subsidiary or Affiliate of any liability with respect to any Foreign Plan as a result of any noncompliance with the terms of such Foreign Plan, the failure to satisfy any applicable funding requirements, or any violation of applicable foreign law.

"Event of Default" has the meaning assigned to such term in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any Obligation hereunder, (a) income, net worth or franchise taxes imposed on (or measured by) its net income or net worth by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its lending office is located or in which it is taxable solely on account of some connection other than the execution, delivery or performance of this Agreement or the receipt of income hereunder, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement or is attributable to such Foreign Lender's failure or inability to comply with Section 2.8(e), except to the extent that such Foreign Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to Section 2.8(a).

"Existing Debt" means (i) Indebtedness of the Credit Parties existing as of the Effective Time which is being repaid in full with the proceeds of the Loans made by the Lenders upon entry of the Final Order and (ii) Indebtedness of the Credit Parties existing as of the Effective Time which is permitted to remain outstanding after the Effective Time under Section 7.1 and is listed on Schedule 7.1.

"Extraordinary Receipts" means any cash received by any Credit Party not in the ordinary course of business, including without limitation (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (including key man life insurance and business interruption insurance, but excluding proceeds of Casualty Events), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) indemnity payments and (f) any purchase price adjustment received in connection with any purchase agreement to the extent not needed to reimburse the Credit Parties for any reasonable and customary out-of-pockets costs and expenses previously incurred by the Credit Parties with respect to which such purchase price adjustment was received.

"FAC Regulations" has the meaning assigned to such term in Section 4.21.

"FCPA" has the meaning assigned to such term in Section 4.21.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate per annum equal, for each day during such period, to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal Funds brokers of recognized standing selected by it.

"Final Auction" has the meaning assigned to such term in Section 6.20.

"Final Order" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a formal hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be substantially in the form of the Interim Order and shall otherwise be reasonably satisfactory in form and substance to the Agent, and from which no appeal or motion to reconsider has been timely filed (or any such appeal or motion has been conclusively resolved in favor of the Borrower) and such order in any respect is not the subject of a stay or injunction pending appeal (unless the Agent and the Required Lenders waive such requirement), together with all extensions, modifications, amendments or supplements thereto, in form and substance reasonably satisfactory to the Agent, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, grant Liens under this Agreement and the other Loan Documents, as the case may be, approves this Agreement and the other Loan Documents and grants Superpriority Claims to the Agent and Lenders.

"Financing Orders" means the Interim Order, the Final Order and any amendment, modification or supplement thereto in form and substance reasonably acceptable to the Agent.

"FIRREA" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Day Orders" means, the First Day Orders, as amended, restated supplemented or otherwise modified prior to the date hereof, in form and substance reasonably acceptable to the Agent.

"First Priority" means, with respect to any Lien purported to be created in any Collateral pursuant to any Loan Document, that such Lien is the most senior Lien to which such Collateral is subject.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Plan" means any employee pension, deferred compensation, or other retirement plan, program, or arrangement (other than a Pension Plan) contributed to or maintained by any Credit Party, Subsidiary or Affiliate with respect to any employees employed outside of the United States.

"Foreign Subsidiary" means any Subsidiary of Borrower organized in a jurisdiction other than the United States of America, any state thereof or the District of Columbia.

"GAAP" means generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory

body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means a guarantee, an endorsement, a contingent agreement to purchase or to furnish funds for the payment or maintenance of, or otherwise to be or become contingently liable under or with respect to, the Indebtedness, other obligations, net worth, working capital or earnings of any Person, or a guarantee of the payment of dividends or other distributions upon the stock or equity interests of any Person, or an agreement to purchase, sell or lease (as lessee or lessor) property, products, materials, supplies or services primarily for the purpose of enabling a debtor to make payment of such debtor's obligations or an agreement to assure a creditor against loss, and including causing a bank or other financial institution to issue a letter of credit or other similar instrument for the benefit of another Person, but excluding endorsements for collection or deposit in the ordinary course of business. The terms "Guarantee" and "Guaranteed" used as a verb shall have a correlative meaning. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligations in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).

"Guarantor" means any PowerPlay and any other Subsidiary of Borrower which is formed and becomes a guarantor hereunder after the Effective Time and as to which all of the requirements set forth in Section 6.10 have been satisfied.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature, in each case regulated or subject to regulation pursuant to any Environmental Law.

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Indebtedness" means, for any Person, without duplication: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, advance, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than (i) trade accounts payable (other than for borrowed money) arising in the ordinary course of business, and (ii) accrued expenses and deferred taxes incurred and paid in the ordinary course of business; (c) Capital Lease Obligations of such Person; (d) obligations of such Person in respect of Hedging Agreements; (e) obligations of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (f) Indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; and (g) Indebtedness of others Guaranteed by such Person. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means all Taxes other than (a) Excluded Taxes and Other Taxes and (b) amounts constituting penalties or interest imposed with respect to Excluded Taxes or Other Taxes.

"Infinia Technology" means Infinia Technology Corporation, a Delaware corporation.

"Interim Amount" means the maximum amount of Term Loans permitted by the Interim Order, but not to exceed the sum of the expenses incurred by the Borrower in connection with the Transactions, including expenses required to be paid on or prior to the Closing Date pursuant to the Loan Documents, in each case, subject to the Budget.

"Interim Order" shall mean collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which, among other matters, but not by way of limitation, grants a Superpriority Claim to Lenders, authorizes, on an interim basis, the Borrower to execute and perform under the terms of this Agreement and the other Loan Documents and is not subject to any stay or injunction or otherwise subject to reversal on appeal as to any Loans funded hereunder, together with all extensions, modifications, amendments and supplements thereto, in form and substance reasonably satisfactory to the Agent.

"Intercompany Indebtedness" has the meaning assigned to such term in Section 10.9.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of capital stock, bonds, notes, debentures, partnership, limited liability company or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business, *provided* that in no event shall the term of any such inventory or supply advance, loan or extension of credit exceed 180 days); or (c) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"ITC Management" means ITC Management Company 2011 Inc., a Delaware corporation.

"Knowledge" means actual knowledge of the Credit Parties' officers and directors, after diligent investigation.

"Landlord's Waiver and Consent" means, with respect to any Leasehold Property, if applicable, a letter, certificate or other instrument in writing from the lessor under the related lease, in form approved by the Agent in its sole discretion.

"Leasehold Property" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by the Agent in its sole discretion as not being required to be included in the Collateral and not being of material importance to the business or operations of the Credit Parties.

"Lenders" means (a) the Persons listed on Schedule 2.1 on the Closing Date; and/or (b) any other Person that becomes a party as a "Lender" hereto by executing an Assignment and Acceptance, in each case (a) and (b), other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), other than an operating lease, relating to such

- 9 -

asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, the Term Notes, the Security Documents, the Financing Orders and any other instruments, certificates or documents executed and delivered or to be delivered from time to time pursuant to this Agreement, as the same may be supplemented and amended from time to time in accordance with their respective terms.

"Loan Exposure" shall mean, (a) with respect to any Lender at any time, the aggregate principal amount at such time of all outstanding Term Loans of such Lender and (b) with respect to the Lenders, collectively, at any time, the aggregate principal amount at any such time of all outstanding Term Loans of the Lenders. The outstanding Term Loans referenced herein shall include any amounts applied by Lenders to refinance the loans and other obligations under the Pre-Petition Credit Agreement.

"Loans" means, individually and collectively, the Term Loans.

"Material Adverse Effect" means, any event, circumstance, happening or condition, which has resulted or is reasonably likely to result in a material adverse effect on (a) the business, assets, condition (financial or otherwise) or results of operations of (i) the Credit Parties taken as a whole, or (ii) the Borrower, individually, (b) the ability of any Credit Parties, taken as a whole, to pay or perform any of their obligations under this Agreement or the other Loan Documents, (c) the validity or enforceability of (i) this Agreement or any Security Document, individually, or (ii) the Loan Documents, taken as a whole, (d) any of the rights of or benefits available to the Agent or Lenders under this Agreement or any of the other Loan Documents or (e) the validity, perfection or priority of the Liens on Collateral having a fair market value in excess of $50,000 in favor of the Agent pursuant to the Loan Documents; provided, however, that a Material Adverse Effect shall not be deemed to exist as a result of the Chapter 11 Case or the Effect of Bankruptcy.

"Material Indebtedness" means Indebtedness (other than the Loans,), including obligations in respect of one or more Hedging Agreements, in an aggregate principal amount exceeding $50,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of any Person in respect of a Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Person would be required to pay if such Hedging Agreement were terminated at such time.

"Material Leasehold Property" means (a) the Leasehold Property of the Credit Parties on the Closing Date and (b) any Leasehold Property acquired by the Credit Parties after the Closing Date (i) having a fair market value in excess of $100,000 or (ii) at which the Credit Parties maintain any books and records or Collateral with a fair market value in excess of $100,000 in the aggregate or which is otherwise reasonably determined by the Agent or the Required Lenders to be of material importance to the operations of the Credit Parties.

"Material Owned Property" means any real property owned by any Credit Party that (a) has a fair market value in excess of $100,000 or (b) is reasonably determined by the Agent or the Required Lenders to be of material importance to the operations of the Credit Parties.

"Material Rental Obligations" means obligations of the Credit Parties to pay rent under any one or more operating leases with respect to any Material Leasehold Property.

"Mortgage" means a security instrument (whether designated as a deed of trust or a mortgage, leasehold mortgage, assignment of leases and rents or by any similar title) executed and delivered by any Credit Party to the Agent in form and substance satisfactory to the Agent, in its sole discretion, in order to grant to the Agent, for the benefit of the Lenders, a Lien on any Real Property Asset, in each case with such

- 10 -

changes thereto as may be recommended by the Agent's local counsel based on local laws or customary local practices.

"Mortgaged Property" means any Material Owned Property or Material Leasehold Property that is now owned or leased, or hereinafter acquired, by the Credit Parties, which the Agent or the Required Lenders reasonably determine to acquire a Mortgage on following the Closing Date.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Payments" means,

(a)     with respect to any Casualty Event, the aggregate amount of cash proceeds of insurance, condemnation awards and other compensation received by the Credit Parties in respect of such Casualty Event net of (i) reasonable and customary out-of-pocket expenses incurred by the Credit Parties in connection therewith and (ii) contractually required repayments of Indebtedness to the extent secured by a Lien on such property which is senior to the Lien held by the Agent for the benefit of the Lenders and (iii) any income and transfer taxes payable by the Credit Parties in respect of such Casualty Event;

(b)     with respect to any Disposition, the aggregate amount of all cash payments received by the Credit Parties directly or indirectly in connection with such Disposition, whether at the time of such Disposition or after such Disposition under deferred payment arrangements or Investments entered into or received in connection with such Disposition, net of (i) the amount of any reasonable and customary legal, title, transfer and recording tax expenses, commissions and other fees and reasonable and customary out-of-pocket expenses payable by the Credit Parties in connection therewith, (ii) any Federal, state and local income or other Taxes estimated to be payable by the Credit Parties as a result thereof, (iii) any repayments by the Credit Parties of Indebtedness to the extent that such Indebtedness is secured by a Lien on the property that is the subject of such Disposition, such Lien is senior to the Lien held by the Agent on such property and the transferee of (or holder of a Lien on) such property requires that such Indebtedness be repaid as a condition to the purchase of such property, and (iv) any repayments by the Credit Parties to minority stockholders if and to the extent permitted hereby; and

(c)     with respect to any incurrence of Indebtedness, offering of equity securities or consummation of any 363 Sale or Reorganization Plan, the aggregate amount of all cash proceeds received by the Credit Parties therefrom less all reasonable and customary legal, underwriting and similar fees and reasonable and customary out-of-pocket expenses incurred in connection therewith.

"Obligations" means (a) the aggregate outstanding principal balance of and all interest on the Loans made by the Lenders to the Borrower (including any interest accruing after the commencement of any proceeding by or against the Borrower under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal, state or foreign bankruptcy, insolvency or other similar law, and any other interest that would have accrued but for the commencement of such proceeding, whether or not any such interest is allowed as a claim enforceable against the Borrower in any such proceeding), and (b) all fees, costs, charges, expenses and other obligations from time to time owing to the Agent, the Lenders or their respective Affiliates by the Credit Parties hereunder or under any other Loan Document, whether such obligations are now existing or hereafter arising or incurred, due or to become due, direct or indirect or absolute or contingent.

"OFAC Regulations" has the meaning assigned to such term in Section 4.20.

"Origination Fee" has the meaning assigned to such term in Section 2.6.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and the other Loan Documents, *provided* that there shall be excluded from "Other Taxes" all Excluded Taxes.

"Patents" means all patents issued or assigned to and all patent applications made by the Credit Parties and all exclusive and nonexclusive licenses to the Credit Parties from third parties or rights to use patents owned by such third parties, including the patents, patent applications and licenses listed on Schedule 4.5, along with any and all (a) inventions and improvements described and claimed therein, (b) reissues, divisions, continuations, extensions and continuations-in-part thereof, (c) income, royalties, damages, claims and payments now and hereafter due and/or payable under and with respect thereto, including damages and payments for past or future infringements thereof, (d) rights to sue for past, present and future infringements thereof, and (e) any other rights corresponding thereto throughout the world.

"Patent Security Agreement" means the Patent Security Agreement dated as of the Closing Date, substantially in the form of Exhibit B-2, among the Agent and the Credit Parties, as amended, supplemented or otherwise modified from time to time.

"Pension Plan" means any Plan that is a defined benefit pension plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Credit Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Petition Date" has the meaning assigned to such term in the preamble hereof.

"Permitted Investments" means:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from Standard and Poor's Ratings Service or from Moody's Investors Service, Inc.;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $250,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)     advances, loans and extensions of credit to any director, officer or employee of the Credit Parties, if the aggregate outstanding amount of all such advances, loans and extensions of credit (excluding travel advances in the ordinary course of business) does not at any time exceed $10,000;

(f)     investments in money market mutual funds that are rated AAA by Standard & Poor's Rating Service;

- 12 -

(g)      trade credit extended by the Borrower and its Subsidiaries in the ordinary course of business, on ordinary business terms and consistent with past practice; and

(h)      the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

"Permitted Liens" has the meaning set forth in Section 7.2.

"Permitted Variances" means that the Credit Parties may have a variance of the Budget which would have an adverse financial effect on the Credit Parties, individually or in the aggregate, so long as (a) actual cash receipts are not less than ninety percent (90%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly and on a cumulative basis commencing with the week ended September 20, 2013; or (b) actual cash disbursements that are not greater than one hundred and ten percent (110%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly and on a cumulative basis commencing with the week ended September 20, 2013, *provided* that savings accrued during any applicable period may be utilized in future periods.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA in which any Credit Party or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA, including, but not limited to, any Pension Plan or Multiemployer Plan.

"Post-Default Rate" means, a rate per annum equal to seven percent (7%) per annum.

"PowerPlay" has the meaning assigned to such term in the preamble hereof.

"Preferred Stock" means the shares of Series 1 Preferred Stock of the Borrower, having a par value of $0.001 per share.

"Pre-Petition" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the preamble hereof.

"Pre-Petition Lender" has the meaning assigned to such term in the preamble hereof.

"Pre-Petition Loan Documents" means the Loan Documents (as defined in the Pre-Petition Credit Agreement).

"Principals" means (a) those Persons listed on Schedule 1.1 and any of their Affiliates (together, the "Permitted Holders") and (b) any group constituting a person (as such term is used in Rule 13(d)-5(b)(1) under the Exchange Act) the membership of which includes any Permitted Holder, *provided* that the Total Voting Power of Borrower on a fully diluted basis represented by the equity interests in Borrower beneficially owned by such Permitted Holder is at least 50.1% of the Total Voting Power of Borrower on a fully diluted basis represented by the equity interests in Borrower beneficially owned by all members of such group.

"Property" means any interest of any kind in property or assets, whether real, personal or mixed, and whether tangible or intangible, including patents, trademarks, copyrights and other intellectual property rights.

"Qualified Equity Interest" means any equity interest of an issuer other than an equity interest that is mandatorily redeemable or purchasable, in whole or in part, at the option of the holder, pursuant to a sinking fund obligation or otherwise, or exchangeable or convertible into debt securities of the issuer thereof or which

- 13 -

entitles the holder thereof to dividend, interest or other payments, in each case, prior to the date which is 180 days after payment in full of all Obligations of the Credit Parties under the Loan Documents.

"Real Property Asset" means, at any time of determination, any and all real property owned or leased by the Credit Parties and the Subsidiaries of the Credit Parties.

"Register" has the meaning assigned to such term in Section 10.4(d).

"Registered Proprietary Rights" has the meaning assigned to such term in Section 4.5(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Reorganization Plan" shall mean a plan of reorganization in the Chapter 11 Case of the Debtors.

"Required Lenders" means, at any time or from time to time, one or more Lenders having Loans and unused Commitments representing at least 51% of the sum of the aggregate Loans and unused Commitments at such time.

"Restricted Junior Payment" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of, or other equity interest in, any Credit Party or any Subsidiary now or hereafter outstanding, except a dividend payable solely in shares of common stock or other equity interests, (ii) any redemption, put, retirement, cancellation, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of, or other equity interest in or Equity Right in respect of, any Credit Party or any Subsidiary now or hereafter outstanding, (iii) any payment made to retire, to cancel, or to obtain the surrender of or in connection with the exercise of any put right with respect to, any outstanding warrants, options or other rights to acquire shares of any class of stock of, or other equity interest in or Equity Right in respect of, any Credit Party or any Subsidiary, (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption purchase, retirement, defeasance (including economic or legal defeasance), sinking fund or similar payment with respect to, any Subordinated Indebtedness, and (v) any payment made to any Affiliate of any Credit Party or any Subsidiary, in each case, in respect of management, consulting or other similar services provided to any Credit Party or any Subsidiary.

"Restrictive Agreements" has the meaning assigned to such term in Section 4.13(b).

"Sale Transaction" shall have the meaning assigned to such term in Section 6.20.

"Sale Benchmarks" shall have the meaning assigned to such term in Section 6.20.

"Security Agreement" means the Pledge and Security Agreement dated as of the Closing Date, substantially in the form of Exhibit B-1, among the Agent and the Credit Parties, as amended, supplemented or otherwise modified from time to time.

"Security Documents" means, collectively, the Security Agreement, the Patent Security Agreement, the Trademark Security Agreement, the Mortgages, the Financing Orders, and each other security agreement, pledge agreement, mortgage or other instrument or agreement executed and delivered to or in favor of the Agent to secure any of the Obligations.

"Shareholders Agreement" means the Voting Agreement, dated as of September 10, 2012 or other similar agreement among Borrower and the Investors as defined therein, as the same may be amended or amended and restated from time to time.

"Stalking Horse APA" means that certain Asset Purchase Agreement by and among Stalking Horse Bidder and the Credit Parties dated as of September 17, 2013, as the same may be amended, restated, supplemented or otherwise modified in accordance with its terms.

"Stalking Horse Bidder" means Atlas Global Investment Management LLP.

"Subordination Agreement" means a subordination agreement between the Agent and any lenders providing any Subordinated Indebtedness to the Credit Parties permitted by Section 7.1(h) in form and substance satisfactory to the Agent and the Required Lenders.

"Subordinated Indebtedness" means any unsecured Indebtedness of the Credit Parties incurred after the Closing Date with the consent of the Agent and the Required Lenders that by its terms (or by the terms of the instrument under which it is outstanding and to which appropriate reference is made in the instrument evidencing such Subordinated Indebtedness) is made subordinate and junior in right of payment to the Loans and to the other Obligations of the Credit Parties pursuant to a Subordination Agreement.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent and/or one or more subsidiaries of the parent.  References herein to "Subsidiaries" shall, unless the context requires otherwise, be deemed to be references to Subsidiaries of Borrower.

"Superpriority Claim" means a claim against any Debtor which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Termination Date" shall have the meaning assigned to such term in the Interim Order or any successor Financing Order.

"Term Loan Advance" means any extension of a portion of the Term Loans made after the Closing Date, and, upon the Termination Date, also an extension of a final portion of the Term Loan in an amount equal to the Carve-Out.

"Term Loan Commitments" means, during the Availability Period, (a) with respect to each Term Loan, as to any Lender, the aggregate commitment of such Lender to fund its pro rata share of such Term Loan, as set forth on Schedule 2.1; (b) as to all Lenders, the aggregate commitment of all Lenders to fund the Term Loans; and (c) as to all Lenders, the aggregate commitments of all Lenders to fund the Term Loans; in each case (a) through (c), as the same may be reduced, modified or terminated from time to time pursuant to this Agreement.  Subject to the Financing Orders, the aggregate amount of the Lenders' Term Loan Commitments is $5,318,500.

"Term Loan Maturity Date" means, in accordance with the terms of this Agreement, the earliest to occur of: (a) December 2, 2013; (b) the acceleration (whether automatic or by written notice) of any Obligations; and (c) the Termination Date.

"Term Loans" shall mean, individually and collectively as the context may require, the term loans evidenced by each Borrowing made by the Term Lenders to Borrower pursuant to this Agreement, and all obligations related thereto.

"Term Notes" means the promissory notes, substantially in the form of Exhibit A annexed hereto, issued by the Borrower in favor of the Lenders and evidencing the Term Loans pursuant to Section 2.10.

"Total Voting Power" means, with respect to any Person, the total number of votes which holders of securities having the ordinary power to vote, in the absence of contingencies, are entitled to cast in the election of directors of such Person.

"Trademarks" means all trademarks (including service marks), federal and state trademark registrations and applications made by the Credit Parties, common law trademarks and trade names owned by or assigned to the Credit Parties, all registrations and applications for the foregoing and all exclusive and nonexclusive licenses from third parties of the right to use trademarks of such third parties, including the registrations, applications, unregistered trademarks, service marks and licenses listed on Schedule 4.5, along with any and all (a) renewals thereof, (b) income, royalties, damages and payments now and hereafter due and/or payable with respect thereto, including damages, claims and payments for past or future infringements thereof, (c) rights to sue for past, present and future infringements thereof, and (d) foreign trademarks, trademark registrations, and trade name applications for any thereof and any other rights corresponding thereto throughout the world.

"Trademark Security Agreement" means the Trademark Security Agreement dated as of the Closing Date, substantially in the form of Exhibit B-3, among the Agent and the Credit Parties, as amended, supplemented or otherwise modified from time to time.

"Transactions" means, collectively, the various transactions occurring at or immediately after the Effective Time pursuant to the Loan Documents and the Chapter 11 Case, including: (a) the execution, delivery and performance of the Loan Documents, including without limitation, the incurrence of the Obligations hereunder; (b) the refinancing of the loans and other obligations outstanding under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents; and (c) the payment of all fees and expenses to be paid on or prior to the Effective Time and owing in connection with the foregoing.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"U.S. Dollars" or "$" refers to lawful money of the United States of America.

"Wind-Down Amount" has the meaning assigned to such term in the Interim Order or in any successor Financing Order, as applicable.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**1.2     Terms Generally.**  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any

- 16 -

reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

     **1.3**     **Accounting Terms; GAAP.** Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that, if the Borrower notifies the Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision shall have been amended in accordance herewith.

     **1.4**     **Joint and Several Obligations; Designated Financial Officers.**

     (a) All Obligations of the Credit Parties hereunder shall be joint and several. Any notice, certificate, request, waiver, consent or other action made, given or taken by any Credit Party shall bind all Credit Parties.

     (b) Each of the Credit Parties hereby authorizes each of the Designated Financial Officers to act as agent for all of the Credit Parties and to execute and deliver on behalf of any Credit Party such notices, requests, waivers, consents, certificates and other documents, and to take any and all actions required or permitted to be delivered or taken by the Credit Parties hereunder. The Credit Parties may replace any of the Designated Financial Officers or add any additional Designated Financial Officers by delivering written notice to the Agent specifying the names of each new Designated Financial Officer and the offices held by each such Person. The Credit Parties hereby agree that any such notices, requests, waivers, consents, certificates and other documents executed, delivered or sent by any Designated Financial Officer and any such actions taken by any Designated Financial Officer shall bind all Credit Parties.

**ARTICLE 2**

**The Credits**

     **2.1**     **Term Loans.**

     (a) <u>Term Loan</u>. Subject to the terms and conditions set forth herein, each Lender severally, and not jointly, agrees on and after the Closing Date and during the Availability Period to make Term Loans to the Borrower in dollars in an aggregate amount not to exceed, its Commitment; *provided* that in no event shall Term Loans be issued and outstanding hereunder on any date in excess of Borrowing Availability. The Term Loans are not a revolving credit facility and may not be drawn, repaid and redrawn, and payments of principal on the Term Loans shall permanently reduce the Term Loans. If at any time the then outstanding principal balance of the Loans exceeds Borrowing Availability, then the Borrower shall immediately prepay the outstanding Term Loans in an amount sufficient to eliminate such excess in accordance herewith.

     (b) <u>Interest on the Term Loans</u>. The outstanding principal amount of the Term Loans shall bear interest until paid in full at the rate of five percent (5.0%) per annum. Notwithstanding the foregoing: (i) any portion of the Term Loans which is not paid when due or within any applicable grace or cure period shall

- 17 -

automatically bear interest until paid in full at the Post-Default Rate; and (ii) in addition to and not in limitation of the foregoing, during the period when any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Term Loans shall automatically bear interest, after as well as before judgment, at the Post-Default Rate; in each case (i) and (ii), commencing on the date such Event of Default first occurred and ending on the date such Event of Default is cured or waived in accordance with the terms of this Agreement. Accrued interest on the outstanding principal balance of Term Loans shall be payable on each date that any portion of the principal of such Term Loan shall be payable hereunder and on the Term Loan Maturity Date; *provided* that interest accrued at the Post-Default Rate shall be payable on demand, subject to the terms of the Financing Orders. All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)  Repayment of the Term Loans.  The Borrower hereby unconditionally promises to pay to the Agent for the account of the Lenders the entire unpaid principal balance of the Term Loans and all accrued and unpaid interest, fees and charges thereon on the Term Loan Maturity Date without further application to or order of the Bankruptcy Court, subject to the terms of the Loan Documents and the Financing Orders.

(d)  No Discharge; Survival of Claims.  The Borrower agrees that: (i) the Obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan in the Chapter 11 Case (and the Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Agent and the Lenders pursuant to the Financing Orders and described in the Loan Documents and the Liens granted to the Agent pursuant to the Financing Orders and described in the Loan Documents shall not be affected in any manner by the entry of an order confirming a Reorganization Plan in the Chapter 11 Case.

(e)  Loan Accounts.  Each Lender shall maintain in accordance with its usual practice an account evidencing the indebtedness of the Borrower to such Lender in respect of the Term Loans made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. The Agent shall maintain accounts in which it shall record the amount of each Lender's portion of the Term Loans made hereunder, the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and the amount of any sum received by the Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries made in the account maintained by the Agent pursuant to this Section 2.1(e) shall be prima facie evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of the Agent to maintain such account or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans in accordance with the terms of this Agreement.

2.2    **Borrowing Procedure**.  To request a Borrowing, the Borrower shall deliver, by hand delivery, electronic mail or telecopier, a duly completed and executed Borrowing Request to the Agent not later than 11:00 a.m., New York City time, on the Business Day immediately prior to the date of the proposed Borrowing. Borrowing Requests shall not be submitted more frequently than bi-weekly, provided each Borrowing Request may cover a two-week period, subject to the other terms and conditions of this Agreement. Each Borrowing Request shall be irrevocable and shall specify the following information in compliance with Section 2.1:

(a)  the aggregate amount of such Borrowing;

(b)  the date of such Borrowing, which shall be a Business Day;

(c)  the location and number of Borrower's account to which funds are to be disbursed; and

(d)  that the conditions set forth in Sections 5.1 and 5.2 have been satisfied as of the date of such Borrowing Request.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.2, the Agent shall advise each Lender of the details thereof and of the amount of such Lender's Term Loan to be made as part of the requested Borrowing.

The Carve-Out shall be funded at the times and in the manner set forth in the Financing Orders.

### 2.3 Loans and Funding of Loans.

(a) Loans and Borrowings. Each Term Loan shall be made as part of a Borrowing consisting of Term Loans made by the Lenders ratably in accordance with their respective Term Loan Commitments, subject to the Borrowing Availability. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required herein. The Term Loans comprising any Borrowing shall be: (i) in an aggregate principal amount that is an integral multiple of $100,000 and not less than $200,000; or (ii) equal to the remaining available balance of the applicable Commitments. The Commitments shall terminate, if not earlier in accordance with this Agreement, then automatically on the Term Loan Maturity Date; *provided, however,* that upon the Term Loan Maturity Date and notwithstanding the occurrence thereof, each Lender agrees to make available to Borrower its pro rata share of an additional Term Loan Advance to fund the Carve-Out in accordance with the terms of this Agreement and the Financing Orders. In furtherance thereof, the Carve-Out shall be funded into an account specified by the Debtors promptly upon the Term Loan Maturity Date; *provided, however,* that any or all of the Carve-Out that constitutes fees and expenses incurred by professionals or professional firms shall be paid only to the extent authorized by the Bankruptcy Court and otherwise pursuant to procedures approved by the Bankruptcy Court, and unutilized amounts, if any, shall be returned to the Agent and Lenders for application to the Obligations as soon as practicable.

(b) Funding of Loans. On the Closing Date, each Lender will fund its portion of the Term Loans to be funded on such date, subject to the Borrowing Availability. Each Lender shall make each Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Agent may designate not later than 2:00 p.m., New York City time, and the Agent shall promptly credit the amounts so received to an account as directed by the Borrower in the applicable Borrowing Request maintained with the Agent or, if a Term Loan shall not be funded on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders. Unless the Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to Agent such Lender's portion of such Term Loan, the Agent may assume that such Lender has made such portion available to the Agent on the date of such Borrowing, and the Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Agent, each of such Lender and the Borrower, severally, agrees to repay to the Agent forthwith on demand such corresponding amount together with interest therein, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Agent at: (i) in the case of the Borrower, the interest rate applicable at the time to the Term Loans; and (ii) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation. If such Lender shall repay to the Agent such corresponding amount, such amount shall constitute such Lender's Term Loan as part of such Borrowing for purposes of this Agreement, and the Borrower's obligation to repay the Agent such corresponding amount pursuant to this Section 2.3(b) shall cease.

### 2.4 Payments Generally; Pro Rata Treatment; Sharing of Set-Offs; Collection.

(a) Payments Generally. The Borrower shall be obligated to make each payment required to be made by the Borrower hereunder (whether of principal, interest, fees or otherwise) prior to 2:00 p.m. New York, New York time, on the date when due, in immediately available funds, in U.S. Dollars, without set-off

- 19 -

or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All payments shall be made to the Agent using the wire transfer instructions provided by Agent, except that payments pursuant to Sections 2.7, 2.8 and 10.3 shall be made directly to the Persons entitled thereto.  The Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof, and the Borrower shall have no liability in the event timely or correct distribution of such payments is not so made.  If any payment shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b)  Application of Payments.  If at any time insufficient funds are received by and available to the Agent to pay fully all amounts of principal, interest and fees then due hereunder under any circumstances, including during, or as a result of the exercise by the Agent or the Lenders of remedies hereunder or under any other Loan Document and applicable law, such funds shall be applied: (i) first, to pay interest, fees, costs and expenses then due hereunder ratably among the parties entitled thereto in accordance with the amounts of interest, fees, costs and expenses then due to such parties; (ii) second, to pay principal of the Loans then due hereunder ratably among the Lenders entitled thereto in accordance with the amounts of principal of the Loans then due to such Lenders; and (iii) third, to any other Obligations then due.

(c)  Pro Rata Treatment.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans  (other than pursuant to Sections 2.7 or 2.8), resulting in such Lender receiving payment of a greater proportion of the aggregate principal amount of its Loans and accrued interest thereon than the proportion of such amounts received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of the other Lenders to the extent necessary so that the benefit of such payments shall be shared by all the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest unless the Lender from which such payment is recovered is required to pay interest thereon, in which case each Lender returning funds to such Lender shall pay its pro rata share of such interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to any Credit Party or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)  Agent's Assumption that Borrower will Make Payments.  Unless the Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Agent for the account of the Lenders entitled thereto (the "Applicable Recipient") hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Applicable Recipient the amount due.  In such event, if the Borrower has not in fact made such payment, then each Applicable Recipient severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Applicable Recipient with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the Federal Funds Effective Rate.

(e)  Lender's Failure to Make Payment.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.4(d), then the Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid.

**2.5    Prepayment of Loans.**

(a) Optional Prepayments of Loans. The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with Section 2.5(d), *provided* that each such prepayment of any Borrowing shall be in an amount that is at least equal to $100,000 or any greater multiple of $100,000.

(b) Mandatory Prepayments.    The Borrower shall be obligated to, and shall, make prepayments of the Loans hereunder as follows:

(i)    Incurrence of Debt; Sale or Offering of Securities. Without limiting the obligation of the Borrower to obtain the consent of the Required Lenders to any incurrence of Indebtedness not otherwise permitted hereunder and subject to the Financing Orders, the Borrower agrees on the closing of any incurrence of Indebtedness by any Credit Party (other than Indebtedness permitted under Sections 7.1(a) through (d), Section 7.1(g) through (j)) or the closing of any offering or sale of equity securities by any Credit Party from and after the date of this Agreement (other than the issuance of Qualified Equity Interests of Borrower in connection with stock options or the exercise of employee compensation under any employee benefit or incentive plan or similar arrangement approved by the Requisite Lenders in advance in writing, including, without limitation, in accordance with Section 7.10 of this Agreement), to prepay the Loans hereunder upon the date of such incurrence of Indebtedness or issuance of such equity securities, as applicable, in an aggregate amount equal to 100% of the amount of the Net Cash Payments from such incurrence of Indebtedness or issuance of equity securities received by any Credit Party, such prepayment to be effected in each case in the manner and to the extent specified in Section 2.5(c) below.

(ii)    Sale of Assets. Without limiting the obligation of the Borrower to obtain the consent of the Required Lenders to any Disposition not otherwise permitted hereunder and subject to the Financing Orders, unless otherwise agreed by the Required Lenders in the exercise of their sole and absolute discretion in writing in advance, the Borrower agrees, on the date of any Disposition by any Credit Party (other than Dispositions permitted by Section 7.4(c)(i) through (iii) and Dispositions consisting of subleases of real property by the Credit Parties permitted by Section 7.4(b)), to prepay the Loans hereunder upon the date of such Disposition, in an aggregate amount equal to 100% of the amount of such Net Cash Payments from such Disposition received by any Credit Party on the date of such Disposition, such payment to be effected in each case and in the manner and to the extent specified in Section 2.5(c) below.

(iii)    Proceeds of Casualty Events. Upon the receipt by the Agent or the Credit Parties of the proceeds of insurance, condemnation award or other compensation in respect of any Casualty Event affecting any property of the Credit Parties and subject to the Financing Orders, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of the Net Cash Payments from such Casualty Event, such prepayment to be effected in each case in the manner and to the extent specified in Section 2.5(c) below.

(iv)    Excess Amounts. If: (a) the Commitments are partially reduced for any reason, then (x) at or prior to the effective date of such reduction, the Agent shall notify the Borrower and the Lenders of the sum of the Loan Exposure after giving effect thereto and (y) if the sum of the Loan Exposure would exceed the aggregate amount of the Commitments less the Carve-Out Reserve after giving effect to such reduction, then the Borrower shall on the date of such reduction, repay or prepay the Term Loans in an aggregate amount sufficient to eliminate such excess; or (b) at any time the then outstanding principal balance of the Term Loans exceeds the Borrowing Availability, then the Borrower shall immediately prepay the outstanding Term Loans in an amount sufficient to eliminate such excess.

- 21 -

(v)     <u>Extraordinary Receipts</u>.  Upon the receipt by any Credit Parties of any Extraordinary Receipts (other than (A) proceeds from any key man life insurance policy not constituting Collateral, (B) liability insurance proceeds which are payable to a third party as a result of any liability of a Credit Party and (C) workers' compensation insurance, directors' and officers' insurance and health insurance payable to workers, directors, officers or employees), subject to the Financing Orders, the Borrower shall prepay the Loans in an amount equal to 100% of such Net Cash Payments, such prepayment to be effected in each case in the manner and to the extent specified in Section 2.5(c) below.

(vi)     <u>363 Sales or Reorganization Plan</u>.  Not later than one (1) Business Day following the closing of any 363 Sale or the confirmation of any Reorganization Plan, including, without limitation, any Reorganization Plan that provides for a Disposition, subject to the Financing Orders, the Borrower shall make prepayments of the Loans, if any are then outstanding, in an amount equal to 100% of such Net Cash Payments, such prepayment to be effected in the manner and to the extent specified in Section 2.5(c) below.

(c)     <u>Application</u>.  In the event of any mandatory prepayment of Loans pursuant to this Section 2.5, the proceeds shall be applied to reduce the installment of principal of the Term Loans due on the Term Loan Maturity Date.

(d)     <u>Notification of Certain Prepayments</u>.  The Borrower shall notify the Agent by telephone (confirmed by telecopy) of any voluntary prepayment of the Term Loans not later than 1:00 p.m., New York, New York time, three Business Days before the date of such prepayment.  The Borrower shall notify the Agent of any mandatory prepayment of the Loans pursuant to Section 2.5(b) hereunder as soon as practicable.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans or portion thereof to be prepaid; <i>provided, however</i>, that a notice of a voluntary prepayment in full of the Term Loans in connection with a proposed refinancing of the Term Loans may be conditioned on the consummation of such refinancing and may be revoked if such refinancing transaction is not consummated.  Promptly following receipt of any such notice, the Agent shall advise the Lenders of the contents thereof.

(e)     <u>Prepayments Accompanied by Interest</u>.  All prepayments of the Term Loans pursuant to this Section 2.5 shall be accompanied by accrued interest through the date of prepayment.

**2.6     Fees.**

(a)     <u>Origination Fee</u>.  The Borrower agrees to pay to the Agent, for the ratable benefit of the Lenders funding Term Loans on the Closing Date, a non-refundable origination fee ("<u>Origination Fee</u>") equal to One Hundred Thousand Dollars ($100,000), which fee shall be fully earned and due and payable on the Closing Date in addition to any other fee from time to time payable under the Loan Documents and paid in cash or cash equivalents on the Closing Date.

(b)     <u>Non-Refundable Nature of Fees</u>.  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Agent for distribution, if and as appropriate, among the Lenders.  Fees paid shall not be refundable under any circumstances, absent manifest error in the determination thereof.

**2.7     Increased Costs.**

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or any of its Affiliates; or

(ii)      impose on any Lender any other condition affecting this Agreement;

and the result of any of the foregoing shall be to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the affected party shall take the actions contemplated by Section 2.9(a) and the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) If any Lender or any of its Affiliates reasonably determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or such Lender's Affiliate's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's and such Affiliate's policies and the policies of such Lender's holding company with respect to capital adequacy), then the affected party shall take the actions contemplated by Section 2.9(a) and from time to time, to the extent permitted by law, the Borrower will pay to such Lender or such Lender's Affiliate such additional amount or amounts as will compensate such Lender or such Lender's holding company, for any such reduction suffered.

(c) A reasonably detailed certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Sections 2.7(a) or 2.7(b) above shall be delivered to the Borrower and shall be conclusive so long as it reflects a reasonable basis for the calculation of the amounts set forth therein and does not contain any manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.7 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.7 for any increased costs or reductions incurred more than six months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; *provided further* that, if the Change in Law giving rise to such increased costs or reductions is (i) retroactive and (ii) occurred within such six-month period, then the six-month period referred to above may be extended to include the period of retroactive effect thereof, but in no event any period prior to the Closing Date.

**2.8      Taxes.**

(a) Any and all payments by or on account of any Obligations of the Borrower hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.8) the Agent or any Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Borrower shall pay all Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) The Borrower shall indemnify the Agent, each Lender and each Affiliate of such Lender, within 10 days after written demand therefor (provided that demand is made within a reasonable amount of time following the Agent's or the applicable Lender's receipt of notice of or knowledge of the liability), for the

full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.8) paid by the Agent or such Lender, as the case may be (and any penalties, interest and reasonable expenses arising therefrom or with respect thereto during the period prior to the Borrower making the payment demanded under this paragraph (c)), whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A reasonably detailed certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by the Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e) Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of a jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate.

**2.9**     **Mitigation Obligations; Replacement of Lenders.**

(a) Designation of a Different Lending Office.   If any Lender requests compensation under Section 2.7, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.8, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder, or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.7 or 2.8, as the case may be, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.   The Borrower hereby agrees to pay all reasonable and documented out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment

(b) Replacement of Lenders.   If any Lender requests compensation under Section 2.7, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.8, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.4, all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) the Borrower shall have received the prior written consent of the Agent, which consent shall not unreasonably be withheld, conditioned or delayed, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.7 or payments required to be made pursuant to Section 2.8, such assignment will result in a reduction in such compensation or payments.   A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

- 24 -

**2.10     Lenders' Evidence of Indebtedness.** The Borrower agrees that: (a) upon written notice by any Lender to the Borrower and the Agent that a promissory note is requested by such Lender to evidence the Loans and other Obligations owing or payable to, or to be made by, such Lender, the Borrower shall promptly (and in any event within five (5) Business Days of any such request) execute and deliver to such Lender an appropriate Term Note (substantially in the form of Exhibit A annexed hereto), as applicable, and (b) upon any Lender's written request, and in any event within five (5) Business Days of any such request, the Borrower shall execute and deliver to such Lender new notes and/or divide the notes in exchange for then existing notes in such smaller amounts or denominations as such Lender shall specify in its reasonable discretion; *provided*, that, the aggregate principal amount of such new notes shall not exceed the aggregate principal amount of the applicable Term Note outstanding at the time such request is made; and *provided, further*, that such notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new notes and returned to the Borrower upon such Lender's receipt of the replacement notes. If any promissory note being replaced has been mutilated, the Lender holding such promissory note shall surrender such promissory note to the Borrower after the Agent's receipt of the replacement promissory note and if any such replaced promissory note has been destroyed, lost or stolen, the holder of such promissory note shall furnish the Borrower with an indemnity in writing reasonably acceptable to the Borrower and such holder to hold the Borrower harmless in respect of such destroyed, lost or stolen promissory note.

## ARTICLE 3

### Guarantee by Guarantors

**3.1     The Guarantee.** The Guarantors hereby guarantee to each Lender and the Agent and their respective successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Obligations. The Guarantors hereby further agree that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Obligations, the Guarantors will promptly pay the same upon demand by the Agent, without the requirement of any other demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**3.2     Obligations Unconditional.** The obligations of the Guarantors under Section 3.1 are absolute and unconditional, to the extent permitted by applicable law, irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the other Loan Documents or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 3.2 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute and unconditional as described above:

(i)     at any time or from time to time, without notice to such Guarantors, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(ii)     any of the acts mentioned in any of the provisions hereof or of the other Loan Documents or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right hereunder or under the other Loan Documents or any other agreement or instrument referred to herein or therein

shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(iv)     any lien or security interest granted to, or in favor of, the Agent or any Lender or Lenders as security for any of the Obligations shall fail to be perfected.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, except for notices required to be given pursuant to the terms of this Agreement (it being understood, however, that if any notice required to be given to the Borrower pursuant to this Agreement is given to the Borrower in accordance with the terms hereof, a copy of such notice need not be given to any Guarantor) or under applicable law, and any requirement that the Agent or any Lender exhaust any right, power or remedy or proceed against the Borrower hereunder or under the other Loan Documents or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Obligations.

3.3     **Reinstatement**. The obligations of the Guarantors under this Article 3 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify the Agent and each Lender on demand for all reasonable and documented out-of-pocket costs and expenses (including reasonable fees and expenses of counsel) incurred by the Agent or any Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

3.4     **Subrogation**. Until such time as the Obligations shall have been indefeasibly paid in full, each of the Guarantors hereby waives all rights of subrogation or contribution, whether arising by contract or operation of law (including, without limitation, any such right arising under the Federal Bankruptcy Code of 1978, as amended) or otherwise by reason of any payment by it pursuant to the provisions of this Article 3 and further agrees with the Borrower for the benefit of each creditor of the Borrower (including, without limitation, the Agent and each Lender) that any such payment by it shall constitute a contribution of capital by such Guarantor to the Borrower.

3.5     **Remedies**. The Guarantors agree that, as between the Guarantors and the Lenders, the Obligations of the Borrower hereunder may be declared to be forthwith due and payable as provided in Section 8.1 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.1) for purposes of Section 3.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such Obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such Obligations being deemed to have become automatically due and payable), such Obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 3.1.

3.6     **Instrument for the Payment of Money**. Each of the Guarantors hereby acknowledges that the guarantee in this Article 3 constitutes an instrument for the payment of money, and consents and agrees that the Agent or any Lender, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to summary judgment or such other expedited procedure as may be available for a suit on a note or other instrument for the payment of money.

3.7     **Continuing Guarantee**. The guarantee in this Article 3 is a continuing guarantee, and shall apply to all Obligations whenever arising.

3.8     **General Limitation on Amount of Obligations Guaranteed**. In any action or proceeding involving any state or non-U.S. corporate law, or any state or Federal or non-U.S. bankruptcy, insolvency,

reorganization or other law affecting the rights of creditors generally, if the obligations of the Guarantors under Section 3.1 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 3.1, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by the Guarantors, any Lender, Agent or other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**ARTICLE 4**

**Representations and Warranties**

Until the Term Loan Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each Credit Party (as to itself and each other Credit Party), each of the Credit Parties represents and warrants to the Lenders and the Agent, as to itself and each other Credit Party, at all times, that:

**4.1      Organization; Powers.** Each Credit Party and each Subsidiary has been duly formed or organized and is validly existing and in good standing under the laws of its jurisdiction of organization. Each Credit Party and each Subsidiary has, upon the entry of the Financing Orders by the Bankruptcy Court, all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure to have such power or authority or to be so qualified or in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.2      Authorization; Enforceability.** Upon the entry of the Financing Orders by the Bankruptcy Court, the Transactions are within the power and authority of the Credit Parties and have been duly authorized by all necessary action on the part of the Credit Parties. Subject to the entry of the Financing Orders, this Agreement and the other Loan Documents have been duly authorized, executed and delivered by the Credit Parties and constitute legal, valid and binding obligations of the Credit Parties, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**4.3      Governmental Approvals; No Conflicts.** Upon entry of the Financing Orders by the Bankruptcy Court, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority which has not been obtained, (b) will not violate any applicable law, policy or regulation or the organizational documents of the Credit Parties or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Credit Parties, or any assets, or give rise to a right thereunder to require any payment to be made by the Credit Parties and (d) except for the Liens created by the Loan Documents, will not result in the creation or imposition of any Lien on any asset of the Credit Parties, except Liens created by the Loan Documents and Permitted Liens (including pursuant to the Financing Orders).

**4.4      Financial Condition; No Material Adverse Change.**

(a)   The Credit Parties have heretofore delivered to the Agent and the Lenders the following financial statements:

(i)      the consolidated balance sheets and statement of operations, shareholders' equity and cash flows of Borrower and its Subsidiaries as of and for the fiscal year ended December 31, 2012 accompanied by a report of Borrower's independent public accountants; and

- 27 -

(ii)   the unaudited consolidated balance sheets and statement of operations, shareholders' equity and cash flows of Borrower and its Subsidiaries for the fiscal quarter ended June 30, 2013, certified by a Designated Financial Officer that such financial statements fairly present the financial condition of Borrower and its Subsidiaries, on a consolidated basis, as at such date and the results of the operations of Borrower and its Subsidiaries for the period ended on such date and that all such financial statements, including the related schedules and notes thereto have been prepared in all material respects in accordance with GAAP applied consistently throughout the periods involved.

Such financial statements present fairly, in all material respects, the respective consolidated financial position and results of operations and cash flows of the respective entities as of such respective dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of such unaudited or *pro forma* statements.

(b)   Except as set forth in Schedule 4.4(b) and other than the commencement of the Chapter 11 Case and Effect of Bankruptcy: (i) there has been no material adverse change in the business, assets, operations or condition, financial or otherwise of Borrower and its Subsidiaries from that set forth in the financial statements referred to in subsection 4.4(a)(ii) above; and (ii) there are no post-Petition Date liabilities of Borrower of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a post-Petition Date liability, other than liabilities under the Loan Documents.

(c)   None of the Credit Parties has as of the Closing Date any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments in each case that are material, except as referred to or reflected or provided for in the balance sheets as at the end of their respective fiscal years referred to above, as otherwise permitted pursuant to this Agreement, or as referred to or reflected or provided for in the financial statements described in this Section 4.4.

(d)   The forecasts of financial performance of the Credit Parties, including the Budget delivered on the Closing Date, projected income statements, statements of cash flows and balance sheets, furnished to the Agent or Lenders have been prepared in good faith by the Credit Parties, and based on assumptions believed by the Credit Parties to be reasonable (it being understood that forecasts are subject to uncertainties and contingencies and that no representation or warranty is given that any forecast will be realized).

**4.5     Properties.**

(a)   Each Credit Party and each Subsidiary has good and marketable title to, or valid and subsisting leasehold interests in, all its Property material to its business. All machinery and equipment material to the business of the Credit Parties and the Subsidiaries is in good operating condition (for the purpose for which it is used) and repair (normal wear and tear and immaterial loss from casualty and condemnation excepted), and all necessary replacements of and repairs thereto have be made so as to preserve and maintain in all material respects the value and operating efficiency of such machinery and equipment.

(b)   Set forth on Schedule 4.5 is a complete list of all federally registered Patents, Trademarks and Copyrights of the Credit Parties ("Registered Proprietary Rights") as of the date of this Agreement. The Registered Proprietary Rights have been properly maintained and renewed in accordance with all applicable provisions of law and administrative regulations in the United States. The Credit Parties have taken commercially reasonable steps to protect their Registered Proprietary Rights.

(c)   As of the Closing Date, Schedule 4.5 contains a true, accurate and complete list of all Real Property Assets, whether owned or leased as of the Date of this Agreement. Each lease, sublease or

assignment of lease (together with all amendments, modifications, supplements, renewals or extensions thereof) affecting any Leasehold Property of the Credit Parties is in full force and effect and the Credit Parties have no Knowledge of any material default that has occurred and is continuing thereunder, and each such agreement constitutes the legal, valid and binding obligation of each applicable Credit Party or Subsidiary, as applicable, enforceable against such Credit Party or Subsidiary in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

**4.6     Litigation and Environmental Matters.**

(a)  Except for the Chapter 11 Case, the Disclosed Matters set forth in part (a) of <u>Schedule 4.6</u> and for litigation that is stayed by the commencement and continuation of the Chapter 11 Case, as of the date of this Agreement, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the Knowledge of the Credit Parties, threatened against or affecting any Credit Party or Subsidiary: (i) in which any Person has alleged that the use by any Credit Party or Subsidiary of any Patent, Trademark or Copyright violates or infringes on the rights of any Person; (ii) that challenge the enforceability or validity of any Loan Document or any part of the Transactions; or (iii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters set forth in part (a) of <u>Schedule 4.6</u>).

(b)  Except for the Disclosed Matters set forth in part (b) <u>Schedule 4.6</u> or except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, the Credit Parties and the Subsidiaries: (i) have not failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required in connection with the operation of the Credit Parties' and the Subsidiaries' business to be in compliance with all applicable Environmental Laws; (ii) have not become subject to any Environmental Liability; (iii) have not received notice of any claim with respect to any Environmental Liability or any inquiry, allegation, notice or other communication from any Governmental Authority which is currently outstanding or pending concerning its compliance with any Environmental Law; or (iv) do not know of any basis for any Environmental Liability.

**4.7     Compliance with Laws and Agreements.**  Each Credit Party and each Subsidiary is in compliance: (a) in all material respects with all laws, regulations, policies and orders of any Governmental Authority applicable to it or its property; and (b) with all indentures, agreements and other instruments binding upon it or its property, except, in the case of this clause (b), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.8     Investment and Holding Company Status.**  No Credit Party is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or (b) a "bank holding company" as defined in, or subject to regulation under, the Bank Holding Company Act of 1956, as amended.

**4.9     Taxes.**  Each Credit Party and each Subsidiary has timely filed or caused to be filed all federal, state, foreign and material local Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except for any Taxes the nonpayment of which is required or permitted by the Bankruptcy Code.

**4.10     ERISA.**  No Credit Party or Subsidiary has any Pension Plans or Foreign Plans. No ERISA Event (other than the commencement of the Chapter 11 Case) has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. No Credit Party or Subsidiary has a present intention to terminate any Pension Plan or Foreign Plan with respect to which any Credit Party or Subsidiary would incur a cost of more than $25,000 to terminate such plan, including amounts required to be

contributed to fund such plan on plan termination and all costs and expenses associated therewith, including without limitation attorneys' and actuaries' fees and expenses in connection with such termination and a reasonable estimate of expenses and settlement or judgment costs and attorneys' fees and expenses in connection with litigation related to such termination.

**4.11    Disclosure.** As of the Effective Time, the Credit Parties have disclosed to the Agent all material agreements, instruments and corporate or other restrictions to which any Credit Party or Subsidiary is subject after the Effective Time, and all other matters known to the Credit Parties, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. The information, reports, financial statements, exhibits and schedules furnished at or prior to the Effective Time in writing by or on behalf of the Credit Parties to the Agent in connection with the negotiation, preparation or delivery of this Agreement and the other Loan Documents or included herein or therein or delivered pursuant hereto or thereto, at the Effective Time, when taken as a whole do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not materially misleading. All written information furnished after the Effective Time by the Credit Parties to the Agent and/or the Lenders in connection with this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby will be true, complete and accurate in every material respect. Any projections at any time delivered to the Agent shall be prepared by the Credit Parties in good faith and based on estimates and assumptions that are reasonable as of the date when such projections are made; *provided, however*, that such projections are not to be viewed as facts and the actual results during the period or periods covered thereby may differ from such projections and the differences may be material. There is no fact known to the Credit Parties that could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Loan Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to the Agent and each Lender for use in connection with the transactions contemplated hereby or thereby.

**4.12    Capitalization.** As of the Effective Time, after giving effect to the Transactions, the capital structure and ownership of the Credit Parties and their Subsidiaries are as set forth on Schedule 4.12. As of the Effective Time, after giving effect to the Transactions, the authorized, issued and outstanding capital stock and equity interests of the Credit Parties and their Subsidiaries consists of the capital stock and equity interests described on Schedule 4.12, all of which is duly and validly issued and outstanding, and in the case of any corporation, fully paid and nonassessable. Except as set forth on Schedule 4.12, as of the Closing Date, (x) there are no outstanding Equity Rights with respect to any Credit Party or any Subsidiary and, (y) there are no outstanding obligations of any Credit Party or any Subsidiary to repurchase, redeem, or otherwise acquire any shares of capital stock of or other equity interest in any Credit Party or any Subsidiary, nor are there any outstanding obligations of any Credit Party or any Subsidiary to make payments to any Person, such as "phantom stock" payments, where the amount thereof is calculated with reference to the fair market value or equity value of any Credit Party or any Subsidiary.

**4.13    Subsidiaries.**

(a) Set forth on Schedule 4.13 is a complete and correct list of all Subsidiaries of the Credit Parties as of the Closing Date, together with, for each such Subsidiary, (i) the jurisdiction of organization of such Subsidiary, (ii) each Person holding ownership interests in such Subsidiary and (iii) the nature of the ownership interests held by each such Person and the percentage of ownership of such Subsidiary represented by such ownership interests. Except as disclosed in Schedule 4.13, (x) each Credit Party and its respective Subsidiaries owns, free and clear of Liens (other than Liens in favor of the Agent pursuant to the Loan Documents), and has the unencumbered right to vote, all outstanding ownership interests in each Person shown to be held by it in Schedule 4.13, (y) all of the issued and outstanding capital stock of each such Person organized as a corporation is validly issued, fully paid and nonassessable and (z) there are no outstanding Equity Rights with respect to such Person.

(b) Except as set forth on Schedule 7.8, as of the Closing Date, none of the Credit Parties is

- 30 -

subject to any indenture, agreement, instrument or other arrangement containing any provision of the type described in Section 7.8 ("Restrictive Agreements"), other than any such provision the effect of which has been unconditionally, irrevocably and permanently waived.

**4.14    Material Indebtedness, Liens and Agreements.**

(a) Part (a) of Schedule 4.14 contains a complete and correct list, as of the Closing Date, of all Material Indebtedness or any extension of credit (or commitment for any extension of credit) to, or guarantee by, any Credit Party or any Subsidiary the aggregate principal or face amount of which equals or exceeds (or may equal or exceed) $25,000, and the aggregate principal or face amount outstanding or that may become outstanding with respect thereto is correctly described on Schedule 4.14.

(b) Part (b) of Schedule 4.14 is a complete and correct list, as of the date of this Agreement, of each Lien (other than the Liens in favor of the Agent) securing Indebtedness of any Person and covering any property of the Credit Parties or their Subsidiaries, and the aggregate Indebtedness secured (or which may be secured) by each such Lien and the Property covered by each such Lien is correctly described in the appropriate part of Schedule 4.14.

(c) Part (c) of Schedule 4.14 is a complete and correct list, as of the date of this Agreement, of each contract and arrangement to which any Credit Party or Subsidiary is a party for which breach, nonperformance, cancellation or failure to renew would have a Material Adverse Effect other than purchase orders made in the ordinary course of business and subject to customary terms. All such agreements are valid, subsisting, in full force and effect, are currently binding and will continue to be binding upon each Credit Party or Subsidiary that is a party thereto and, to the Knowledge of the Credit Parties, binding upon the other parties thereto in accordance with their terms. The Credit Parties are not in default in any material respect under any such agreements.

**4.15    Federal Reserve Regulations.** No Credit Party is engaged principally or as one of its important activities in the business of extending credit for the purpose of purchasing or carrying margin stock (as defined in Regulation U of the Board). The making of the Loans hereunder on the Closing Date, the use of the proceeds thereof as contemplated hereby, and the security arrangements contemplated by the Loan Documents and the Financing Orders, will not violate or be inconsistent with any of the provisions of Regulations T, U, or X of the Board of Governors of the Federal Reserve System.

**4.16    Legality; Validity and Enforceability of Liens.** Upon entry of the Financing Orders by the Bankruptcy Court, the Agent will have legal, valid and enforceable Liens having the priority specified in the Financing Orders on, and security interests in, all of the Credit Parties' right, title and interest in and to the Collateral and the proceeds thereof.

**4.17    Force Majeure.** Since December 31, 2012, the business, properties and other assets of the Credit Parties and their Subsidiaries have not been materially and adversely affected in any way as the result of any fire or other casualty, strike, lockout or other labor trouble, embargo, sabotage, confiscation, contamination, riot, civil disturbance, activity of armed forces or act of God.

**4.18    Labor and Employment Matters.**

(a) (A) as of the date of this Agreement, no employee of the Credit Parties or any Subsidiary is represented by a labor union, no labor union has been certified or recognized as a representative of any such employee, and the Credit Parties and their Subsidiaries do not have any obligation under any collective bargaining agreement or other agreement with any labor union or any obligation to recognize or deal with any labor union, and there are no such contracts or other agreements pertaining to or which determine the terms or conditions of employment of any employee of the Credit Parties or their Subsidiaries; (B) there are no pending or threatened representation campaigns, elections or proceedings, except such as could not reasonably be

expected to have, individually or in the aggregate, a Material Adverse Effect; (C) the Credit Parties do not have Knowledge of any strikes, slowdowns or work stoppages of any kind, or threats thereof, and no such activities occurred during the 24-month period preceding the date hereof, except such as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (D) no Credit Party or Subsidiary has engaged in, admitted committing or been held to have committed any unfair labor practice, except such as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)  The Credit Parties and their Subsidiaries are in compliance in all material respects with, all applicable laws, rules and regulations respecting employment, wages, hours, compensation, benefits, and payment and withholding of taxes in connection with employment.

(c)  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Credit Parties and their Subsidiaries are in compliance with, all applicable laws, rules and regulations respecting occupational health and safety, whether now existing or subsequently amended or enacted, including the Occupational Safety & Health Act of 1970, 29 U.S.C. Section 651 et seq. and the state analogies thereto, all as amended or superseded from time to time, and any common law doctrine relating to worker health and safety.

**4.19    Bank Accounts.**  Upon any request by Agent, the Credit Parties shall furnish the Agent with a list of all banks, securities intermediaries and other financial institutions at which any Credit Party maintains any deposit account, bank account, securities account and/or other account.

**4.20    OFAC.**  No Credit Party, nor any Subsidiary of any Credit Party (i) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.  The regulations and executive orders described in clauses (i) through (iii) of the preceding sentence are referred to herein as "OFAC Regulations".

**4.21    Patriot Act.**  The Credit Parties are in compliance, in all material respects, with the (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto (collectively, the "FAC Regulations"), and (ii) the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001).  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "FCPA").

**4.22    Trade Relations.**  There exists no actual or, to the Knowledge of the Credit Parties, threatened, termination, cancellation or limitation of, or any adverse modification or adverse change in, the business relationship between any Credit Party or Subsidiary and any customer or any group of customers whose purchases of goods or services individually or in the aggregate are material to the business of such Credit Party or Subsidiary, or with any material supplier, and there exists no present condition or state of facts or circumstances which could materially adversely affect the Credit Parties or their Subsidiaries or prevent the Credit Parties or their Subsidiaries from conducting their businesses after the consummation of the Transactions in substantially the same manner in which such businesses heretofore have been conducted

**ARTICLE 5**

**Conditions**

**5.1     Conditions to Funding of the Closing Date Term Loan Advance and the Closing.**  The obligations of the Lenders to make the Closing Date Term Loan Advance and to consummate the Closing is subject to the satisfaction or waiver of each of the following conditions precedent:

(a)  <u>No Defaults</u>.  At the time of, and immediately after giving effect to the making of the Term Loans, no Default shall have occurred and be continuing.

(b)  <u>Representations and Warranties</u>.  The representations and warranties of each Credit Party set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of the making of the Term Loans, both before and after giving effect thereto and to the use of the proceeds thereof, except: (i) to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case, such representation or warranty shall be true and correct in all material respects as of such date; and (ii) that any representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects, subject to the materiality qualification contained therein.

(c)  <u>Counterparts of Agreement</u>.  The Agent shall have received from each party hereto either: (i) a counterpart of this Agreement executed on behalf of such party; or (ii) written evidence satisfactory to the Agent (which may include telecopy transmission of an executed signature page of this Agreement) that such party has executed a counterpart of this Agreement.

(d)  <u>Security Agreement</u>.  The Agent shall have received from each party thereto a counterpart of the Security Agreement executed on behalf of such party.

(e)  <u>Patent Security Agreement and Trademark Security Agreement</u>.  The Agent shall have received from each party thereto a counterpart of the Patent Security Agreement and the Trademark Security Agreement, each executed on behalf of such party.

(f)  <u>Notes</u>.  The Agent shall have received a duly completed and executed Term Note for the account of each Lender which has requested that its Term Loans be evidenced by a promissory note.

(g)  <u>Financial Officer Certificate</u>.  The Agent shall have received a certificate, dated the Closing Date and executed by a Designated Financial Officer, confirming compliance with the conditions set forth in this Article 5 at the Effective Time.

(h)  <u>Interim Order</u>.  Entry by the Bankruptcy Court of the Interim Order, in form and substance satisfactory to the Agent and the Required Lenders (and such entry shall occur no later than the close of business on September 23, 2013).

(i)  <u>Budget</u>.  The Agent shall have received the Budget referred to in Section 6.15 hereof and attached hereto as <u>Exhibit 6.15</u>.

(j)  <u>Stalking Horse APA</u>.  Receipt by the Agent of a duly executed Stalking Horse APA.

(k)  <u>Evidence of Insurance</u>.  The Agent shall have evidence from the Credit Parties' or their insurance brokers that all insurance required to be maintained pursuant to Section 6.5 is in full force and effect.

(l)  <u>Other Documents</u>.  The Agent shall have received all material contracts, instruments, opinions, certificates, assurances and other documents as the Agent or any Lender shall have reasonably

- 33 -

requested and the same shall be reasonably satisfactory to each of them.

(m) <u>No Material Adverse Effect</u>.  There shall have occurred no Material Adverse Effect (other than the commencement of the Chapter 11 Case) since June 30, 2013.

(n) <u>Necessary Governmental Permits, Licenses and Authorizations and Consents; Etc</u>.  The Credit Parties shall have obtained all permits, licenses, authorizations and consents from all other Governmental Authorities and all consents of other Persons with respect to Material Indebtedness, Liens and material agreements listed on <u>Schedule 4.14</u> (and so identified thereon), in each case that are necessary or advisable in connection with the Transactions and the operation of the business of the Credit Parties as currently conducted and as proposed to be conducted by the Credit Parties, and each of the foregoing shall be in full force and effect, in each case other than those which the failure to obtain or maintain which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  All applicable waiting periods in connection with the Transactions shall have expired or been terminated without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the Transactions.  No action, request for stay, petition for review or rehearing, reconsideration or appeal with respect to any of the foregoing shall be pending, and the time for any applicable Governmental Authority to take action to set aside its consent on its own motion shall have expired.

(o) <u>Fees and Expenses</u>.  At or prior to the Effective Time, the Agent shall have: received all fees and other amounts due and payable to the Agent, including, to the extent invoiced, reimbursement or payment of all reasonable and documented out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(p) <u>Existence and Good Standing</u>.  The Agent shall have received such documents and certificates as the Agent may reasonably request relating to the organization, existence and good standing of the Credit Parties and their Subsidiaries, the authorization of the transactions contemplated hereby and any other legal matters relating to the Credit Parties and their Subsidiaries, this Agreement or the other Loan Documents, all in form and substance reasonably satisfactory to the Agent.

(q) <u>Security Interests in Personal and Mixed Property</u>.  <u>Security Interests in Personal and Mixed Property</u>.  The Agent shall have received the following, each in form and substance reasonably satisfactory to the Agent:

(i)     <u>Lien Searches and UCC Termination Statements</u>.  (A) The results of a recent search, by one or more Persons satisfactory to the Agent, of all effective UCC financing statements, fixture filings or other comparable filings (and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Credit Party, together with copies of all such filings disclosed by such search, and (B) UCC or other comparable termination statements duly executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements, fixture filings or other comparable filings disclosed in such search (other than any such financing statements, fixture filings or other comparable filings in respect of Liens permitted to remain outstanding pursuant to the terms of this Agreement) or if such termination statements cannot be obtained from a creditor whose debt is to be repaid with the proceeds of the Loans, an agreement to deliver such termination statements upon receipt by such creditor of payment in full of the amounts due such creditor;

(ii)    <u>UCC Financing Statements and Fixture Filings</u>.  UCC financing statements and, where reasonably required by the Agent, fixture filings duly authorized by each applicable Credit Party with respect to all personal and mixed property Collateral of such Credit Party, for filing in all jurisdictions as may be necessary or, in the opinion of the Agent, desirable to perfect the security interests created in such Collateral pursuant to the Loan Documents;

(iii)    Stock Certificates.  The following possessory Collateral: certificates (which certificates shall be accompanied by irrevocable undated stock powers, undated and duly endorsed in blank and otherwise reasonably satisfactory in form and substance to the Agent) representing all capital stock and other equity interests pledged pursuant to the Security Agreement; and

(iv)    PTO Cover Sheets, Etc.  All security agreements, cover sheets or other documents or instruments required to be filed with the United States Patent and Trademark Office or United States Copyright Office in order to create or perfect Liens in respect of any Patents, Trademarks or Copyrights.

All obligations of the Agent and Lenders under this Agreement shall automatically terminate without any further action if the conditions required under this Section 5.1 have not been satisfied on or before the close of business on September 23, 2013 or waived by Required Lenders in their sole discretion.

**5.2    Conditions to each Term Loan.**  The obligations of the Lenders to make any Term Loan (including the Closing Date Term Loan Advance) are subject to the satisfaction or waiver of each of the following conditions precedent:

(a)    Notice.  The Agent shall have received a Borrowing Request as required by Section 2.2 (or such notice shall have been deemed given in accordance with Section 2.2) if Term Loans are being requested.

(b)    No Defaults.  At the time of, and immediately after giving effect to the making of the Term Loans, no Default shall have occurred and be continuing.

(c)    Representations and Warranties.  The representations and warranties of each Credit Party set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of the making of the Term Loans, both before and after giving effect thereto and to the use of the proceeds thereof, except: (i) to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case, such representation or warranty shall be true and correct in all material respects as of such date; and (ii) that any representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects, subject to the materiality qualification contained therein.

(d)    No Legal Bar.  No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Term Loans to be made by it.

(e)    Bankruptcy Matters.  At the time of such Borrowing: (i) if such Borrowing is prior to the entry and effectiveness of the Final Order, the Interim Order shall not have terminated or expired, and the date of such Borrowing shall not be more than twenty six (26) days from the Petition Date; (ii) if such Borrowing is after the entry and effectiveness of the Final Order, the Final Order shall be effective, and shall not have been terminated or expired; (iii) no Financing Order shall have been vacated, reversed, stayed, amended, supplemented or otherwise modified (without the consent of the Agent); (iv) no motion for reconsideration of any Financing Order shall be pending; and (v) no appeal of any Financing Order shall be pending and no Financing Order shall be the subject of a stay pending appeal or a motion for a stay pending appeal.

(f)    Budget.  At the time of such Borrowing, the amount of such Borrowing shall not be in excess of the amounts necessary to fund expenditures (in the aggregate) permitted under the Budget for such period, subject to any Permitted Variance and shall be for a purpose permitted under Section 6.9.

(g)    Commitment; Borrowing Availability.  After giving effect to such Borrowing, the aggregate then outstanding principal amount of the Term Loans shall not exceed the Commitment, and in no event shall the outstanding principal amount of the Term Loans be in excess of the Borrowing Availability at

any time.

(h) <u>Other Documents</u>. The Agent shall have received all material contracts, instruments, opinions, certificates, assurances and other documents as the Agent or any Lender shall have reasonably requested and the same shall be reasonably satisfactory to each of them.

Each delivery of a Borrowing Request and the acceptance by the Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrower that on the date of such Borrowing (both immediately before and after giving effect to such Borrowing and the application of the proceeds thereof) the conditions contained in this Section 5.2 have been satisfied. The Borrower shall provide such information as the Agent may reasonably request to confirm that the conditions in this Section 5.2 have been satisfied.

## ARTICLE 6
### Affirmative Covenants

Until the Term Loan Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each Credit Party (as to itself and each other Credit Party) covenants and agrees with the Agent and the Lenders that:

**6.1     Financial Statements and Other Information.** The Credit Parties will furnish to the Agent and each Lender:

(a) as soon as available and in any event within 30 days after the end of each month:

(i) consolidated statements of operations and free cash flows of Borrower and its Subsidiaries for such month and for the period from the beginning of the respective fiscal year to the end of such month, and the related consolidated balance sheets of Borrower and its Subsidiaries as at the end of such period, setting forth in each case in comparative form the corresponding consolidated figures for the corresponding period in the preceding fiscal year, and the corresponding figures for the forecasts most recently delivered to the Agent for such period; and

(ii) a certificate of a Designated Financial Officer in the form of <u>Exhibit C</u>, which certificate shall state that said consolidated financial statements referred to in the preceding clause (i) fairly present in all material respects the consolidated financial condition and results of operations of Borrower and its Subsidiaries, in each case in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal quarter-end adjustments and year-end audit adjustments and the omission of footnotes).

(b) promptly upon receipt thereof, copies of all management letters and accountants' letters received by the Credit Parties; and

(c) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Credit Parties, or compliance with the terms of this Agreement, as the Agent or any Lender may reasonably request.

**6.2     Notices of Material Events.** The Credit Parties will furnish to the Agent and each Lender prompt written notice of the following:

(a) the occurrence of any Default;

(b) the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Credit Party or Affiliate that could reasonably be expected

- 36 -

to result in a Material Adverse Effect;

(c) the occurrence of any ERISA Event (other than the initial commencement of the Chapter 11 Case) related to any Plan or Foreign Plan of any Credit Party or Subsidiary or Knowledge of any ERISA Event related to a Plan or Foreign Plan of any other ERISA Affiliate that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Credit Parties or their Subsidiaries in an aggregate amount exceeding $25,000;

(d) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect (other than the initial commencement of the Chapter 11 Case); and

(e) the incurrence of any material Lien (other than Permitted Liens and the Carve-Out) on, or claim asserted against any of the Collateral (other than as a result of filing proofs of claims in the Chapter 11 Cases).

Each notice delivered under this Section 6.2 shall be accompanied by a statement of a Designated Financial Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**6.3     Existence; Conduct of Business.**  Except as resulting from the Chapter 11 Case, the Credit Parties shall continue to, and shall continue to cause each of their Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect (a) its legal existence and (b) the rights, licenses, permits, privileges and franchises material to the conduct of its business, except, in the case of this clause (b), such as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; *provided* that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution or any discontinuance or sale of such business permitted under Section 7.4.

**6.4     Payment of Obligations.**  Subject to the approval of the Bankruptcy Court in the Chapter 11 Case, the Credit Parties shall, and shall cause each of their Subsidiaries to, pay its obligations, including Tax liabilities before the same shall become delinquent or in default, except where: (a) the validity or amount thereof is being contested in good faith by appropriate proceedings; (b) such Credit Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, which reserves shall be acceptable to Agent; and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.5     Maintenance of Properties; Insurance.**  The Credit Parties shall, and shall cause each of their Subsidiaries to, (a) keep and maintain all property material to the conduct of its business in good working order and condition (for the purpose for which it is used), ordinary wear and tear and immaterial loss from casualty and condemnation excepted, and (b) maintain insurance, with financially sound and reputable insurance companies, as may be required by law and such other insurance in such amounts and against such risks as are customarily maintained by similarly sized companies engaged in the same or similar businesses operating in the same or similar locations, including business interruption insurance, product liability insurance and, in the event that any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", flood insurance on such Collateral; *provided* that the Agent and the Lenders agree that the Credit Parties' insurance policies and coverage levels existing as of the Closing Date are satisfactory to the Agent and the Lenders as of the Closing Date.  Without limiting the generality of the foregoing, the Credit Parties shall, and shall cause each of their Subsidiaries to, maintain or cause to be maintained replacement value casualty insurance on the Collateral under such policies of insurance, in each case with such insurance companies, in such amounts, with such deductibles, and covering such terms and risks as are at all times satisfactory to the Agent in its commercially reasonable judgment.  As soon as practicable and in any event on or before the date that is seven (7) Business Days after the Effective Time, all general liability and other liability policies with respect to any Credit Party shall name the Agent for the benefit of the Lenders as an additional insured thereunder as its interests may appear, and all business

- 37 -

interruption and casualty insurance policies shall contain a loss payable clause or endorsement, satisfactory in form and substance to the Agent that names the Agent for the benefit of the Lenders as the loss payee thereunder. All policies of insurance shall provide that the insurer shall endeavor to provide at least 30 days prior written notice to the Agent of any modifications or cancellation of such policy.

**6.6   Books and Records; Inspection Rights.** The Credit Parties shall, and shall cause each of their Subsidiaries to, keep proper books of record and account in which entries are made of all dealings and transactions in relation to its business and activities which fairly record in all material respects such transactions and activities. The Credit Parties shall, and shall cause each of their Subsidiaries to, permit any representatives of the Agent or any Lender (or, if a Default or Event of Default has occurred and is continuing, any independent examiners or advisors designated by the Agent) to visit, inspect and audit its properties, to examine, audit and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants as frequently as the Agent deems appropriate. The Credit Parties shall, and shall cause each of their Subsidiaries to, reimburse the Agent and each Lender for all reasonable and documented examination, audit and inspection costs (including all reasonable and documented fees, costs and expenses charged by independent inspectors, auditors or examiners during the occurrence and continuance of a Default or Event of Default), and all reasonable and documented out-of-pocket expenses incurred in connection with such examinations, inspections and audits.

**6.7   Fiscal Year.** The fiscal year of the Credit Parties ends on December 31 of each year and, the Credit Parties shall, and shall cause each of their Subsidiaries to, maintain such fiscal year end.

**6.8   Compliance with Laws.** The Credit Parties shall, and shall cause each of their Subsidiaries to, comply with (i) all permits, licenses and authorizations, including environmental permits, licenses and authorizations, issued by a Governmental Authority, except to the extent that any failure to comply therewith could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (ii) all laws, rules, regulations and orders including Environmental Laws, all OFAC Regulations, the Trading with the Enemy Act, the FAC Regulations, the USA Patriot Act of 2001 and the FCPA, of any Governmental Authority and (iii) all contractual obligations, in each case applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**6.9   Use of Proceeds.** The Borrower will use the proceeds of the Term Loans in a manner consistent with the Budget (subject to the Permitted Variance) and the Financing Orders for payment of: (a) all loans and obligations outstanding under the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents, (b) post-petition operating expenses and other working capital and financing requirements of the Borrower; (c) certain transaction and bankruptcy related fees, costs and expenses (including the fees, expenses and disbursements of professionals retained by order of the Bankruptcy Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code in accordance with the Financing Orders and standing orders of the Bankruptcy Court applicable to the Chapter 11 Case; (d) the Carve-Out; and (e) Pre-Petition claims permitted by the Bankruptcy Court. For the avoidance of doubt, all expenditures (including, without limitation, all capital expenditures) of Borrower and the other Credit Parties may not exceed the expenditures set forth in the Budget (subject to the Permitted Variance) at any time. No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

**6.10   Certain Obligations Respecting Subsidiaries.**

(a)   The Credit Parties shall, and shall cause each of their Subsidiaries to, take such action from time to time as shall be necessary to ensure that the percentage of the issued and outstanding shares of capital stock of any class or character owned by it in any Subsidiary on the date hereof is not at any time decreased; *provided* that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution or any discontinuance or sale of such business permitted under Section 7.4.

(b) In the event that the Credit Parties form or acquire any Subsidiary after the Closing Date, this Section 6.10(b) shall be applicable and the Credit Party forming or acquiring such Subsidiary will take or cause to be taken the following actions:  as soon as possible but in any case not later than 20 days after the date on which such Subsidiary is created (or, in the case of the acquisition of any Subsidiary, concurrently with the consummation of such acquisition) (x) cause such Subsidiary to (A) execute and deliver to the Agent a joinder to this Agreement and thereby become a Guarantor hereunder, (B) execute and deliver to the Agent a counterpart to the Security Agreement or Financing Order and thereby become a party thereto as an additional "Grantor" thereunder and grant to the Agent a First Priority Lien (subject to Permitted Liens and the Carve-Out) on all "Collateral" of such Subsidiary thereunder, (C) take such other action as shall be necessary to create and perfect valid and enforceable First Priority Liens (subject to Permitted Liens and the Carve-Out) in favor of the Agent on all or substantially all of the assets of such Subsidiary consistent with the provisions of this Agreement and the applicable other Loan Documents and as contemplated by the Financing Orders and (D) deliver proof of corporate action, incumbency of officers and other documents as is consistent with those delivered by the Borrower pursuant to Article 5 as of the Effective Time and (y) execute and deliver to the Agent such pledge agreements or such addenda or amendments to the Security Agreement and take such other actions (including delivering the certificates representing such shares of stock or other equity interests to the Agent) as shall be necessary to create and perfect valid and enforceable First Priority Liens (subject to Permitted Liens and the Carve-Out) in favor of the Agent on all of the issued and outstanding stock or other equity interests of such Subsidiary, all of the foregoing to be in form and substance reasonably satisfactory to the Agent.

**6.11    ERISA.**  Subject to the applicable provisions of the Bankruptcy Code and except (a) as a result of the Chapter 11 Case (including the effects of the Chapter 11 Case on the funding of the Plans) and (b) where a failure to comply with any of the following, individually or in the aggregate, would not or could not reasonably be expected to result in a Material Adverse Effect: (i) the Credit Parties will maintain, and cause each ERISA Affiliate to maintain, each Plan in compliance with all applicable requirements of ERISA and of the Code and with all applicable rulings and regulations issued under the provisions of ERISA and of the Code; (ii) the Credit Parties will not and, to the extent authorized, will not permit any of the ERISA Affiliates to (x) engage in any transaction with respect to any Plan which would subject any Credit Party to either a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Code, (y) fail to make full payment when due of all amounts which, under the provisions of any Plan, any Credit Party or any ERISA Affiliate is required to pay as contributions thereto, or permit to exist any accumulated funding deficiency (as such term is defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, with respect to any Pension Plan or (z) fail to make any payments to any Multiemployer Plan that any Credit Party or any of the ERISA Affiliates may be required to make under any agreement relating to such Multiemployer Plan or any law pertaining thereto; and (iii) the Credit Parties will maintain, and will cause each Subsidiary to maintain, each Foreign Plan in compliance with the terms thereof and all requirements of applicable law.

**6.12    Environmental Matters; Reporting.**  The Credit Parties shall, and shall cause each of their Subsidiaries to, observe and comply with, and cause each Subsidiary to observe and comply with all Environmental Law, except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  The Credit Parties will give the Agent and each Lender prompt written notice of any violation as to any Environmental Law by any Credit Party and of the commencement of any judicial or administrative proceeding relating to Environmental Laws which shall, or could reasonably be expected to, have a Material Adverse Effect.

**6.13    Matters Relating to Additional Real Property Collateral.**

(a) From and after the Effective Time, in the event that Credit Party acquires any Mortgaged Property or in the event that the Agent or the Required Lenders determine that any Real Property Asset has become a Mortgaged Property, if requested by Agent, the Credit Parties shall, and shall cause each of their Subsidiaries to: (i) deliver to the Agent, as soon as practicable after the Agent or the Required Lenders have

notified the Credit Parties that a Real Property Asset is a Mortgaged Property, fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering the interest of the applicable Credit Party in such Mortgaged Property, together with mortgagee title insurance policies or commitments therefor, and copies of all surveys, deeds, title exception documents, flood hazard certificates and other documents as the Agent or the Required Lenders may reasonably require with respect to such Mortgaged Property, all of which shall be in form and substance satisfactory to the Agent and provided at the sole cost and expense of the Credit Parties; and (ii) take or cause to be take all such other actions as the Agent or the Required Lenders may reasonably require in order to provide the Agent with a perfected, First Priority Lien (subject to Permitted Liens and the Carve-Out) on such Mortgaged Property, all of which actions shall be taken in a manner satisfactory to the Agent and at the sole cost and expense of the Credit Parties.

(b) From and after the Effective Time, in the event that any Credit Party enters into any lease with respect to any real property, such Credit Party shall provide prompt written notice thereof to the Agent and, if requested by the Agent, the Credit Parties shall deliver promptly to the Agent copies of the lease, and all amendments thereto, between the Credit Party and the landlord or tenant, and, if such real property constitutes Material Leasehold Property, such Credit Party shall deliver to the Agent a Landlord's Waiver and Consent with respect thereto and where required by the terms of any lease, the consent of the mortgagee, ground lessor or other party.

6.14    **Cash Deposits; Bank Accounts and Securities Accounts**.  Upon request made upon the occurrence and during the continuation of an Event of Default, the Credit Parties shall take all actions reasonably requested by Agent to maintain, preserve and protect the rights and interests of the Agent with respect to all cash deposits of the Credit Parties and all other proceeds of Collateral.

6.15    **Compliance with Budget; Budget Reporting; Carve-Out**.

(a) The Credit Parties shall meet and comply, in all respects and at all times, with the Budget, subject to the Permitted Variance, including, without limitation, as to actual disbursements, cash receipts and expenditures.

(b) Beginning with the first week after the Petition Date and continuing on each Thursday thereafter, the Credit Parties shall furnish to the Agent for distribution to each Lender, a budget compliance certificate of a Designated Financial Officer in the form of Exhibit D certifying that the Credit Parties are in compliance with the Budget (subject to the Permitted Variance), accompanied by: (i) a report of the net aggregate unfavorable variances under the Budget, including, without limitation, as to cash flow, actual cash receipts and actual cash disbursements, in form and substance satisfactory to Agent; and (ii) a report containing a summary of accrued, but unpaid, professional fees and expenses of the Borrower and the other Credit Parties and the Committee incurred in the Chapter 11 Case as of such date.

(c) No portion of the Carve-Out or any other proceeds of any Borrowing under this Agreement may be used to litigate, investigate, object, contest or challenge in any manner or raise any defenses or offsets to the Obligations, security interests or Liens of the Agent or Lenders under this Agreement or the other Loan Documents or any other claims against the Agent or Lenders or their Affiliates, whether by challenging the validity, perfection or priority of any Security Document, security interest or Lien with respect thereto or any other rights or interests or replacement Liens with respect thereto or any other or interests of the Agent or Lenders (in such capacities), or by seeking to subordinate or recharacterize the Obligations or disallow any claim, Security Document, security interest or Lien by asserting any claims or causes of action, including without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Agent, Lenders or any of their officers, directors, agents, attorneys, representatives or employees.  In addition, the Carve-Out and any other proceeds of any Borrowing under this Agreement shall not be used in connection with: (i) preventing, hindering or delaying (directly or indirectly)  the Agent or Lenders' enforcement or realization upon the Collateral once an Event of Default has occurred; (ii) selling or otherwise disposing of the Collateral without the written consent of the Agent and Lenders; (iii) using or seeking to use any insurance proceeds

related to the Collateral without the written consent of the Agent and Lenders; or (iv) incurring indebtedness senior to the Liens granted to Agent under the Loan Documents or Financing Orders, other than in accordance with the Loan Documents.

**6.16    Minimum Cash Balance.**  After giving effect to the Wind-Down Amount to be funded on the dates and in the manner set forth in the Financing Orders, the Borrower shall have access to aggregate amount of unrestricted cash in deposit accounts (other than any payroll or other special accounts) of the Borrower of not less than $100,000 at all times.

**6.17    Certain Deliverables.**  The Credit Parties shall, at their own expense, deliver or cause to be delivered, to the Agent the items set forth below, in form and substance satisfactory to Agent, on or prior to the corresponding dates set forth below (or such later date or dates as may be approved by the Agent in its sole discretion in writing):

(a)  On or before the date that is seven (7) Business Days after the Effective Time, all general liability and other liability policies with respect to any Credit Party shall name the Agent for the benefit of the Lenders as an additional insured thereunder as its interests may appear, and all business interruption and casualty insurance policies shall contain a loss payable clause or endorsement, satisfactory in form and substance to the Agent that names the Agent for the benefit of the Lenders as the loss payee thereunder;

(b)  On or before the date that is seven (7) Business Days after the Effective Time, the following possessory Collateral: all promissory notes or other instruments (duly endorsed, where appropriate, in a manner reasonably satisfactory to the Agent) evidencing any Collateral.

(c)  On or before the date that is twenty (20) days after any request made by Agent, in its discretion; (i) a fully executed three-party escrow service agreement, by and among (a) Borrower, as depositor, (b) Agent (on behalf of itself and the Lenders), as beneficiary and (c) Iron Mountain Intellectual Property Management, Inc. or another software escrow agent satisfactory to Agent, as escrow agent; and (ii) written evidence that Borrower's material software assets have been placed on deposit with such escrow agent.

**6.18    Additional Deliverables.**

(a)  Documents To Filed with the Bankruptcy Court or Delivered to the U.S. Trustee or Committee. As soon as available and in any event at least two (2) Business Days' prior to their being filed with the Bankruptcy Court (unless exigent circumstances require a shorter period, provided that as much advance notice as is possible shall still be given), copies of all monthly reports as well as all pleadings, motions, applications, judicial information or other information with respect to the Credit Parties' financial condition anticipated to be filed by or on behalf of the Credit Parties with the Bankruptcy Court or served by the Credit Parties to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee.

(b)  Documents Filed with the Bankruptcy Court or Delivered to the U.S. Trustee or Committee. Promptly, upon their being filed with the Bankruptcy Court, provide copies of all monthly reports as well as all pleadings, motions, applications, judicial information or other information with respect to the Credit Parties' financial condition filed by or on behalf of the Credit Parties with the Bankruptcy Court or served by the Credit Parties to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee, at the time such document is filed with the Bankruptcy Court or served by the Credit Parties to or upon the United States Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee, to the extent such document has not otherwise been served pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Case or otherwise.

(c)  Additional Security Documents. As soon as reasonably practicable, upon the reasonable

request of the Agent, at the Credit Parties' expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents, the Financing Orders or otherwise deemed by the Agent reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except Permitted Liens and the Carve-Out, or use commercially reasonable efforts to obtain any consents or waivers as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Agent as the Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents or the Financing Orders. Upon the exercise by the Agent of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Agent may reasonably require. If the Agent or the Required Lenders determine that they are required by law or regulation to have appraisals prepared in respect of the Mortgaged Property of the Credit Parties constituting Collateral, the Credit Parties shall provide to the Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance reasonably satisfactory to the Agent.

(d) Information Regarding Status of Sale Transaction. The Credit Parties shall promptly provide the Agent and Lenders with copies of all financial reports, schedules and other materials or information related to the Collateral at any time furnished by the Credit Parties, or on behalf of the Credit Parties, to any purchaser of the Credit Parties' business operations or assets, any Committee or any of the Credit Parties' shareholders, concurrently with the delivery thereof. The Credit Parties shall keep the Agent fully informed of the Credit Parties' efforts to consummate a Sale Transaction, and upon the Agent's request, shall promptly provide the Agent and Lenders with copies of all material documents, schedules or materials provided to any purchaser of the Credit Parties' business operations or assets. In addition to and not in lieu of the foregoing, the Credit Parties shall provide the Agent and the Lenders with copies of any and all notices of default or other material events under any purchase agreement or other similar agreement, simultaneously with the issuance or receipt thereof, as applicable.

(e) Other Information. As soon as reasonably practicable, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of any Loan Document, as the Agent or any Lender may reasonably request.

6.19    Cooperation with Advisors. The Credit Parties will use commercially reasonable efforts to cooperate and assist Advisors hired by or at the discretion of the Agent to enable such Advisors to perform the services for which they were engaged, including, without limitation, promptly providing such information and documents as such Advisors may reasonably request.

6.20    Sale Transaction. The Credit Parties shall use their best efforts to make a Disposition of their assets and business operations as promptly as possible, pursuant to a 363 Sale, pursuant to a transaction or transactions that shall generate liquidity in an amount sufficient to enable the Borrower to satisfy the Obligations to the Agent and the Lenders in full in cash, and on terms and conditions reasonably satisfactory to Agent (one or more such transactions, collectively, the "Sale Transaction"). Any asset purchase agreement(s), arrangements, pleadings or other documents relating to such Disposition Transaction which the Credit Parties shall enter into shall be reasonably acceptable to Agent. In furtherance and not in limitation of the foregoing, and unless otherwise agreed to by the Agent, in its absolute and sole discretion, the Credit Parties shall comply with the following milestones by the dates specified below (or such later date as may be agreed to by the Agent in its sole discretion) (collectively, the "Sale Transaction Benchmarks") in all material respects;

(a) Motion to Approve Bidding Procedures. On the Petition Date, the Credit Parties shall file a motion to approve proposed bidding procedures and a timeline to consummate a Sale Transaction (which

shall include, without limitation, an auction date, the requirement that the sale be either (a) be for cash consideration in an amount that will satisfy the sum of the Obligations (including all fees, expenses and costs of the Agent associated therewith, the timing of a proposed sale, and deadlines for completing due diligence and submitting offers/bids) or (b) otherwise be on terms and conditions (including non-cash, cash or combination bid terms for some or all of the assets) acceptable to the Required Lenders in their sole discretion, and designating Stalking Horse Bidder as the "stalking horse bidder" pursuant to the Stalking Horse APA in accordance with its terms, which shall also be in form and substance satisfactory to Agent; provided, however, that the parties hereby acknowledge and agree that the Agent and/or the agent under the Pre-Petition Credit Agreement, individually or collectively, shall be permitted to submit a bid consisting in whole or in part of a credit bid or other similar non-cash bid on behalf of the Lenders hereunder and/or on behalf of the Pre-Petition Lender, as the case may be;

(b) Interim Order; Final Order. No later than one (1) Business Day after the Petition Date, the Credit Parties shall file a motion seeking Bankruptcy Court approval of this Agreement, the other Loan Documents and the Transactions, in form and substance satisfactory to the Agent. The Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to the Agent, within four (4) Business Days of the Petition Date and a Final Order on or before the date that is twenty six (26) days after the Petition Date.

(c) Approval of Bidding Procedures. On or before the date that is twenty six (26) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Credit Parties' proposed bidding procedures and timeline to consummate a Sale Transaction, which shall be in form and substance satisfactory to Agent;

(d) Final Auction. On or before the date that is fifty-three (53) days following the Petition Date, the Credit Parties shall have held a final auction (the "Final Auction"), made a determination as to the highest or best bid with respect to a Sale Transaction in consultation with the Agent and Lenders, and accepted such bid (the "Accepted Bid");

(e) Sale Order. On or before the date that is fifty five (55) days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Sale Transaction with respect to the Accepted Bid, which order shall be in form and substance reasonably satisfactory to the Agent; and

(f) Closing of Sale; Remittance of Proceeds. On or before the date that is sixty (60) days following the Petition Date, the Credit Parties shall close the Sale Transaction and concurrently with such closing shall deliver the indefeasible payment to the Agent, for the benefit of the Lenders, of any and all proceeds therefrom as a permanent reduction of the Obligations.

6.21    Assumption and Rejection of Leases. Prior to the date upon which the Obligations have been indefeasibly repaid in full in cash, the Credit Parties shall not assume or reject any leases of real property or any executory contract(s): (a) unless such assumption or rejection is contemplated by the terms of the Stalking Horse APA; or (b) the Agent consents to such assumption or rejection in writing in advance, provided that any such consent may be granted or withheld by Agent in the exercise of its reasonable discretion.

## ARTICLE 7

### Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each Credit Party covenants and agrees with the Agent and the Lenders that:

7.1    Indebtedness. The Credit Parties shall not, and shall not permit any of their Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

- 43 -

(a)  Indebtedness created hereunder (including, without limitation, the Closing Date Term Loan Advance and any other Term Loan Advances);

(b)  Existing Debt on the Closing Date which is set forth in Schedule 7.1 and has been designated on such schedule as Indebtedness that will remain outstanding following the funding of the initial Loans, and any extension, renewal, refunding, refinancing or replacement of any such Indebtedness that does not increase the principal amount thereof;

(c)  Indebtedness of a Domestic Credit Party to any other Credit Party;

(d)  Guarantees permitted under Section 7.3;

(e)  Intentionally Omitted;

(f)  Intentionally Omitted;

(g)  Indebtedness in respect of Hedging Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Credit Parties are exposed in the conduct of their business or the management of their liabilities;

(h)  Subordinated Indebtedness of the Credit Parties, *provided* that (i) the principal amount of all such Indebtedness incurred by the Credit Parties from and after the Effective Time shall not exceed $50,000 in the aggregate, (ii) at the time of and immediately after giving effect to the incurrence of such Subordinated Indebtedness, no Default shall have occurred and be continuing, (iii) such Indebtedness shall be unsecured and (iv) the proceeds of such Indebtedness (less any portion thereof required to be applied to prepay the Loans pursuant to Section 2.5(b)(i)) shall be used by the Credit Parties for working capital purposes of the Credit Parties;

(i)  Indebtedness consisting of netting services, overdraft protection and similar arrangements in connection with deposit accounts in the ordinary course of business; and

(j)  Indebtedness consisting of unsecured promissory notes issued by Borrower to directors or employees to finance the purchase or redemption of capital stock of Borrower to the extent such purchase or redemption is permitted by Section 7.6(c).

Notwithstanding the foregoing, no Indebtedness under Sections 6.1(b) through (j), shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the Superpriority Claims of the Agent and Lenders, except as specifically set forth herein or in the Financing Orders.

7.2    **Liens**.  The Credit Parties shall not, and shall not permit any of their Subsidiaries to, create, incur, assume or permit to exist any Lien on any Property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except (the following being called "Permitted Liens"):

(a)  Liens created in favor of the Agent hereunder or under the other Loan Documents or pursuant to the Financing Orders;

(b)  any Lien on any property or asset of any Credit Party existing on the date hereof and set forth in Schedule 7.1 (excluding, however, following the making of the Loans hereunder, the Liens in favor of any Person other than the Agent securing Indebtedness not designated on said schedule as Indebtedness to remain outstanding following the funding of the Loans), *provided* that (i) such Lien shall not apply to any other property or asset of any Credit Party and (ii) such Lien shall secure only those obligations which it

- 44 -

secures on the date hereof and extensions, renewals, refinancing and replacements thereof that do not increase the outstanding principal amount thereof;

(c) Liens imposed by any Governmental Authority for taxes, assessments or charges not yet delinquent or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Credit Party in accordance with GAAP;

(d) landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens, and vendors' Liens imposed by statute or common law not securing the repayment of Indebtedness, arising in the ordinary course of business which are not overdue by more than 60 days or which are being contested in good faith and by appropriate proceedings and Liens securing judgments (including pre-judgment attachments) but only to the extent for an amount and for a period not resulting in an Event of Default under Section 8.1(j) hereof;

(e) pledges or deposits under worker's compensation, unemployment insurance and other social security legislation and pledges or deposits to secure the performance of bids, tenders, trade contracts (other than for borrowed money), leases (other than capital leases), utility purchase obligations, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(f) easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, easements, licenses, restrictions on the use of Property or minor imperfections in title thereto which, in the aggregate, are not material in amount, and which do not, in the aggregate, materially detract from the value of the Property of any Credit Party or materially interfere with the ordinary conduct of the business of any Credit Party;

(g) Liens consisting of bankers' liens and rights of setoff, in each case, arising by operation of law, and Liens on documents presented in letter of credit drawings;

(h) Any interest or title of a lessor, sublessor, licensor or sublicensor under any operating lease or license entered into by any Credit Party as lessee, sublessee, licensee or sublicensee in the ordinary course of business and any precautionary UCC financing statements filed in connection therewith;

(i) Liens of a collecting bank arising under Section 4-210 of the UCC on items in the course of collection; and

(j) the Carve-Out;

provided, however, that no consensual Liens shall be permitted to exist, directly or indirectly, on any capital stock of any Credit Party, other than Liens granted to Agent and Lenders pursuant to the Financing Orders. Notwithstanding the foregoing, Liens permitted under Sections 7.2(b) through (j) shall at all times be junior and subordinate to the Liens under the Loan Documents and the Financing Orders, other than the Carve-Out. The prohibition provided for in this Section 7.2 specifically includes, without limitation, a prohibition on and against any Credit Party, any Committee, or any other party-in-interest in the Chapter 11 Case or in any successor case priming or creating pari passu to any claims, Liens or interests of the Agent and the Lenders any Lien (other than for the Carve-Out) irrespective of whether such claims, Liens or interests may be "adequately protected" (unless the Obligations and adequate protection claims will be paid in full in cash upon the granting of any such Lien and the Commitments hereunder terminated).

7.3    **Contingent Liabilities.**  The Credit Parties shall not, and shall not permit any of their Subsidiaries to, Guarantee the Indebtedness or other obligations of any Person, or Guarantee the payment of dividends or other distributions upon the stock of, or the earnings of, any Person, except:

(a) endorsements of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(b) Guarantees and letters of credit in effect on the date hereof which are disclosed in Schedule 7.1, and any replacements thereof in amounts not exceeding such Guarantees;

(c) Guarantees in favor of the Agent and the Lenders;

(d) Guarantees by any Credit Party of Indebtedness of any Domestic Credit Party to the extent such Indebtedness is otherwise permitted by Section 7.1; and

(e) Guarantees by any Credit Party of obligations (other than Indebtedness) of any Domestic Credit Party to the extent such obligations are permitted or not restricted by this Agreement.

**7.4    Fundamental Changes; Asset Sales.**

(a) The Credit Parties shall not, and shall not permit any of their Subsidiaries to, enter into any transaction of merger or consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution). The Credit Parties shall not, and shall not permit any of their Subsidiaries to, acquire any business or property from, or capital stock of, or other equity interests in, or be a party to any acquisition of, any Person except for purchases of property in the ordinary course of business, Investments permitted under Section 7.5, *provided* that the Lien on and security interest in such property granted or to be granted in favor of the Agent pursuant to the Financing Orders or under the Security Documents shall be maintained or created in accordance with the terms of this Agreement. The Credit Parties shall not, and shall not permit any of their Subsidiaries to, form or acquire any Subsidiary without the express prior written consent of the Required Lenders.

(b) The Credit Parties shall not, and shall not permit any of their Subsidiaries to, convey, sell, lease, transfer or otherwise dispose (including any Disposition) of, in one transaction or a series of transactions, any part of their business or property, whether now owned or hereafter acquired (including receivables, Patents, Trademarks, Copyrights and leasehold interests but excluding (x) obsolete or worn-out tangible property (including leasehold interests other than Material Leasehold Property), or tools, equipment or other tangible property (other than any Material Leasehold Property or Material Owned Property) no longer used or useful in their business and (y) any inventory or other property (other than receivables) sold or disposed of in the ordinary course of business and on ordinary business terms), *provided* that the Credit Parties may sublease real property to the extent such sublease would not interfere with the operation of the business of the Credit Parties. The Credit Parties shall not, and shall not permit any of their Subsidiaries to, offer to issue or issue any capital stock or other equity interests, *provided* that Borrower may issue Qualified Equity Interests so long as (A) the proceeds thereof are applied to prepay the Loans to the extent required by Section 2.5(b)(i) and (B) no Change of Control results therefrom.

(c) Notwithstanding the foregoing provisions of this Section 7.4:

(i)    any Domestic Credit Party may be merged or combined with or into any other Domestic Credit Party, *provided* that if such merger involves the Borrower, (x) the Borrower shall be the surviving entity and (y) no Change of Control shall occur;

(ii)    any Domestic Credit Party which is a Subsidiary of the Borrower may sell, lease transfer or otherwise dispose of any or all of its property (upon voluntary liquidation or otherwise) to the Borrower or any other Domestic Credit Party which is a Subsidiary of the Borrower;

(iii)    the Credit Parties may consummate other Dispositions not otherwise permitted by clauses (i) through (ii) of this Section 7.4(c), *provided* that the aggregate fair market

value of all such assets sold or otherwise disposed of during the term of this Agreement does not exceed $10,000;

(iv)    the Credit Parties may consummate Dispositions pursuant to a 363 Sale, through a confirmed Reorganization Plan in the Chapter 11 Case, or otherwise (including, without limitation, a Sale Transaction), provided that the Obligations are paid in full in cash or cash equivalents concurrently with the closing or confirmation thereof and the Lenders' Commitments terminate hereunder.

To the extent the Required Lenders or all the Lenders, as applicable, waive the provisions of this Section 7.4 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 7.4, such Collateral shall be sold free and clear of the Liens created pursuant to the Financing Orders or by the Security Documents.

**7.5    Investments; Hedging Agreements; Subsidiary Cash.**

(a) The Credit Parties shall not, and shall not permit any of their Subsidiaries to, make or permit to remain outstanding any Investment, except:

(i)     (A) Investments existing on the date hereof by any Credit Party in the equity interests of its Subsidiaries, (B) Investments by the Borrower in the equity interests of its Subsidiaries that are Domestic Credit Parties and (C) Investments by Subsidiaries that are not Credit Parties in other Subsidiaries that are not Credit Parties;

(ii)    Investments consisting of Guarantees permitted by Section 7.3 and Indebtedness permitted by Section 7.1(c);

(iii)   Permitted Investments, subject to the Budget (subject to the Permitted Variance);

(iv)    Intentionally Omitted;

(v)     Checking and deposit accounts with banks used in the ordinary course of business;

(vi)    Investments by the Borrower in PowerPlay, *provided* that (w) all such Investments are made solely in cash, (x) the sum of the aggregate amount of all Investments made by the Borrower in PowerPlay from and after the date of this Agreement shall not exceed amounts set forth in the Budget, (y) if requested by Agent, all loans by the Borrower to PowerPlay shall be evidenced by an intercompany note, which together with any necessary endorsements shall have been pledged to the Agent and delivered to the Agent to be held as collateral security for the Obligations and (z) no Default or Event of Default exists or would immediately result after giving effect to such transaction;

(vii)   Investments consisting of capital stock received in satisfaction of disputes or in connection with the bankruptcy of a customer; and

(viii)  Deposits or pledges permitted under Section 7.2(e).

In determining the amount of Investments permitted under Section 7.5(a)(vi), (A) the amount of any Investment not constituting Indebtedness outstanding at any time shall be the aggregate Investment by the applicable Person, less all dividends or other distributions on equity or returns of capital received by such Person with respect to that particular Investment and (B) the amount of any Investment constituting

- 47 -

Indebtedness outstanding at any time shall be the outstanding principal balance of such Indebtedness at such time plus all accrued interest thereon.

(b) The Credit Parties shall not, and shall not permit any of their Subsidiaries to, enter into any Hedging Agreement, other than Hedging Agreements permitted by Section 7.1(g).

**7.6     Restricted Junior Payments.** The Credit Parties shall not, and shall not permit any of their Subsidiaries to declare or make any Restricted Junior Payment at any time; *provided, however,* that:

(a) any Subsidiary of a Domestic Credit Party may pay or make dividends and distributions to such Domestic Credit Party;

(b) so long as no Default has occurred and is continuing or would result therefrom, Borrower may redeem its capital stock solely in exchange for other capital stock of Borrower constituting Qualified Equity Interests;

(c) so long as the Requisite Lenders have provided their written consent in writing in advance in their sole discretion, Borrower may redeem any of its capital stock or warrants or options to acquire any of its capital stock owned by any terminated employee, *provided* that: (i) no Default or Event of Default has occurred and is continuing or would arise as a result of such payment; (ii) the aggregate amount of all such payments (whether made in cash, by the issuance of Indebtedness or otherwise) shall not exceed $10,000 during the term of this Agreement; and (iii) the aggregate amount of all such payments made in cash shall not exceed $10,000 during the term of this Agreement; and

(d) To the extent permitted under the applicable Subordination Agreement, the applicable Credit Party may pay as and when due and payable regularly scheduled interest in respect of Subordinated Indebtedness.

**7.7     Transactions with Affiliates.** Except for the Transactions contemplated by this Agreement and as expressly permitted by this Agreement, the Credit Parties shall not, and shall not permit any of their Subsidiaries to, directly or indirectly (a) make any Investment in an Affiliate; (b) transfer, sell, lease, assign or otherwise dispose of any property to an Affiliate; (c) merge into or consolidate with an Affiliate, or purchase or acquire property from an Affiliate; or (d) enter into any other transaction directly or indirectly with or for the benefit of an Affiliate (including guarantees and assumptions of obligations of an Affiliate); *provided* that:

(i)     any Affiliate who is an individual may serve as a director, officer, employee or consultant of any Credit Party, receive reasonable compensation for his or her services in such capacity and benefit from Permitted Investments to the extent specified in clause (e) of the definition thereof;

(ii)     the Credit Parties may engage in and continue the transactions with or for the benefit of Affiliates which are described in Schedule 7.7 or are referred to in Section 7.6 (but only to the extent specified in such section); and

(iii)     the Credit Parties may engage in transactions with Affiliates in the ordinary course of business on terms which are no less favorable to the Credit Parties than those likely to be obtained in an arms' length transaction between a Credit Party and a non-affiliated third party.

**7.8     Restrictive Agreements.** The Credit Parties shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement (other than this Agreement) that prohibits, restricts or imposes any condition upon (a) the ability of any Credit Party to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary of any Credit Party to pay dividends or other distributions to such Credit Party with respect to any

shares of its capital stock or other equity interests or to make or repay loans or advances to any Credit Party or the ability of any Credit Party to Guarantee Indebtedness of any other Credit Party; *provided* that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 7.8 (but shall apply to any extension or renewal of, or any amendment or modification materially expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of stock or assets of a Subsidiary of a Credit Party pending such sale, *provided* such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts (excluding license agreements) restricting the assignment thereof.

       **7.9**    **Sale-Leaseback Transactions; Leases**. The Credit Parties shall not, and shall not permit any of their Subsidiaries to, directly or indirectly: (a) enter into any arrangements with any Person whereby any Credit Party or such Subsidiary shall sell or transfer (or request another Person to purchase) any property, real, personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property from any Person; and/or (b) enter into any arrangements with any Person whereby any Credit Party or such Subsidiary shall enter into any lease of any property, real, personal or mixed without the prior written consent of the Required Lenders, which consent may be granted or withheld by them in their sole discretion.

       **7.10**    **Certain Employee Related Matters**. The Credit Parties shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, enter into any arrangements with workers, directors, officers or employees in respect of employment, separation or severance matters without the prior written consent of the Required Lenders, which consent may be granted or withheld by them in the sole discretion.

       **7.11**    **Lines of Business**. The Credit Parties shall not, and shall not permit any of their Subsidiaries to, engage to any substantial extent in any line or lines of business activity other than (a) the types of businesses engaged in by the Credit Parties as of the Effective Time and businesses substantially related or incidental thereto, and (b) such other lines of business as may be consented to by the Required Lenders.

       **7.12**    **Other Indebtedness.**

       (a) The Credit Parties shall not, and shall not permit any of their Subsidiaries to, purchase, redeem, retire or otherwise acquire for value, or set apart any money for a sinking, defeasance or other analogous fund for the purchase, redemption, retirement or other acquisition of, or make any voluntary payment or prepayment of the principal of or interest on, or any other amount owing in respect of any Subordinated Indebtedness, except to the extent permitted by Section 7.6 or the Financing Orders.

       (b) The Credit Parties shall not, and shall not permit any of their Subsidiaries to, make any payments or transfer, or agree to any setoff or recoupment, with respect to any Pre-Petition claim, Pre-Petition Lien or Pre-Petition Indebtedness, except as approved by order of the Bankruptcy Court.

       **7.13**    **Modifications of Certain Documents and Financing Orders**. The Credit Parties shall not, and shall not permit any of their Subsidiaries to, consent to or effect any amendment, modification, supplement or waiver of any of the provisions of any organizational documents of any Credit Party or Subsidiary, any documents or agreements evidencing, governing or securing any Subordinated Indebtedness; *provided, however*, that the Credit Parties may amend any term or provision of their organizational documents so long as such amendment does not materially and adversely affect the interests or rights of the Agents and the Lenders. By way of illustration and without limiting the condition set forth in the proviso contained in the immediately preceding sentence, any amendment to any term or provision of any organizational documents of the Credit

Parties pertaining to the rights of holders of preferred equity interests, common equity interests or warrants shall be deemed to materially and adversely affect the interests of the Agent and the Lenders to the extent that such amendment confers upon the holders thereof rights which, if exercised against any Credit Party, would cause an Event of Default to occur. The Credit Parties shall not, and shall not permit any of their Subsidiaries to, consent to or effect any amendment, modification, supplement or waiver of any of the provisions of (i) any Financing Order without the prior written consent of the Agent or (ii) any First Day Order except for amendments or modifications which are not in any way adverse in any material respect to the interests of the Agent or Lenders in such capacities.

**7.14    Critical Vendor and Other Payments.** The Credit Parties shall not, and shall not permit any of their Subsidiaries to, make: (a) any pre-petition "critical vendor" payments or other payments on account of any creditor's Pre-Petition unsecured claims; (b) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code; or (c) payments under any plan or on account of any claim that requires approval pursuant to Section 503(c) of the Bankruptcy Code; except in each case in amounts and on terms and conditions that (x) are approved by order of the Bankruptcy Court and (y) are expressly permitted by the terms of the Loan Documents and the Budget (subject to the Permitted Variance) or as otherwise expressly permitted under the First Day Orders.

**7.15    Pre-Petition Indebtedness.** Except as provided in the Financing Orders or other orders entered by the Bankruptcy Court, the Credit Parties shall not, and shall not permit any of their Subsidiaries to, make any adequate protection payments on account of any Pre-Petition Indebtedness.

# ARTICLE 8

## Events of Default

**8.1    Events of Default.** The occurrence of any of the following events shall be deemed to constitute an "Event of Default" hereunder:

(a) the Credit Parties shall fail to pay to the Agent or the Lenders (i) any principal of any Loan when the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration of such due or prepayment date, or otherwise or (ii) any interest on any Loan or any other Obligation (other than any Obligation specified in clause (i) of this Section 8.1(a)) of the Credit Parties to the Agent or the Lenders within five (5) days after same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration of such due or prepayment date, or otherwise;

(b) any representation or warranty made or deemed made by or on behalf of any Credit Party or any Subsidiary in or in connection with this Agreement, any of the other Loan Documents or any amendment or modification hereof or thereof, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement, any of the other Loan Documents or any amendment or modification hereof or thereof, shall prove to have been incorrect in any material respect when made or deemed made;

(c) the Credit Parties (i) shall fail to observe or perform any covenant, condition or agreement contained in Sections 6.1, 6.2, 6.3 (with respect to existence), 6.5, 6.6, 6.8, 6.9, 6.14, 6.15, 6.16 or 6.17, 6.18, 6.19, 6.20, 6.21 or in Article 7, (ii) shall fail to observe or perform any covenant, condition or agreement contained in Section 6.10 and such failure described in this clause (ii) shall continue unremedied for a period of 10 days after the earlier of (x) Knowledge by any Credit Party or (y) written notice thereof from the Agent (given at the request of any Lender) to the Borrower or (iii) shall fail to observe or perform any other covenant, condition or agreement contained in Sections 6.3 (other than with respect to existence), 6.4, 6.7, 6.11, 6.12, or 6.13 and such failure described in this clause (iii) shall continue unremedied for a period of 30 days after the earlier of (x) Knowledge by any Credit Party or (y) written notice thereof from the Agent (given

at the request of any Lender) to the Borrower;

(d) the Credit Parties or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clauses (a), (b) or (c) of this Section 8.1) or any other Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier of (x) Knowledge by any Credit Party or (y) written notice thereof from the Agent (given at the request of any Lender) to the Borrower;

(e) the Credit Parties or any Subsidiary shall fail to make any payment (whether of principal, interest or otherwise and regardless of amount) in respect of any Material Indebtedness or any Material Rental Obligation incurred or entered into after the Petition Date, when and as the same shall become due and payable, after giving effect to any grace period with respect thereto;

(f) any event or condition (other than the commencement of the Chapter 11 Cases on the Petition Date) occurs that results in (i) any Material Indebtedness of any Credit Party or any Subsidiary becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, or (ii) the lease with respect to any Material Rental Obligation of any Credit Party or any Subsidiary being terminated prior to its scheduled expiration date or that enables or permits (with or without the giving of notice, the lapse of time or both) the counterparty to such lease to cause such lease to be terminated prior to its scheduled expiration date;

(g) the Credit Parties (i) shall fail to achieve the Sale Transaction Benchmarks set forth in Section 6.20 by the dates specified therein (or such later date as may be agreed to by the Agent in its sole discretion), in form and substance satisfactory to Agent and Required Lenders; or (ii) shall fail to comply with the provisions of the Stalking Horse APA or any other definitive written agreement providing for the sale, transfer or other disposition of any of the Credit Party's assets or the termination or revocation of the Stalking Horse APA or any other such agreement;

(h) the occurrence of any of the following in the Chapter 11 Case:

(i) the entry of an order or ruling (which has not been withdrawn, dismissed or reversed): (a) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in full the Obligations due under this Agreement with the termination of all related Commitments hereunder); (b) to grant any Lien other than Permitted Liens and the Carve-Out upon or affecting any Collateral without the prior written consent of the Agent (unless the granting of such Lien is simultaneous with a refinancing to pay in full in cash all Obligations due under this Agreement and the termination of the Lenders' Commitments hereunder); or (c) except as provided in the Financing Orders, to use cash collateral of Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent;

(ii) the filing of any Reorganization Plan or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by the Credit Parties which plan does not propose to provide for the payment in full in cash of all Obligations under this Agreement and the termination of the Lenders' Commitments hereunder, in each case to which the Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(iii) the entry of an order in the Chapter 11 Case confirming a Reorganization Plan that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement, to which the Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(iv)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or any other Financing Order (except with respect to ministerial changes) without the written consent of the Agent or the filing of a motion for reconsideration with respect to any Financing Order;

(v)    the entry of an order allowing any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any Agent, any Lender or any of the Collateral;

(vi)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, the reorganization of the Credit Parties (or the Credit Parties seek or acquiesce in such relief);

(vii)    the sale without the Agent's and the Required Lenders' consent, of all or substantially all of the assets of the Credit Parties through a 363 Sale, through a confirmed Reorganization Plan in the Chapter 11 Case, or otherwise (or the Credit Parties seek or acquiesce in such relief) that does not provide for payment in full in cash of the Obligations and termination of Lenders' Commitments, to which the Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(viii)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code (except as consented to by the Agent and the Required Lenders) or the Credit Parties shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code, conversion of the Chapter 11 Case or otherwise;

(ix)    other than pursuant to the First Day Orders or the Financing Orders, the entry of a final order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code: (a) to allow any creditor to execute upon or enforce a Lien on any Collateral having value in excess of $150,000; or (b) with respect to any Lien on or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(x)    the entry of an order in the Chapter 11 Case avoiding or requiring disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xi)    the failure of the Credit Parties to perform any of their material obligations under the Interim Order, the Final Order or any other Financing Order, which materially and adversely affects the interests of any of the Lenders, taken as a whole, the Agent as reasonably determined by the Agent and the Required Lenders, as the case may be;

(xii)    except as otherwise provided by the Financing Orders, the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to Agent, on behalf of itself and/or the Lenders;

(xiii)    the Credit Parties' return of goods constituting Collateral pursuant to Section 546(g) of the Bankruptcy Code other than in accordance with any such program (a) approved pursuant to a First Day Order, or (b) otherwise approved by the Bankruptcy Court.

(i)    any claim is asserted against Agent or Lenders pursuant to Section 7 of the Interim Order or any successor provision in any subsequent Financing Order;

(j)   a final judgment or judgments for the payment of money in excess of $100,000 in the aggregate (exclusive of judgment amounts fully covered by insurance where the insurer has not denied liability in respect of such judgment) shall be rendered by one or more courts, administrative tribunals or other bodies having jurisdiction against any Credit Party or any Subsidiary and the same shall not be discharged (or provision shall not be made for such discharge), bonded, or a stay of execution thereof shall not be procured, within 60 days from the date of entry thereof and the relevant Credit Party or any Subsidiary shall not, within said period of 60 days, or such longer period during which execution of the same shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal;

(k)   an ERISA Event (other than the commencement of the Chapter 11 Case on the Petition Date) shall have occurred that, in the reasonable opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(l)   there shall occur any Change of Control;

(m)   any of the following shall occur: (i) the Liens created hereunder or under the other Loan Documents, Security Documents or Financing Orders shall at any time (other than by reason of the Agent relinquishing such Lien) cease to constitute valid and perfected Liens on Collateral intended to be covered thereby having a fair market value of $100,000 in the aggregate; (ii) except for expiration in accordance with its respective terms, (A) this Agreement, (B) any Note, (C) any Security Document, (D) the Loan Documents or (E) the Financing Orders, taken as a whole, shall for whatever reason be terminated, or shall cease to be in full force and effect; or (iii) the enforceability of any Loan Document shall be contested by (x) any Person (other than a Credit Party, the Agent or any Lender) in good faith or (y) any Credit Party;

(n)   there shall occur any loss theft, damage or destruction of any Collateral not fully covered (subject to such reasonable deductibles as the Agent shall have approved) by insurance and having a fair market value of $100,000 in the aggregate;

(o)   any Guarantor shall assert that its obligations under any Loan Document shall be invalid or unenforceable;

(p)   there shall occur any Material Adverse Effect, subject to reasonable allowances for: (i) (the commencement of the Chapter 11 Case or the Effect of Bankruptcy; and (ii) the Budget and limitations under this Agreement; or

(q)   the occurrence of any condition or event that permits Agent and/or Lenders to exercise any of the remedies set forth in any Financing Orders, including, without limitation, any event which causes the occurrence of the Termination Date (as defined in any Financing Order), in each case, without any notice, grace and/or cure period of any kind (except to the extent, if any, required or permitted under any Financing Order or any other order of the Bankruptcy Court);

then, and in every such event, and at any time thereafter during the continuance of such event (notwithstanding anything herein to the contrary, but subject in each case to the provisions of the Loan Documents and the Financing Orders), the Agent may, and at the request of the Required Lenders shall, by notice to the Credit Parties, take any or all of the following actions, at the same or different times (i) terminate the Commitments and declare a Termination Date (as defined in any Financing Order), and thereupon the Commitments shall terminate immediately, but without affecting the Obligations or Liens granted to Agent or Lenders hereunder, in any Loan Document or any Financing Order, (ii) notify the Borrower that the outstanding principal of the Loans shall bear interest at the Post-Default Rate, and thereupon the outstanding principal of the Loans shall bear interest at the Post-Default Rate, (iii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations, shall become due and payable immediately, without

presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Credit Parties, (iv) the Agent and the Lenders may exercise all of the rights as secured party and mortgagee hereunder or under the other Loan Documents or Financing Agreements, subject in all respects to the provisions of those Loan Documents, and the Agent and Lenders shall have relief from the automatic stay in order to do so (v) direct the Credit Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions reasonably acceptable to the Agent and the Required Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code and the Agent (on behalf of the Lenders) shall have the right to "credit bid" the allowed amount of the Lenders' claims during any sale of all or substantially all of the Collateral, including, without limitation, in any 363 Sale or included as part of any Reorganization Plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code (and, without limiting the foregoing, direct the Credit Parties to assume and assign any lease or executory contract included in the Collateral to the Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code, (vi) enter onto the premises of the Credit Parties in connection with an orderly liquidation of the Collateral, and/or (vii) exercise any rights and remedies provided to such Agent under the Loan Documents or at law or in equity, including all remedies provided for under the UCC and, pursuant to the Interim Order, the Final Order or any other Financing Order.

Upon the occurrence and during the continuance of an Event of Default and the exercise by the Agent, on behalf of the Lenders, of their rights and remedies under this Agreement and the other Loan Documents: (a) the Credit Parties shall use commercially reasonably efforts to assist the Agent and the Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Agent and the Required Lenders; and (b) the Credit Parties will be deemed to have assumed and assigned to the Lenders all executory contracts and leases to which any of the Credit Parties are a party (without further order or action of the Bankruptcy Court or any other Person), other than executory contracts or leases specifically excepted by the Lenders by written notice to the Credit Parties.

## ARTICLE 9

### The Agent

**9.1    Appointment and Authorization.**  Each of the Lenders hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender hereby authorizes the Agent to consent, on behalf of each Lender, to the Financing Orders.

**9.2    Agent's Rights as Lender.**  Atlas or any other financial institution serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender hereunder as any other Lender and may exercise the same as though it were not the Agent, and Atlas (and any successor acting as Agent) and its Affiliates may (without having to account therefor to any Lender) lend money to, make investments in and generally engage in any kind of business with the Credit Parties (and any of their respective Subsidiaries or Affiliates) as if it were not acting as Agent, and Atlas and its Affiliates may accept fees and other consideration from the Credit Parties and any of their respective Subsidiaries and Affiliates for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

**9.3    Duties As Expressly Stated.**  The Agent shall not have any duties or obligations except those expressly set forth in this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by this Agreement and the other Loan Documents that the Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as is required hereunder with respect to such action), and (c) except as expressly set forth herein and in the other Loan Documents, the Agent shall have no

duty to disclose, or shall not be liable for the failure to disclose, any information relating to any Credit Party or any of their respective Subsidiaries that is communicated to or obtained by the financial institution serving as the Agent or any of its Affiliates or Approved Funds in any capacity. The Agent shall not shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as is required hereunder with respect to such action) or all of the Lenders if expressly required, or in the absence of its own gross negligence, willful misconduct or bad faith. The Agent shall be deemed to have no knowledge of any Default other than a Default of the types specified in Section 8.1(a) unless and until written notice thereof is given to the Agent by the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in, or in connection with, this Agreement or the other Loan Documents, (ii) the contents of any certificate, report or other document delivered hereunder or under any of the other Loan Documents or in connection herewith of therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, the other Loan Documents or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent. The Agent shall not, except to the extent the Agent expressly instructed by the Required Lenders with respect to collateral security hereunder and under the other Loan Documents, be required to initiate or conduct any litigation or collection proceedings hereunder or under any other Loan Document; *provided, however*, that the Agent shall not be required to take any action which exposes the Agent to personal liability or which is contrary to the Loan Documents or applicable law.

   **9.4    Reliance By Agent**. The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been executed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action (it being understood that this provision shall not release the Agent from performing any action with respect to the Borrower expressly required to be performed by it pursuant to the terms hereof or the Security Agreement) under this Agreement. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

   **9.5    Action Through Sub-Agents**. The Agent may perform any and all of its duties, and exercise its rights and powers, by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through its Related Parties. The exculpatory and indemnification provisions set forth in this Article 9 with respect to the Agent shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to its activities in connection with the syndication of the credit facilities provided for herein as well as activities of the Agent.

   **9.6    Resignation of Agent and Appointment of Successor Agent**. Subject to the appointment and acceptance of a successor Agent, as provided in this paragraph, the Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor Agent. If no successor shall have been so appointed

and shall have accepted such appointment within 30 days after such retiring Agent gives notice of its resignation, then such retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a bank or other financial institution with an office in New York, New York, or an Affiliate of any such bank or other financial institution. Upon the acceptance of its appointment as Agent hereunder, by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article and Section 10.3 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

**9.7     Lenders' Independent Decisions.** Each Lender acknowledges that it has, independently and without reliance upon the Agent, or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement and the other Loan Documents, any related agreement or any document furnished hereunder or thereunder. Except as explicitly provided herein, the Agent has no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before the first Event of Default or at any time thereafter. The Agent shall not be deemed a trustee or other fiduciary on behalf of any party.

**9.8     Indemnification.** Each Lender agrees to indemnify and hold harmless the Agent in its capacity as Agent and not in any other capacity (to the extent not reimbursed under Section 10.3, but without limiting the obligations of the Credit Parties under Section 10.3), ratably in accordance with the aggregate principal amount of the respective Commitments of and/or Loans held by the Lenders (or, if all of the Commitments shall have been terminated or expired, ratably in accordance with the aggregate outstanding amount of the Loans held by the Lenders), for any and all liabilities (including pursuant to any Environmental Law), obligations, losses, damages, penalties, actions, judgments, deficiencies, suits, costs, expenses (including reasonable attorney's fees) or disbursements of any kind and nature whatsoever that may be imposed on, incurred by or asserted against the Agent (including by any Lender) arising out of or by reason of any investigation in or in any way relating to or arising out of any Loan Document or any other documents contemplated by or referred to therein for any action taken or omitted to be taken by the Agent under or in respect of any of the Loan Documents or other such documents or the transactions contemplated thereby (including the costs and expenses that the Credit Parties are obligated to pay under Section 10.3, but excluding, unless a Default has occurred and is continuing, normal administrative costs and expenses incident to the performance of its agency duties hereunder) or the enforcement of any of the terms hereof or thereof or of any such other documents; *provided, however*, that no Lender shall be liable for any of the foregoing to the extent they are determined by a court of competent jurisdiction in a final and nonappealable judgment to have resulted from the gross negligence, willful misconduct or bad faith of the party to be indemnified. The agreements set forth in this Section 9.8 shall survive the payment of all Loans and other obligations hereunder and shall be in addition to and not in lieu of any other indemnification agreements contained in any other Loan Document.

**9.9     Consents Under Other Loan Documents.** Except as otherwise provided in this Agreement and the other Loan Documents, the Agent may, with the prior written consent of the Required Lenders (but not otherwise), consent to any modification, supplement or waiver under any of the other Loan Documents.

**9.10     Intentionally Omitted.**

**9.11    Collateral Matters.** The Lenders hereby irrevocably authorize the Agent, at its option and in its sole discretion, to (a) release any Lien on any Collateral (i) upon the payment and satisfaction in full of all Obligations (other than contingent indemnification obligations that have not been asserted) and the termination or expiration of all Commitments hereunder; or (ii) constituting property being sold or disposed of if the Credit Party disposing of such property certifies to the Agent that the sale or disposition is permitted by Section 7.4 (and the Agent may conclusively rely on any such certification without further inquiry) and (b) terminate the Guarantee of any Guarantor under Article 3 and release the Lien on any capital stock or other equity interests of such Guarantor if all of the capital stock or other equity interests in such Guarantor that is owned by any other Credit Party is sold to any Person that is not (and is not required to become) a Credit Party in a transaction permitted by Section 7.4.

## ARTICLE 10

### Miscellaneous

**10.1    Notices.** Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telephonic facsimile (fax), as follows:

(a)    if to any Credit Party, c/o Infinia Corporation, 300 West 12th Street, Ogden, UT 84404, Attention: Jeffrey Williams, Chief Executive Officer (Fax No. 801-571-4790), with a copy to Parsons Kinghorn Harris, 111 East Broadway, 11th Floor, Salt Lake City, Utah 84111, Attention: George Hofmann (Fax No. 801-363-4378) and Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Salt Lake City, Utah 84101 (Fax No. 801-257-1800);

(b)    if to the Agent, to Atlas Global Investment Management LLP, 13 Hanover Square, 8th Floor, London W1S 1HN, United Kingdom, Attention: Joost Schellens, with a copy to Brown Rudnick LLP, 7 Times Square, New York, NY 10036, Attention: John F. Storz (Fax No. 212-938-2825); and

(c)    if to any Lender, to it at its address (or fax number) on record with the Agent.

Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

**10.2    Waivers; Amendments; Voting Rights.**

(a)    No failure or delay by the Agent or the Lenders in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Credit Parties therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 10.2, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    None of this Agreement, any other Loan Document, any Security Document, the Budget or any provision of any of the foregoing may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the

Agent with the written consent of the Required Lenders, *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent hereunder without the prior written consent of the Agent.

(c) To the extent that the Lenders become owners of the assets or equity of any Credit Party through the formation of a new corporation or organizational entity following the exercise of any rights or remedies by Agent, on behalf of the Lenders, including, without limitation, through a foreclosure, sale or other similar action, then the voting provisions and rights of the equity interests in and to such new corporation or organizational entity shall be consistent with the voting rights of the Required Lenders set forth herein.

**10.3    Expenses; Indemnity: Damage Waiver.**

(a) The Credit Parties jointly and severally agree to pay, or reimburse the Agent or the Lenders, as applicable, for paying, (i) all reasonable and documented out-of-pocket expenses incurred by the Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of Advisors to the Agent, in connection with the preparation of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by the Agent, any Lender or any of their respective Affiliates including the reasonable and documented fees, charges and disbursements of any Advisors for the Agent, any Lender or any of their respective Affiliates, in connection with the enforcement or protection of their rights in connection with this Agreement and the other Loan Documents or any right or Lien granted under any Financing Order, including their rights under this Section 10.3, or in connection with the Loans made hereunder, including in connection with any workout, restructuring or negotiations in respect thereof, (iii) all reasonable and documented fees and expenses incurred by the Agent (including the reasonable and documented fees and expenses of other advisors and professionals engaged by the Agent) in connection therewith in connection with the monitoring of Collateral, and any reviews or appraisals of Collateral (including field examination fees, environmental reviews to the extent reimbursable pursuant to Section 6.6), (iv) all reasonable and documented costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Loan Document or any other document referred to therein and (v) all of the reasonable out-of-pocket fees and expenses of the Advisors incurred from and after the Closing Date in connection with the preparation, reproduction, delivery and review of pleadings, documents and reports related to the Chapter 11 Case (including, without limitation, the Loan Documents) and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code.

(b) The Credit Parties jointly and severally agree to indemnify the Agent (in its capacity as Agent and not in any other capacity), each Lender (in its capacity as a Lender and not in any other capacity), each of their respective Affiliates and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses actually incurred, including the reasonable and documented fees, charges and disbursements of any Advisors for any Indemnitee and settlement costs, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby, the performance by the parties hereto and thereto of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned, leased or operated by any Credit Party or any Subsidiary, or any Environmental Liability related in any way to any Credit Party or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any

- 58 -

Indemnitee, be available to the extent that (A) such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee and (B) such losses, claims, liabilities or related expenses arise solely from claims among Indemnitees.

(c)  To the extent that the Credit Parties fail to pay any amount required to be paid by them to the Agent under paragraph (a) or (b) of this Section 10.3 (as determined after giving effect to the proviso to paragraph (b) of this Section 10.3), each Lender severally agrees to pay to the Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such.  For purposes hereof, a Lender's Applicable Percentage shall be determined based upon its share of the sum of the total Loan Exposure, outstanding Term Loans and unused Commitments at the time.

(d)  TO THE EXTENT PERMITTED BY APPLICABLE LAW, NONE OF THE PARTIES SHALL ASSERT, AND EACH PARTY HEREBY WAIVES, ANY CLAIM AGAINST ANY OTHER PARTY HERETO, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS CONTEMPLATED HEREBY, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF.

(e)  All amounts due under this Section 10.3 shall be payable promptly after written demand therefor.

**10.4    Successors and Assigns.**

(a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the Agent (and any attempted assignment or transfer without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  Each Lender may at any time and from time to time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) to any of its Affiliated or Approved Funds with the prior consent of the Agent.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Acceptance.

(c)  Upon acceptance and recording pursuant to paragraph (e) of this Section 10.4, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.7, 2.8 and 10.3). Notwithstanding anything therein to the contrary, no Approved Fund shall be entitled to receive any greater amount pursuant to Sections 2.7 and 2.8 than the transferor Lender would have been entitled to receive in respect of the assignment effected by such transferor Lender had no assignment occurred.  Any assignment or transfer by a Lender of rights or obligations under this Agreement

that does not comply with paragraph (b) of this Section 10.4 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(d) The Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender or the Agent, at any reasonable time and from time to time upon reasonable prior notice.

(e) Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, any required processing and recordation fee referred to in paragraph (b) of this Section 10.4 and any written consent to such assignment required by paragraph (b) of this Section 10.4, the Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(f) Any Lender may, without the consent of or notice to the Borrower or the Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.2(b), that affects such Participant. Subject to paragraph (g) of this Section 10.4, the Borrower agree that each Participant shall be entitled to the benefits of Sections 2.7 and 2.8 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.4. In the event that any Lender sells participations in a Loan, such Lender shall, acting for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name of all participants in such Loan and the principal amount (and stated interest thereon) of the portion of such Loan that is the subject of the participation. A Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on such participant register (and each registered note shall expressly so provide). Any participation of such Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on such participant register. Such participant register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(g) A Participant shall not be entitled to receive any greater payment under Section 2.7 or 2.8 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.8 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.8(e) as though it were a Lender.

**10.5  Survival.** All covenants, agreements, representations and warranties made by the Credit Parties and Subsidiaries herein and in the other Loan Documents, and in the certificates or other instruments

delivered in connection with or pursuant to this Agreement and the other Loan Documents, shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of any Loans, regardless of any investigation made by any such party or on its behalf and notwithstanding that the Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect so long as the principal of or any accrued interest on any Loan or any fee or any other Obligation payable under this Agreement or the other Loan Documents is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.7, 2.8, and 10.3 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

**10.6    Counterparts; Integration; References to Agreement; Effectiveness.** This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Agent and its counsel constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Whenever there is a reference in any Loan Document or UCC Financing Statement to the "Credit Agreement" to which the Agent, the Lenders and the Credit Parties are parties, such reference shall be deemed to be made to this Agreement among the parties hereto. Except as provided in Article 5, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.7    Severability.** Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**10.8    Right of Setoff.** Each Credit Party hereby grants to the Agent, each Lender and each Affiliate of a Lender that from time to time maintains any deposit accounts, holds any funds or otherwise becomes indebted to any Credit Party a security interest in all deposits (general or special, time or demand, provisional or final) and funds at any time held and other indebtedness at any time owing by the Agent, any Lender or any such Affiliate of a Lender to or for the account of such Credit Party as security for the Obligations, and each Credit Party hereby agree that if an Event of Default shall have occurred and be continuing, the Agent and each Lender are hereby authorized at any time and from time to time, to the fullest extent permitted by law (notwithstanding the provisions of Section 352 of the Bankruptcy Code, without any application, motion to, hearing before, or order from, the Bankruptcy Court, but subject in all cases to the provisions of the Financing Order), to set off and apply any and all deposits (general or special, time or demand, provisional or final) or other funds at any time held and other indebtedness at any time owing by the Agent, such Lender or any such Affiliate of a Lender to or for the credit or the account of such Credit Party against any and all of the Obligations, irrespective of whether or not the Agent or the Lenders shall have made any demand under this Agreement and although any of the Obligations may be unmatured. The rights of the Agent, each Lender and each Affiliate of a Lender under this Section 10.8 are in addition to any other rights and remedies (including other rights of setoff) which the Agent, any such Lender or any such Affiliate of a Lender may have.

- 61 -

**10.9    Subordination by Credit Parties.**  The Credit Parties hereby agree that all present and future Indebtedness of any Credit Party to any other Credit Party ("Intercompany Indebtedness") shall be subordinate and junior in right of payment and priority to the Obligations, and each Credit Party agrees not to make, demand, accept or receive any payment in respect of any present or future Intercompany Indebtedness, including any payment received through the exercise of any right of setoff, counterclaim or cross claim, or any collateral therefor, unless and until such time as the Obligations shall have been indefeasibly paid in full; *provided* that, so long as no Default shall have occurred and be continuing and no Default shall be caused thereby and such Indebtedness is expressly permitted hereunder, the Credit Parties may make and receive such payments in respect of Intercompany Indebtedness as shall be customary in the ordinary course of the Credit Parties' business.  Without in any way limiting the foregoing, in the event of any insolvency or bankruptcy proceedings, or any receivership, liquidation, reorganization, dissolution or other similar proceedings relative to any Credit Party or to its businesses, properties or assets, the Lenders shall be entitled to receive payment in full of all of the Obligations before any Credit Party shall be entitled to receive any payment in respect of any present or future Intercompany Indebtedness.

**10.10    Governing Law; Jurisdiction; Consent to Service of Process.**

(a)  This Agreement shall be construed in accordance with and governed by the law of State of New York.

(b)  Each of the Credit Parties hereby consents and agrees that the Bankruptcy Court (or if the reference is withdrawn, the applicable United States District Court) shall have exclusive jurisdiction to hear and determine any claims or disputes between the Credit Parties, Agent and the Lenders pertaining to this Agreement or any of the other Loan Documents related to this Agreement or to any other matter arising out of or relating to this Agreement; *provided*, that Agent, the Lenders and the Credit Parties acknowledge that any appeals from the Bankruptcy Court may have to be heard by a court other than the Bankruptcy Court; *provided, further,* that nothing in this Agreement shall be deemed or operate to preclude Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Agent.  Each of the Credit Parties expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any court, and each of the Credit Parties hereby waives any objection that such Credit Party may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court.  Each of the Credit Parties hereby waives personal service of the summons, complaint and other process issued in any such action or suit and agrees that service of such summons, complaint and other process may be made by registered or certified mail addressed to the Credit Parties at the address set forth in Section 10.1 of this Agreement and that service so made shall be deemed completed upon the earlier of the Credit Parties' actual receipt thereof or three (3) days after deposit in the United States mail, proper postage prepaid.

(c)  Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any court referred to in paragraph (b) of this Section 10.10.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.1. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**10.11    WAIVER OF JURY TRIAL.**  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR

RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

**10.12    Headings.**   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**10.13    Confidentiality.**   The Agent and each Lender agrees to keep confidential information obtained by it pursuant hereto and the other Loan Documents confidential in accordance with its customary practices and agrees that it will only use such information in connection with the transactions contemplated by this Agreement and not disclose any of such information other than (a) to the Agent or any Lender, (b) to its employees, representatives, directors, attorneys, auditors, agents, professional advisors, trustees or Affiliates who are advised of the confidential nature of such information or to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 10.13), (b) to the extent such information presently is or hereafter becomes available to the Agent or any Lender on a non-confidential basis from any source of such information that is in the public domain at the time of disclosure, (c) to the extent disclosure is required by law (including applicable securities law), regulation, subpoena or judicial order or process (*provided* that notice of such requirement or order shall be promptly furnished to the Borrower unless such notice is legally prohibited) or requested or required by bank, securities, insurance or investment company regulators or auditors or any administrative body or commission to whose jurisdiction the Agent or such Lender may be subject, (d) to any rating agency to the extent required in connection with any rating to be assigned to such Lender, (e) to assignees or participants or prospective assignees or participants who agree to be bound by the provisions of this Section 10.13, (f) to the extent required in connection with any litigation between any Credit Party and the Agent or any Lender with respect to the Loans or this Agreement and the other Loan Documents or (g) with the Borrower's prior written consent.

**10.14    Interest Rate Limitation.**   Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lenders in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.14 shall be cumulated and the interest and Charges payable to the Lenders in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lenders.

**10.15    Obligations Absolute.**

To the fullest extent permitted by applicable law, all obligations of the Credit Parties hereunder or the granting of any Lien on any property shall be absolute and unconditional irrespective of:

(a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of the Credit Parties;

(b) any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against the Credit Parties;

(c) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d) any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e) any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f) any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Credit Parties.

**10.16   Parties including the Trustees; Bankruptcy Court Proceedings.**  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Credit Parties, the bankruptcy estate of the Credit Parties, and any trustee, other bankruptcy estate representative or any successor-in-interest of the Credit Parties in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agent and Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents and Security Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Credit Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its Liens under applicable law.  The Credit Parties may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents or Security Documents without the express written consent of the Agent and Lenders.  Any such purported assignment, transfer, hypothecation or other conveyance by the Credit Parties without the prior express written consent of Agent and Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Credit Parties, Agent and Lenders with respect to the transactions contemplated hereby and no person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the parties hereto have caused this Senior, Secured, Super-Priority Debtor-In-Possession Credit Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

<u>BORROWER, DEBTOR AND A CREDIT PARTY</u>

INFINIA CORPORATION

By: _____

Name: Michael Ward

Title: Chief Executive Officer

<u>GUARANTOR, DEBTOR AND A CREDIT PARTY</u>

POWERPLAY SOLAR I, LLC

By: _____

Name: Michael Ward

Title: Chief Executive Officer of Infinia Corporation, the sole member of PowerPlay Solar I, LLC with management authority

[SIGNATURES CONTINUE ON NEXT PAGE]

<u>AGENT</u>

ATLAS GLOBAL INVESTMENT MANAGEMENT LLP, as
Administrative Agent and Collateral Agent

By: _____
Name: Joost Schellens
Title: Partner

[SIGNATURES CONTINUE ON NEXT PAGE]

<u>LENDER</u>

ATLAS GLOBAL ASSET HOLDINGS LP

By:  Atlas Global Investment Management LLP as investment
manager and authorized agent for Atlas Global Asset Holdings LP


By: _____
Name:
Title:        Joost Schellens
              Partner

- 67 -

## SCHEDULES & EXHIBITS
[Available Upon Written Request to the Debtors]

**Schedules:**

| | |
|---|---|
| Schedule 1.1 | Principals |
| Schedule 2.1 | Lenders and Commitments |
| Schedule 4.4(b) | Material Adverse Change Exceptions To Specified Financial Statements |
| Schedule 4.5 | Properties; Registered Proprietary Rights; Real Property Assets |
| Schedule 4.6 | Litigation and Environmental Matters |
| Schedule 4.12 | Capitalization |
| Schedule 4.13 | Subsidiaries |
| Schedule 4.14 | Material Indebtedness, Liens and Agreements |
| Schedule 7.1 | Existing Indebtedness |
| Schedule 7.7 | Transactions with Affiliates |
| Schedule 7.8 | Restrictive Agreements |

**Exhibits:**

| | |
|---|---|
| Exhibit 1 | Form of Borrowing Request |
| Exhibit 6.15 | Budget |
| Exhibit A | Form of Term Note |
| Exhibit B-1 | Form of Pledge and Security Agreement |
| Exhibit B-2 | Form of Patent Security Agreement |
| Exhibit B-3 | Form of Trademark Security Agreement |
| Exhibit C | Form of Section 6.1 Compliance Certificate |
| Exhibit D | Form of Budget Compliance Certificate |