*Prepared and Submitted by:*

George Hofmann (10005)
Steven C. Strong (6340)
Victor P. Copeland (13511)
**Parsons Kinghorn Harris**
A Professional Corporation
111 East Broadway, 11th Floor
Salt Lake City, Utah  84111
Telephone: (801) 363-4300
gbh@pkhlawyers.com
scs@pkhlawyers.com

Proposed attorneys for
Infinia Corporation

Troy J. Aramburu (10444)
Jeff D. Tuttle (14500)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile:  (801) 257-1800
taramburu@swlaw.com
jtuttle@swlaw.com

Proposed attorneys for
PowerPlay Solar I, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re INFINIA CORPORATION, LLC, and POWERPLAY SOLAR I, LLC,<br><br>Debtors. | Jointly Administered under Case No. 13-30688 (WTT)<br><br>Chapter 11<br><br>**THIS DOCUMENT RELATES TO:**<br>☐  In re Infinia Corporation<br>☐  In re PowerPlay Solar I, LLC<br>X  Both Debtors |

**INTERIM ORDER PURSUANT TO
11 U.S.C. SECTIONS 105, 361, 362, 363, 364, 503(b) AND 507(a), RULES 2002, 4001
AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND RULE
4001-2 OF THE LOCAL RULES OF PRACTICE FOR THE UNITED STATES
BANKRUPTCY COURT, DISTRICT OF UTAH, CENTRAL DIVISION (I)
AUTHORIZING THE DEBTORS (A) TO OBTAIN POST-PETITION SECURED DIP**

{00175852.DOC / 3}

**FINANCING WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. SECTION 363 AND PROVIDING FOR ADEQUATE PROTECTION; (II) GRANTING LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

---

THIS MATTER having come before this United States Bankruptcy Court for the District of Utah, Central Division (the "Court") upon the motion (the "DIP Motion") by Infinia Corporation ("Infinia") and PowerPlay Solar I, LLC ("PowerPlay"; and together with Infinia, each a "Debtor" and, collectively, the "Debtors"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Cases"), seeking, among other things, entry of an interim order (this "Interim Order") authorizing the Debtors, as applicable, to:

(i)    Obtain credit and incur debt, pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, on an interim basis for a period (the "Interim Period") from the entry of this Interim Order in these Cases through and including the date of the final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the DIP Motion on a final basis up to the aggregate committed amounts set forth in the Budget (as defined below) for such period (and on terms and conditions more fully described herein), secured by, as set forth in the DIP Financing Agreements (as defined below), first priority, valid, perfected and enforceable Liens (as defined in section 101(37) of chapter 11 of title 11 of the United States Code, as

amended (the "Bankruptcy Code")) on all real and personal property of the Debtors' estate pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, subject only to Permitted Liens (as defined in the DIP Financing Agreement), and with priority, over all other administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)     (a) Establish that financing arrangement ("DIP Facility") pursuant to (I) the terms of the Senior, Secured Debtor-in-Possession Credit Agreement (the "DIP Financing Agreement")[1], substantially in the form of **Exhibit "C"** to the DIP Motion, by and among Infinia, as borrower and as a credit party, PowerPlay, as a guarantor and as a credit party, the other credit parties party thereto, Atlas Global Investment Management LLP, as administrative agent and collateral agent (the "DIP Agent") and the Lenders party thereto (collectively, the "DIP Lenders," and, together with the DIP Agent, the "DIP Secured Parties"), and (II) all other agreements, documents, notes, certificates and instruments executed and/or delivered with, to, or in favor of the DIP Secured Parties, including, without limitation, the security agreements, notes, guaranties, mortgages and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, instruments and certificates executed and/or delivered in connection therewith or related thereto (items (I) and (II), collectively,

---

[1]     Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreement.

as the same may be amended, modified or supplemented and in effect from time to time, the "DIP Financing Agreements"); and (b) incur the Obligations under and as defined in the DIP Financing Agreement (collectively, the "DIP Obligations");

(iii)   Authorize the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) (subject to the terms and conditions of the DIP Financing Agreements) solely for (a) working capital and general corporate purposes and (b) payment of costs of administration of these Cases, to the extent set forth in the Budget and the DIP Financing Agreements.

(iv)   Grant, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Secured Parties), continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens (the "New DIP Liens"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estate except for Permitted Liens and as otherwise provided in this Interim Order, upon and to all of the Collateral granted under the terms of the DIP Financing Agreements, and, for the avoidance of doubt, Collateral shall expressly include all real and personal property of the Debtors now owned or hereafter acquired (excluding Avoidance Actions of the Debtors, but including only the proceeds of Avoidance Actions brought pursuant to section 549 of the

Bankruptcy Code to recover any post-Petition Date transfer of Collateral) and all other property of whatever kind and nature, in each case, that is pledged as collateral under any Security Document, the Financing Orders or any other order of the Bankruptcy Court in the Cases, and all products, proceeds (cash and non-cash), any deposit or similar payment made pursuant to the terms of an asset purchase agreement or otherwise related to a Sale Transaction, substitutions, and accessions of or to any of the foregoing.   Notwithstanding anything to the contrary in this Interim Order or any DIP Financing Agreements, (a) with respect to the Debtors' non-residential real property leases, no Liens or encumbrances shall be granted on or extend to the Debtors' non-residential real property leases themselves, but rather any Liens or encumbrances granted shall extend only to the proceeds of such non-residential real property leases; and (b) upon the Termination Date, the rights of the DIP Secured Parties to enter onto the Debtors' leases premises to access and/or liquidate any Collateral shall be limited to (x) any such rights agreed to in writing by the applicable landlord prior to entry onto the lease premises, (y) any rights that the DIP Secured Parties have under applicable non-bankruptcy law or (z) such rights as may be granted by this Court on a separate motion with notice to the applicable landlords of the leased premises and an opportunity for such landlord to respond and be heard;

(v)     Grant, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Secured Parties) superpriority administrative claim

status in respect of all DIP Obligations, subject only to the Carve-Out as provided herein;

(vi)     Authorize the use of "cash collateral" as such term is used in section 363 of the Bankruptcy Code (the "<u>Cash Collateral</u>"), including in which the DIP Secured Parties and/or the Pre-Petition Lender Party (as defined below) have an interest, in accordance with the terms of this Interim Order and the DIP Financing Agreements;

(vii)    Grant the Pre-Petition Lender Party the Pre-Petition Lender Party's Replacement Liens and Pre-Petition Lender Party's Superpriority Claims (each as defined below) to the extent of any Pre-Petition Diminution in Value (as defined below) of the Pre-Petition Lender Party's interest in the Pre-Petition Lender Party's Collateral (as defined below) as adequate protection for the granting of the New DIP Liens to the DIP Secured Parties, the use of Cash Collateral and for the imposition of the automatic stay;

(viii)   Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Interim Order; and

(ix)     Waive the fourteen (14) day stay provisions of rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the Federal Rules of Bankruptcy Procedure are referred to herein as the "<u>Bankruptcy Rules</u>") and provide for immediate effectiveness of this Interim Order.

This Court having considered the DIP Motion, the exhibits attached thereto, the DIP Facility and the DIP Financing Agreements, and the evidence submitted at the hearing on this Interim Order (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), 9014 and Rule 4001-2 of the Local Rules of Practice for the United States Bankruptcy Court, District of Utah, Central Division (the "Local Rules"), due and proper notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing having been held and concluded on September ___, 2013; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date.**  On September 17, 2013 (the "Petition Date"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Utah, Central Division.  The Debtors have continued in the management and operation of their businesses and properties as

debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

B. **Jurisdiction and Venue**.  This Court has jurisdiction over this proceeding, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby.  Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for these Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. **Committee Formation**.  A statutory committee of unsecured creditors has not yet been appointed in these Cases.

D. **Notice**.  The Interim Hearing was held pursuant to the authorization of Bankruptcy Rules 4001 and 6003 and Local Rule 4001-2.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by telecopy, email, overnight courier or hand delivery on September 18, 2013, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Utah, Central Division (the "U.S. Trustee"), Attn: Vincent Cameron, Esq., 405 S Main Street # 300, Salt Lake City, UT 84111-3402; (ii) the Internal Revenue Service; (iii) the Debtors' twenty (20) largest unsecured creditors, (iv) counsel to the Pre-Petition Lender Party, Attn: John F. Storz, Esq., Seven Times Square, New York, New York 10036; (v) counsel to the proposed DIP Agent, Brown Rudnick LLP, Attn: William R. Baldiga, Esq. Seven Times Square, New York, New York

10036, John F. Storz, Esq., Seven Times Square, New York, New York 10036 and

Mary D. Bucci, Esq., One Financial Center, Boston, MA 02111;   (vi) all secured

creditors of record; and (vii) those parties who have filed a notice of appearance and

request for service of pleadings in these Cases pursuant to Bankruptcy Rule 2002.

Under the circumstances, such notice of the Interim Hearing and the relief requested in

the DIP Motion is due and sufficient notice and complies with sections 102(1), 364(c)

and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and

Local Rule 4001-2.

   E.   **Debtors' Acknowledgements and Agreements.**   Without prejudice to

the rights of other parties in interest as set forth in Section 7 below, the Debtors (on

behalf of themselves and their estates) admit, stipulate and acknowledge and agree as

indicated below that (collectively, subsections E (i) through E (vi) hereof shall be

referred to herein as the "Debtors' Stipulations"):

> (i)   **Pre-Petition Lender Party's Financing Agreements**.   The
> Debtors admit, stipulate, acknowledge and agree that prior to the entry of
> this Interim Order in these Cases, Infinia incurred indebtedness consisting
> of term loans and other financial accommodations pursuant to (a) that
> certain Credit Agreement, dated as of July 26, 2013, between Infinia, as
> borrower, Atlas Global Investment Management LLP, as administrative
> and collateral agent (in such capacity and not in any other capacity, the
> "Pre-Petition Agent") and Atlas Global Asset Holdings LP, as lender (in
> such capacity and not in any other capacity, the "Pre-Petition Lender";
> and, collectively, with the "Pre-Petition Agent" the "Pre-Petition Lender
> Party"), and (b) all other agreements, documents, notes, certificates and
> instruments executed and/or delivered with, to, or in favor of the Pre-

Petition Lender Party, including, without limitation, all notes, mortgages, UCC financing statements and all other related agreements, documents, notes, certificates and instruments executed and/or delivered in connection therewith or related thereto (collectively, and as the same may be amended, modified or supplemented and in effect from time to time, the "Pre-Petition Lender Party's Financing Agreements").

(ii)       **Pre-Petition Lender Party's Debt Amount.**  The Debtors admit, stipulate, acknowledge and agree that as of September 17, 2013, the Infinia was indebted under the Pre-Petition Lender Party's Financing Agreements to the Pre-Petition Lender Party in the approximate principal amount of $3,000,000; plus interest accrued and accruing, costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations (collectively the "Pre-Petition Lender Party's Debt").   The Debtors admit, stipulate, acknowledge and agree that Pre-Petition Lender Party's Debt was extended as a protective advance to maintain Infinia's business operations while Infinia and the other Debtors considered and pursued various options for restructuring their businesses either by filing a Chapter 11 petition, through a sale outside of bankruptcy or otherwise.  Without the Pre-Petition Lender Party's Debt, Infinia would not have had sufficient available sources of working capital and financing to carry on the operation of its business or to seek to restructure the Debtors' businesses.

(iii)      **Pre-Petition Lender Party's Collateral.**  The Debtors admit, stipulate, acknowledge and agree that to secure the Pre-Petition Lender Party's Debt, Infinia granted security interests and Liens (the "Pre-Petition Lender Party's Liens") to the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements on all or substantially all of its assets and personal property (provided, however, that in respect to real property leaseholds, only accounts receivable, payment obligations and/or proceeds arising from a sale, assignment or other disposition thereof were included) (collectively, the "Pre-Petition Lender Party's Collateral").

(iv)      **Pre-Petition Lender Party's Liens**.  The Debtors admit, stipulate, acknowledge and agree that as of the Petition Date (i) the Pre-Petition Lender Party's Liens on the Pre-Petition Lender Party's Collateral were not subject to avoidance, recharacterization or subordination pursuant to

the Bankruptcy Code or applicable non-bankruptcy law, and subject only to any Permitted Liens (as defined in the Pre-Petition Lender Party's Financing Agreements), (ii) the Pre-Petition Lender Party's Debt constituted legal, valid and binding obligations of Infinia, enforceable in accordance with the terms of the Pre-Petition Lender Party's Financing Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Lender Party's Debt existed, and no portion of the Pre-Petition Lender Party's Debt was subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Lender Party's Debt constituted allowable secured claims.  The Debtors admit, stipulate, acknowledge and agree that on and as of the date that this Interim Order is entered, the Debtors have waived, discharged and released the Pre-Petition Lender Party, together with its affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Pre-Petition Lender Party's Debt, (y) to challenge or object to the security for the Pre-Petition Lender Party's Debt, and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Pre-Petition Lender Party's Financing Agreements or otherwise.

None of the Debtors possess or will assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Lender Party's Financing Agreements or the Pre-Petition Lender Party's Liens, and/or security interests in the Pre-Petition Lender Party's Collateral, or any claim of the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements.

(v)      **Value of Pre-Petition Lender Party's Collateral.**  The Debtors acknowledge that after investigation it could be determined that the aggregate value of the Pre-Petition Lender Party's Collateral granted to the Pre-Petition Lender Party pursuant to the Pre-Petition Lender Party's Financing Agreements exceeded the amount of the Pre-Petition Lender Party's Debt as of the Petition Date and, accordingly, that it could be determined that all of the Pre-Petition Lender Party's Debt constitutes an

over-secured claim within the meaning of section 506(b) of the Bankruptcy Code.

(vi)   **Cash Collateral**.   The Pre-Petition Lender Party has a security interest and Lien in Cash Collateral, including on all amounts on deposit in Infinia's banking, checking, or other deposit accounts and all proceeds of the Pre-Petition Lender Party's Collateral to secured the Pre-Petition Lender Party's Debt, to the same extent and order of priority as that which was held by each such party prior to the filing of these Cases.

F.   **Findings Regarding the Post-Petition Financing.**

(i)   **Need for Post-Petition Financing and use of Collateral**.   An immediate need exists for the Debtors (A) to obtain funds from the DIP Facility in order to fund the working capital requirements and other financing needs of the Debtors, and (B) to use the Collateral, including the Cash Collateral.   The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors and their equity holders and the possibility for a successful reorganization or sale of the Debtors' assets as a going concern or otherwise.

(ii)   **No Credit Available on More Favorable Terms**.   The Debtors have been unable to obtain (A) unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, (B) credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, (C) credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien, or (D) additional post-petition liquidity or a consent to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code from or of the Pre-Petition Lender Party under the terms of the Pre-Petition Lender Party's Financing Agreements, in each case, (A) through (C) on more favorable terms and conditions than those provided in the DIP Financing Agreements and this Interim Order, and, in the case of (D),  on terms other than those provided in the DIP Financing Agreements and this Interim Order.

(iii)    **Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any Permitted Liens are valid, senior, perfected and unavoidable.    Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the DIP Secured Parties and any committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection and extent of any such Permitted Lien and or security interest, subject to the time periods set forth in Section 7 of this Interim Order.

G.    **Section 506(c) Waiver.**  Subject to and effective only upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and the Pre-Petition Agent, and no such consent shall be implied from any other action or inaction by the DIP Secured Parties or Pre-Petition Lender Party.

H.    **Roll-Up of Pre-Petition Lender Party's Debt.**  The DIP Secured Parties will request approval to irrevocably repay in full to the Pre-Petition Lender Party an amount equal to the Pre-Petition Lender Party's Debt in full satisfaction and cancellation of the Pre-Petition Lender Party's Debt from the proceeds of the DIP Facility (the "Pre-Petition Lender Party's Debt Payoff") upon entry of the Final Order, which request will be delayed until the Final Hearing on the DIP Facility.  This Court specifically does not

approve such Pre-Petition Lender Party's Debt Payoff as part of the DIP Facility at this time, but will consider the issue at the Final Hearing.

I.      **Use of Proceeds of the DIP Facility**.  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) (subject to the terms and conditions of the DIP Financing Agreements), solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of these Cases, to the extent set forth in the Budget and (c) upon entry of the Final Order, the Pre-Petition Lender Party's Debt Payoff in accordance with the DIP Financing Agreements, which shall constitute a roll-up under the DIP Financing Agreements.

J.      **Adequate Protection for Pre-Petition Lender Party.**  As a result of the grant of the New DIP Liens, and the use of Cash Collateral authorized herein, the Pre-Petition Lender Party is entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code for any Pre-Petition Diminution in Value (as defined below) resulting from the automatic stay or Debtors' use, sale or lease of the Pre-Petition Lender Party's Collateral (including Cash Collateral) during these Cases. As adequate protection, the Pre-Petition Lender Party will receive: (1) the Prior-Lender Party's Replacement Liens and (2) the Pre-Petition Lender Party's Superpriority Claim.

K.    **Extension of Financing**.  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Financing Agreements and subject to (i) the entry of this Interim Order and a Final Order, and (ii) findings by this Court that such financing is essential to the Debtors' estate, that the DIP Lenders are good faith financiers, and that the DIP Secured Parties' claims, superpriority claims, security interests and Liens and other protections granted pursuant to this Interim Order (and the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.  The New DIP Liens (as defined herein) shall not be (i) subject or subordinate to (A) any Lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any Liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

L.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The terms and conditions of the DIP Facility and the DIP Financing Agreements, and the fees paid and to be paid thereunder are (i) fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Facility and the use of the Collateral (including, without

limitation, the Cash Collateral) was negotiated in good faith and at arms' length between the Debtors, the DIP Secured Parties and the Pre-Petition Lender Party, and (iii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that the DIP Secured Parties are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

M.      **Relief Essential; Best Interest; Good Cause.**   The relief requested in the DIP Motion (and as provided in this Interim Order), including, without limitation, the establishment of the DIP Facility and the use of the Collateral (including, without limitation, the Cash Collateral), is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and personal property.  It is in the best interest of the Debtors' estates to be allowed to establish the DIP Facility and to use the Collateral (including, without limitation, the Cash Collateral) contemplated by the DIP Financing Agreements. Good cause has been shown for the relief requested in the DIP Motion (and as provided in this Interim Order).

N.      **Entry of Interim Order**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE**, on the DIP Motion of the Debtors and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the DIP Secured Parties and the Pre-Petition Lender Party to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.      **Motion Granted**.   The DIP Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order and the DIP Financing Agreements.

2.      **DIP Financing Agreements**.

(a)      **Approval of Entry Into DIP Financing Agreements.**   The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations, in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreements (including, without limitation, the Budget), and to execute and deliver all instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtors under the DIP Facility (including, without limitation, the Collateral Assignment of Note Documents and Allonge dated September 18, 2013 (the "Collateral Assignment")) and the creation and perfection of the New DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreements.   The Debtors are hereby authorized and directed to do and perform all

acts, pay the principal, interest, fees, expenses and other amounts described in the DIP

Financing Agreement and all other DIP Financing Agreements as such become due,

including, without limitation, closing fees, administrative fees, origination fees, and

reasonable attorneys', financial advisors' and accountants' fees and disbursements as

provided for in the DIP Financing Agreement which amounts shall not otherwise be

subject to approval of this Court; provided, however, that unresolved disputes as to the

reasonableness of any professional fees and expenses may be determined by this

Court.   Upon execution and delivery, the DIP Financing Agreements shall represent

valid and binding obligations of the Debtors enforceable against the Debtors in

accordance with their terms.

(b)      **Authorization to Borrow**.

(i)      In order to enable the Debtors to continue to operate their business during

the Interim Period and subject to the terms and conditions of this Interim Order, the DIP

Financing Agreement, the other DIP Financing Agreements, and the Budget (as defined

below) (subject to any variances thereto permitted under the terms and conditions of the

DIP Financing Agreement), the Debtors are hereby authorized to borrow under the DIP

Facility, and subject to entry of the Final Order, Debtors shall be authorized under the

DIP Facility to consummate Pre-Petition Lender Party's Debt Payoff, which shall

constitute a roll-up under the DIP Financing Agreements, and in doing all of the

foregoing, to borrow up to a total committed amount of up to $5,318,500.

(ii)     Upon execution and delivery of the DIP Financing Agreements, such DIP Financing Agreements shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against the Debtors in accordance with their respective terms and the terms of this Interim Order for all purposes during these Cases, any subsequently converted cases of the Debtors under chapter 7 of the Bankruptcy Code or after the dismissal of these Cases.   No obligation, payment, assignment or repayment thereof or recovery on or in respect thereof, transfer or grant of security under the DIP Financing Agreements, or this Interim Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(c)     **Application of DIP Proceeds**.  The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreement, and in accordance with the Budget (as defined below) (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreement) solely for  (a) working capital and general corporate purposes, to the extent set forth in the Budget,  (b) payment of costs of

administration of these Cases, to the extent set forth in the Budget, and (c) upon entry of the Final Order, the Pre-Petition Lender Party's Debt Payoff in accordance with the DIP Financing Agreements, which shall constitute a roll-up under the DIP Financing Agreements.

(d)     **Conditions Precedent**.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Financing Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Financing Agreement have been satisfied in full or waived by the DIP Secured Parties in their sole discretion.

(e)     **Liens.**  Effective immediately upon the entry of this Interim Order, the DIP Secured Parties are hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and New DIP Liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estate except for Permitted Liens and as otherwise provided in this Interim Order, upon and to all of the Collateral, and, for the avoidance of doubt, Collateral shall include all real and personal property of the Debtors now owned or hereafter acquired (excluding Avoidance Actions of the Debtors, but including only the proceeds of Avoidance Actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-Petition Date transfer of Collateral) and all other property of whatever kind and

nature, in each case, that is pledged as collateral under any Security Document (including, without limitation, the Collateral Assignment), the Financing Orders or any other order of the Bankruptcy Court in these Cases.

(f)      **DIP Lien Priority**.  The New DIP Liens created and granted to the DIP Secured Parties, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to any of the Collateral, subject only to: (x) the Carve-Out, and (y) the Permitted Liens.  The New DIP Liens shall secure all DIP Obligations (including, but not limited to, the advances under the DIP Facility used to effectuate the Pre-Petition Lender Party's Debt Payoff).  The New DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in these Case except for the Permitted Liens and the Carve-Out; and shall be valid and enforceable against any trustee subsequently appointed in these Case, upon the conversion of these Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Case"), and/or upon the dismissal of these Cases.  The New DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, or if approved in the Final Order, section 506(c) of the Bankruptcy Code.  The New DIP Liens (as defined herein) shall not be (i) subject or subordinate to (A) any Lien or security interest that is avoided and preserved

for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any Liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(g)   **Enforceable Obligations**. The DIP Financing Agreements (including, without limitation, the DIP Obligations evidenced thereby) shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors, in accordance with their terms.

(h)   **Budget**.   From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreement and this Interim Order and in accordance with the Budget (subject to the terms and conditions of the DIP Financing Agreement).

(i)   **Superpriority Administrative Claim Status**.   Subject to the Carve-Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Superpriority Claim" and, together with the New DIP Liens, the "DIP Protections") with priority (except as otherwise provided in Section 8 below) in these Cases or any

Successor Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code
and otherwise over all administrative expense claims, adequate protection claims and
all other claims against the Debtors and their estates, now existing or hereafter arising,
of any kind or nature whatsoever including, without limitation, administrative expenses
of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330 of
the Bankruptcy Code (except as otherwise provided in Section 8 below), 331, 503(a),
503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code,
and, if approved in the Final Order, section 506(c) of the Bankruptcy Code), whether or
not such expenses or claims may become secured by a judgment Lien or other non-
consensual Lien, levy or attachment.   Other than the Carve-Out, no costs or expenses
of administration, including, without limitation, professional fees allowed and payable
under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or
may be incurred in this proceeding, or in any Successor Case, and no priority claims
are, or will be, senior to, prior to (subject to the Pre-Petition Lender Party's Superpriority
Claim as set forth in this Interim Order), or on a parity with the DIP Protections or the
DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder.

3. **Authorization to Use Proceeds of DIP Financing Agreement**.

(a)  The Debtors shall use the DIP Loans and the Collateral (including, without
limitation, the Cash Collateral) solely as provided in this Interim Order and the DIP

Financing Agreements, and in accordance with the Budget.  Pursuant to the terms and conditions of this Interim Order, the DIP Facility and the DIP Financing Agreement, and in accordance with the budget attached hereto as **Exhibit "A"** (as the same may be modified, supplemented or updated from time to time consistent with the terms of the DIP Financing Agreement and this Interim Order, the "Budget"), the Debtors are authorized to use Collateral (including, without limitation Cash Collateral) and to use the advances under the DIP Financing Agreement (during the period commencing immediately after the entry of the Interim Order and terminating upon termination of the commitment to fund the DIP Facility pursuant to the provisions of this Interim Order). The Budget may be updated (with the consent and/or at the request of the DIP Agent, subject to the provisions of the DIP Financing Agreement), from time to time, provided that such updated Budget shall be in form and substance acceptable to the DIP Agent, in its reasonable discretion, and the Debtors shall be required always to comply with the Budget and the DIP Financing Agreement pursuant to the terms of the DIP Facility. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business or other proceeds resulting therefrom, except as permitted pursuant to the DIP Facility, the DIP Financing Agreement and this Interim Order.

(b)    Neither the advances under the DIP Financing Agreement nor any of the Collateral (including, without limitation, the Cash Collateral) may be used by the

Debtors, and any committee appointed pursuant to section 1102 of the Bankruptcy Code, or any other person or entity to object to or contest in any manner, or raise any defenses to the validity, extent, perfection, priority, or enforceability of the Pre-Petition Lender Party's Debt or any Liens or security interests with respect thereto or any other rights or interests of the Pre-Petition Lender Party, or to assert any claims or causes of action, including, without limitation, any Avoidance Actions, against the Pre-Petition Lender Party.

4.     **Adequate Protection for Pre-Petition Lender Party.**   As adequate protection for the interest of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral (including Cash Collateral) on account of the granting of the New DIP Liens, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay or the Debtors' use, sale, depreciation, or disposition of the Pre-Petition Lender Party's Collateral (the "Pre-Petition Diminution in Value"), the Pre-Petition Lender Party shall receive adequate protection as follows:

(a)     **Pre-Petition Lender Party's Replacement Liens.**  Solely to the extent of the Pre-Petition Diminution in Value of the interests of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral, the Pre-Petition Lender Party shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code additional and replacement security interests and Liens in the Collateral (the "Pre-Petition Lender Party's Replacement Liens"), which

shall be junior only to the New DIP Liens, Permitted Liens and the Carve-Out as provided herein.

(b)   **Pre-Petition Lender Party's Superpriority Claim**.  Solely to the extent of the Pre-Petition Diminution in Value of the interest of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral, the Pre-Petition Lender Party shall have an allowed superpriority administrative expense claim pursuant to Bankruptcy Code section 507(b) (the "Pre-Petition Lender Party's Superpriority Claim") which shall have priority (except with respect to the New DIP Liens, the DIP Superpriority Claim, and the Carve-Out) over any other claims under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses of claims may become secured by a judgment or other non-consensual Lien, levy or attachment.

(c)   **Adequate Protection Upon Sale of Collateral.**  Upon the sale of any Collateral pursuant to section 363 of the Bankruptcy Code, any such Collateral shall be sold free and clear of any Permitted Liens, the Pre-Petition Lender Party's Liens and the

Pre-Petition Lender Party's Replacement Liens; <u>provided</u>, <u>however</u>, that such Liens shall attach to the proceeds of any such sale in the order and priority as established by final order of this Court.

5.     **Section 507(b) Reservation.**   Nothing herein shall impair or modify the Pre-Petition Lender Party's right to seek additional adequate protection in the event that the adequate protection provided to the Pre-Petition Lender Party hereunder is insufficient to compensate for the Pre-Petition Diminution in Value of the interest of the Pre-Petition Lender Party in the Pre-Petition Lender Party's Collateral  during these Cases or any Successor Cases.

6.     **Lien Perfection**.

(a)     This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the New DIP Liens and the Pre-Petition Lender Party's Replacement Liens, including, without limitation, perfection of the DIP Secured Parties' interest in any deposit that the Debtors have a right, title or interest in with respect to a Sale Transaction, without the necessity of filing or recording any financing statement, deed of trust, mortgage, assignment or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreements) to validate or perfect the New DIP Liens or the Pre-Petition Lender Party's Replacement Liens or to entitle the New DIP

Liens or the Pre-Petition Lender Party's Replacement Liens to the priorities granted

herein.  Notwithstanding the foregoing, the DIP Agent may, in its sole discretion, file

such financing statements, mortgages, security agreements, assignments, notices of

Liens and other similar documents, and is hereby granted relief from the automatic stay

of section 362 of the Bankruptcy Code in order to do so, and with respect to the New

DIP Liens, all such financing statements, mortgages, security agreements,

assignments, notices and other documents shall be deemed to have been filed or

recorded at the time and on the date of entry of this Interim Order.  Upon request, the

Debtors shall execute and deliver to the DIP Agent and the Pre-Petition Lender Party all

such financing statements, mortgages, notices and other documents as the DIP Agent

or Pre-Petition Lender Party may reasonably request to evidence, confirm, validate or

perfect, or to ensure the contemplated priority of, the New DIP Liens and the Pre-

Petition Lender Party's Replacement Liens granted pursuant hereto.  Each of the DIP

Agent and the Pre-Petition Lender Party, in its discretion, may file a photocopy of this

Interim Order as a financing statement with any recording officer designated to file

financing statements or with any registry of deeds or similar office in any jurisdiction in

which the Debtors have real or personal property, and in such event, the subject filing or

recording officer shall be authorized to file or record such copy of this Interim Order.

(b) This Interim Order shall be sufficient and conclusive evidence that the DIP

Secured Parties shall be, and shall be deemed to be, without any further action or

notice, named as additional insureds and loss payees, as applicable, on each insurance

policy maintained now or in the future by any of the Debtors which in any way relates to

the Collateral.  Notwithstanding the foregoing, the Debtors are authorized and directed

to take any actions that the DIP Agent shall request, in its sole and absolute discretion,

to have the DIP Agent, on behalf of the DIP Secured Parties, be added as an additional

insured and loss payee on each insurance policy.

       7.      **Reservation of Certain Third Party Rights and Bar of Challenges and**

**Claims.**  Nothing in this Interim Order or the DIP Financing Agreements, including,

without limitation, the Debtors' Stipulations, shall prejudice whatever rights any

committee appointed pursuant to section 1102 of the Bankruptcy Code or any other

party in interest with requisite standing, including, for the avoidance of doubt, any

subsequently appointed chapter 7 and 11 trustee (other than the Debtors) may have (a)

to file a contested matter or an adversary proceeding or otherwise to object to or

challenge the findings herein that pertain to the Pre-Petition Lender Party's Debt,

including, but not limited to, those in relation to (i) the validity, extent, perfection,

enforceability or priority of the Pre-Petition Lender Party's Liens in and to the Pre-

Petition Lender Party's Collateral, or (ii) the validity, allowability, priority, status or

amount of the Pre-Petition Lender Party's Debt, or (b) to bring suit or otherwise assert

any claims or causes of action against the Pre-Petition Lender Party in connection with

or related to the Pre-Petition Lender Party's Financing Agreements, or the actions or

inactions of the Pre-Petition Lender Party arising out of or related to the Pre-Petition

Lender Party's Financing Agreements; provided, however, that, unless any committee

appointed pursuant to section 1102 of the Bankruptcy Code or any other party in

interest with requisite standing commences a contested matter or adversary proceeding

raising such objection or challenge that pertains to the Pre-Petition Lender Party's Debt,

including, without limitation, any claim against the Pre-Petition Lender Party in the

nature of a setoff, counterclaim or defense to the Pre-Petition Lender Party's Debt

(including, but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or

552 of the Bankruptcy Code or by way of suit against the Pre-Petition Lender Party),

within the earlier of (a) 60 days after the formation of any committee pursuant to section

1102 of the Bankruptcy Code, or (b) if no committee is formed pursuant to section 1102

of the Bankruptcy Code, for all other parties 75 days following entry of the Interim Order

or (c) the date upon which a Sale Transaction is consummated as contemplated by the

terms of the DIP Financing Agreements (collectively, (a), (b) and (c) shall be referred to

herein as the "Pre-Petition Lender Party Challenge Period," and the date that is the next

calendar day after the termination of the Pre-Petition Lender Party Challenge Period

shall be referred to herein as the "Pre-Petition Lender Party Challenge Period

Termination Date"), upon the Pre-Petition Lender Party Challenge Period Termination

Date, (i) any and all such contested matters, adversary proceedings and other

objections and challenges by any party (including, without limitation, all creditors, any

committee appointed pursuant to section 1102 of the Bankruptcy Code, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases, receivers, administrators, examiners with expanded powers, responsible officers, other estate representatives appointed in these Cases or any Successor Cases or in any jurisdiction, and all other parties in interest) as to the findings in this Interim Order and/or the Debtors' Stipulations shall be deemed to be forever waived and barred, (ii) the Pre-Petition Lender Party's Debt shall be deemed to be allowed in full and shall be deemed to be allowed as fully secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Cases and any Successor Cases, (iii) the Pre-Petition Lender Party's Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected security interests and Liens, not subject to recharacterization, subordination or otherwise avoidable, and (iv) the Debtors' Stipulations shall be binding on all parties (including, without limitation, all creditors, any committee appointed pursuant to section 1102 of the Bankruptcy Code , any chapter 11 or chapter 7 trustee appointed herein or in any Successor Cases, receivers, administrators, examiners with expanded powers, responsible officers, other estate representatives appointed in these Cases or in any Successor Case or in any jurisdiction, and all other parties in interest).  To the extent any such contested matter, adversary proceeding or other objection or challenge is filed, the Pre-Petition Lender Party shall be entitled to include such costs and expenses, including, but not limited to

reasonable attorneys' fees, incurred in defending the objection or complaint as part of the Pre-Petition Lender Party's Debt, in each case, to the extent allowable under section 506(b) of the Bankruptcy Code.

8.    **Carve-Out**.    During the Interim Period and subject to the terms and conditions contained in this Section 8, the New DIP Liens, the DIP Superpriority Claim, the Pre-Petition Lender Party's Liens, the Pre-Petition Lender Party's Replacement Liens and the Pre-Petition Lender Party's Superpriority Claim are subordinate only to the following items (a), (b), (c) and (d) (items (a), (b), (c) and (d), collectively, the "Carve-Out"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 to the extent such interest is awarded by final order of this Court; (b) to the extent allowed fees, expenses and disbursements  of professionals retained by order of this Court by the Debtors or any committee appointed pursuant to section 1102 of the Bankruptcy Code in these Cases (the "Professionals") incurred (i) prior to the entry of this Interim Order and (ii) thereafter, in accordance with the Budget; and (c) up to $50,000 of allowed fees, expenses and disbursements of the Professionals (the "Professional Fee Carve-Out Cap") incurred after the occurrence of the Termination Date (defined in this paragraph below); and (d) the sum of $100,000 (the "Wind-Down Amount"); provided, however, that in each case (a), (b), (c) and (d), such fees and expenses are approved by this Court, or such lesser amount so approved.  To the

extent not previously funded in accordance with the terms of this Interim Order, DIP

Secured Parties shall deposit the Carve-Out (including, without limitation, the Wind-

Down Amount) into a deposit account specified by the Debtors upon the Termination

Date (as defined below).   For the purposes hereof, the "Termination Date" shall occur

upon the earliest to occur of: (i) the Term Loan Maturity Date (as defined in the DIP

Financing Agreement; (ii)  the occurrence and during the continuance of an Event of

Default under the DIP Agreement; (iii) a material breach by the Debtors of this Interim

Order; and (iv) the date upon which a Sale Transaction (as defined in the DIP Financing

Agreement) is closed as contemplated by the DIP Financing Agreement; and, in each

case, (i) through (iv) upon delivery of a written notice thereof by the DIP Agent to the

Debtors and their counsel and the counsel for any committee appointed pursuant to

section 1102 of the Bankruptcy Code specifying that such notice constitutes a notice

that the Termination Date has occurred (a "Termination Notice").   Upon the delivery of a

Termination Notice, the right of the Debtors to pay professional fees incurred under

clause (b) above without reduction of the Professional Fee Carve-Out Cap in clause (c)

above shall terminate and upon receipt of such notice, the Debtors shall provide

immediate notice by facsimile and email to all retained professionals informing them that

the Termination Date has occurred and that the Debtors' ability to pay professionals is

subject to the Professional Fee Carve-Out Cap.   Upon the occurrence of the

Termination Date and the full and final funding of the Carve-Out (including, without

limitation, the Wind-Down Amount), there shall be no further obligations on the part of the DIP Secured Parties or the Pre-Petition Lender Party regarding the Carve-Out (including, without limitation, the Wind-Down Amount), any Professional Fees, any U.S. Trustee Fees or any other fees and expenses of the Debtors' estates in these cases or in any Successor Cases or proceedings.  The DIP Secured Parties' obligation to fund or otherwise pay the Carve-Out (including, without limitation, the Wind-Down Amount), shall be added to and made a part of the DIP Obligations, secured by the New DIP Liens, and the DIP Secured Parties shall be entitled to all of the rights, claims Liens, priorities, and protections under this Interim Order, the DIP Financing Agreements, the Bankruptcy Code and/or applicable law in connection therewith.   Subject to the provisions of this Section 8, the Carve-Out (including, without limitation, the Wind-Down Amount) shall exclude any fees and expenses (x) incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (1) the DIP Obligations, (2) the DIP Secured Parties' Liens in the Collateral, (3) the Pre-Petition Lender Party's Debt or (4) the Pre-Petition Lender Party's Liens or (B) preventing, hindering or delaying, whether directly or indirectly, the DIP Secured Parties' or the Pre-Petition Lender Party's assertions or enforcement of their Liens, security interests or realization upon any Collateral,

provided, however, that with respect to solely the Pre-Petition Lender Party's Lien in the

Pre-Petition Lender Party's Collateral, such exclusion does not encompass any

investigative work, at an aggregate expense not to exceed $10,000, conducted by the

Professionals prior to bringing any action relating to the foregoing, (y) related to the

proposed sale or the disposition of any other Collateral, or incurrence of indebtedness

not permitted under the DIP Financing Agreement, except with the DIP Agent's express

written consent or (z) arising after the conversion of these Cases to cases under

chapter 7 of the Bankruptcy Code.   The DIP Agent may implement reserves in

accordance with the terms and conditions of the DIP Financing Agreement.   Except for

a lien obligation to fund the Carve-Out (including, without limitation, the Wind-Down

Amount) as set forth in this Interim Order and the DIP Financing Agreement, nothing

herein shall be construed to obligate the DIP Secured Parties or the Pre-Petition Lender

Party, in any way, to pay the Professionals' fees or U.S. Trustee Fees, or to assure that

the Debtors have sufficient funds on hand to pay any Professional Fees, U.S. Trustee

Fees or other liabilities or obligations of the Debtors.

        9.    **Payment of Compensation.**   Nothing herein shall be construed as

consent to the allowance of any professional fees or expenses of any of the Debtors,

any committee appointed pursuant to section 1102 of the Bankruptcy Code or of any

person or shall affect the right of the DIP Secured Parties or the Pre-Petition Lender

Party to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

10.  **Section 506(c) Claims; Roll Up**.

(a)    Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and no such consent shall be implied from any other action or inaction by the DIP Secured Parties or the Pre-Petition Lender Party; and

(b)    Subject to and effective upon entry of the Final Order, the Debtors shall be authorized make payment to the Pre-Petition Lender Party in an amount necessary to accomplish the Pre-Petition Lender Party's Debt Payoff, which shall constitute a roll-up under the DIP Financing Agreements, in accordance with the terms of the Final Order and the DIP Financing Agreements.

11.  **Collateral Rights**.  Unless the DIP Agent has provided its prior written consent or the Pre-Petition Lender Party's Debt and all DIP Obligations have been

indefeasibly paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness, if any, described in subparagraph (a) below), all commitments to lend have terminated, and all indemnity obligations under the DIP Financing Agreement have been cash secured to the reasonable satisfaction of the DIP Agent, there shall not be entered in this proceeding, or in any Successor Case, any order which authorizes any of the following:

(a)      the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Secured Parties or the Pre-Petition Lender Party; or

(b)      the use of Collateral (including, without limitation Cash Collateral) for any purpose other than to pay in full in cash the DIP Obligations or as otherwise permitted in this Interim Order and the DIP Financing Agreement;

(c)      relief from stay by any person other than of the DIP Secured Parties on all or any portion of the Collateral; or

(d)      the Debtors' return of goods constituting Collateral pursuant to section 546(h) of the Bankruptcy Code, except as permitted in the DIP Financing Agreements.

12.      **Proceeds of Subsequent Financing.**  Without limiting the provisions and protections of Section 11 above, if at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Secured Parties' obligations to make loans

and advances under the DIP Facility, including subsequent to the confirmation of any chapter 11 plan or plans (the "Plan") with respect to the Debtors, and the repayment in full of the Pre-Petition Lender Party's Debt, the Debtors' estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Financing Agreement or engage in an Asset Sale or Debt Issuance, then all of the cash proceeds derived from such credit or debt or such sale or issuance shall immediately be turned over (a) first, to the Pre-Petition Lender Party for application to the Pre-Petition Lender Party's Debt pursuant to the Pre-Petition Lender Party's Financing Agreements; and (b) second, to the DIP Agent for application to the DIP Obligations outstanding pursuant to the terms of the DIP Financing Agreement, in accordance with the terms of this Interim Order.

13.     **Disposition of Collateral.**   The Debtors shall not (a) sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the DIP Secured Parties (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Secured Parties or an order of this Court), except for sales of the Debtors' services in the ordinary course of business or as permitted by the DIP Financing Agreement and this Interim Order and as approved by this Court, or (b) assume, reject or assign any leasehold interest without the prior

consultation with the DIP Agent, except as otherwise permitted by the DIP Financing Agreements.

14.    **Remedies After Event of Default**.

(a)    The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Secured Parties and the Pre-Petition Lender Party to exercise, upon the occurrence of the Termination Date and at any time thereafter upon five (5) business days' prior notice to the Debtors, counsel to the Debtors, counsel for any committee appointed pursuant to section 1102 of the Bankruptcy Code, the U.S. Trustee and the Pre-Petition Lender Party ("Default Notice Period") of such occurrence, all rights and remedies provided for in the DIP Financing Agreements (including, without limitation and without prior notice, the right to freeze monies or balances in the Debtors' accounts or set off monies or balances of the Debtors in accounts maintained by any DIP Secured Party, the right to charge the Post-Default Rate, terminate commitments and cease funding under the DIP Agreement). Notwithstanding the occurrence of the Termination Date or termination of the commitments to fund under the DIP Agreement or anything herein, all of the rights, remedies, benefits, and protections provided to the DIP Secured Parties under the DIP Financing Agreements and to the DIP Secured Parties and the Pre-Petition Lender Party under this Interim Order shall survive.   The Debtors and/or any committee appointed pursuant to section 1102 of the Bankruptcy Code shall be entitled to seek an

expedited hearing regarding an Event of Default or termination of the commitments to fund under the DIP Agreement(a "Default Pleading"); provided, however, that the only issue to be determined at such hearing is whether an Event of Default has occurred and is continuing. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

(b)     Upon the Termination Date, all (i) DIP Obligations of the Debtors to the DIP Secured Parties shall be immediately due and payable, and (ii) authority to use or borrow the proceeds of the DIP Financing Agreements shall cease.  If the DIP Secured Parties or the Pre-Petition Lender Party exercise any of their rights and remedies upon the occurrence of the Termination Date, the DIP Agent may retain one or more agents to sell, lease, or otherwise dispose of the Collateral in accordance with the terms of the DIP Financing Agreements.   In any exercise of their rights and remedies upon the Termination Date, the DIP Secured Parties are authorized to proceed under or pursuant to the DIP Financing Agreements.  Without limiting the foregoing, subject to the terms of the DIP Financing Agreements, in the exercise of the DIP Agent's rights and remedies upon the Termination Date, the DIP Agent may by written notice to the Debtors require the Debtors to file a motion seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the DIP Agent (the cost of

which shall be funded by the DIP Facility in accordance with the Budget).  The Debtors

shall file such motion within ten (10) days of the DIP Agent's request and shall diligently

prosecute such motion.  If the Debtors fail to so file the motion, the DIP Agent may file

and prosecute such a motion in the name of the Debtors.  Subject to the rights, if any, of

the holders of any Permitted Liens and/or of Professionals under Section 8 hereof, all

proceeds realized from any of the foregoing shall be turned to the DIP Agent for

application to the DIP Obligations pursuant to the DIP Financing Agreements.

(c)     If the DIP Secured Parties exercise their rights under the DIP Financing

Agreements to foreclose upon the Collateral, in connection with such foreclosure the

Debtors will be deemed to have assumed and assigned to the DIP Secured Parties (or

their assigns) all executory contracts and leases to which the Debtors are a party, other

than executory contracts or leases specifically excepted by the DIP Secured Parties or

their assigns by written notice.  The Court shall retain jurisdiction to adjudicate any

disputes relating to assumption and assignment, including, inter alia, disputes as to the

assignability of such contracts and leases, required cure amounts and/or the provision

of adequate assurances of future performance under the assigned contracts and

leases.

15.     **Transaction Proceeds; Survival of Protections**  Any and all Net Cash

Payments received from the consummation of an asset sale, debt issuance, mandatory

prepayment event pursuant to Section 2.9(b) of the DIP Financing Agreement or any

Sale Transaction shall be remitted directly to the DIP Agent upon Debtors' receipt thereof for application to the unpaid Pre-Petition Lender Party's Debt and the DIP Obligations (in that order) in accordance with the terms of the DIP Financing Agreement and this Interim Order.  Unless and until the Pre-Petition Lender Party's Debt and the DIP Obligations are irrevocably repaid in full or have been cash secured to the reasonable satisfaction of the Pre-Petition Lender Party and the DIP Agent, as applicable, all commitments under the DIP Financing Agreements to lend have irrevocably terminated, the protections afforded to the Pre-Petition Lender Party and the DIP Secured Parties pursuant to this Interim Order or the DIP Financing Agreement, as applicable, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting this into a Successor Case, and the New DIP Liens, the DIP Superpriority Claim and the Pre-Petition Lender Party's Superpriority Claim shall continue in this proceeding and in any Successor Case, and such Liens, the DIP Superpriority Claim and the Pre-Petition Lender Party's Superpriority Claim shall maintain their priority as provided by this Interim Order.

16.    **Modification of Automatic Stay.**    The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Financing Agreement as necessary to (a) permit the Debtors to grant the New DIP Liens and the Pre-Petition Lender Party's Replacement Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Pre-Petition Lender Party under the

DIP Financing Agreements, the DIP Facility, and this Interim Order, as applicable, and (b) authorize the DIP Secured Parties and the Pre-Petition Lender Party to retain and apply payments hereunder.

17. **Credit Bid.** The DIP Secured Parties, directly or through a designee, shall have the unqualified right to credit bid up to the full amount of the DIP Obligations, as a stalking horse bidder or otherwise, in any sale of any portion of the Collateral, whether pursuant to an action or a Reorganization Plan or otherwise.

18. **Proofs of Claim.** The DIP Secured Parties and the Pre-Petition Lender Party will not be required to file proofs of claim in these Cases or Successor Cases. This Interim Order shall constitute a proof of claim on behalf of the DIP Secured Parties and the Pre-Petition Lender Party in these Cases. The Pre-Petition Lender Party is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as they see fit) aggregate proofs of claim in these Cases or any Successor Cases. Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by the Pre-Petition Lender Party.

19. **Other Rights and Obligations**.

(a) **Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of this Interim Order**. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all

of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or Lien or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Secured Parties shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim.  Since the loans made pursuant to the DIP Financing Agreement are made in reliance on this Interim Order, the obligations owed the DIP Secured Parties prior to the effective date of any stay, modification or vacation of this Interim Order cannot, as a result of any subsequent order in this, or in any Successor Case, be subordinated, lose their Lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the Liens and claims granted to the DIP Secured Parties under this Interim Order and/or the DIP Financing Agreements.

(b)    **Expenses**.  As provided in the DIP Financing Agreements, all costs and expenses of the DIP Secured Parties and the Pre-Petition Lender Party in connection

with the DIP Financing Agreements and the Pre-Petition Lender Party's Financing

Agreements, as applicable, whether incurred prior to or after the commencement of

these Cases, including, without limitation, reasonable, documented legal, accounting,

collateral examination, monitoring and appraisal fees, financial advisory fees, fees and

expenses of other consultants, indemnification and reimbursement of fees and

expenses, and other out of pocket expenses will be paid by the Debtors; provided,

however, that such costs and expenses shall be paid only after each relevant

professional has provided copies of its fee and expense statements to the U.S. Trustee

and counsel to any committee appointed pursuant to section 1102 of the Bankruptcy

Code reasonably contemporaneously with the delivery of such fee and expense

statements to the Debtors (which may be done no more frequently than monthly).  Such

statements need not be submitted in the form of a fee application or comply with U.S.

Trustee fee guidelines, but shall contain reasonable detail as to the number of hours

worked and applicable hourly rates, but may be redacted to the extent necessary to

delete any information subject to attorney-client privilege, any information constituting

attorney work product or any other confidential information and the provision of such

invoices shall not constitute any waiver of the attorney-client privilege or any benefits of

the attorney work product doctrine.   The U.S. Trustee, any committee appointed

pursuant to section 1102 of the Bankruptcy Code or any other party in interest may

object to the reasonableness of the fees, costs and expenses included in any

professional fee invoice submitted hereunder, provided that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on counsel to the parties seeking reimbursement no later than ten (10) days after the objecting parties receiving such applicable professional fee invoice, and (ii) it describes with particularity the items and categories of fees, costs and expenses that are subject to the objection and it provides for a specific basis for the objection to each such item of category of fees, costs and expenses; provided, however, further that the Debtors shall pay all amounts that are not subject of any objection within ten (10) days of the objection deadline.  Any hearing on an objection to any payment of any fees, costs and expenses of such professionals shall be limited to the reasonableness of the particular items or categories of fees, costs, and expenses which are the subject to such objection. Except as provided in this subsection (b), the Debtors shall not make any payment in respect to attorneys' or other professional fees incurred by the Pre-Petition Lender Party.  Under no circumstances shall professionals for the DIP Secured Parties or the Pre-Petition Lender Party be required to comply with the U.S. Trustee fee guidelines.

(c)     **Binding Effect.**  The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Pre-Petition Lender Party and the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Cases, in any Successor

Case, or upon dismissal of any such chapter 11 or chapter 7 cases; provided, however, that, except to the extent expressly set forth in this Interim Order, the DIP Secured Parties shall have no obligation to permit the use of the DIP Facility or the Collateral (including, without limitation, the Cash Collateral) or extend and financing to any including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors.

(d)    **No Waiver**.  The failure of the DIP Secured Parties or the Pre-Petition Lender Party to seek relief or otherwise exercise their rights and remedies under the DIP Financing Agreements, the DIP Facility, or this Interim Order, as applicable, shall not constitute a waiver of any of the DIP Secured Parties' or Pre-Petition Lender Party's rights hereunder.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Secured Parties or the Pre-Petition Lender Party under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Secured Parties or the Pre-Petition Lender Party to (i) request conversion of these Cases to cases under chapter 7, dismissal of these Cases, or the appointment of a trustee in these Cases, or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan or (iii) any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Pre-Petition Lender Party.

(e)     **No Third Party Rights**.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f)     **No Marshaling**.   None of the DIP Secured Parties nor the Pre-Petition Lender Party shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

(g)     **Section 552(b).**   The DIP Secured Parties and the Pre-Petition Lender Party shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Pre-Petition Lender Party, product, offspring or profits of any of the Collateral.

(h)     **Amendment**.   The Debtors and the DIP Agent may amend, modify, supplement or waive any provision of the DIP Financing Agreements, provided that such amendment, modification, supplement or waiver, in the judgment of the Debtors and the DIP Agent, is either nonprejudicial to the rights of third parties or is not material; provided, however that, the Debtor and the DIP Secured Parties may agree (in their respective sole discretion) to extend the Maturity Date for up to 60 days without consent of any committee appointed pursuant to section 1102 of the Bankruptcy Code). Otherwise, such waiver, modification, or amendment of any of the provisions hereof shall be effective only if (a) set forth in writing, signed by or on behalf of the Debtors and

the DIP Agent (after having obtained the approval of the DIP Secured Parties as provided in the DIP Financing Agreements), and (b) approved by this Court.

(i)     **Survival of Interim Order**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in these Cases, (ii) converting these Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing these Cases, (iv) withdrawing of the reference of these Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of these Cases in this Court, and the terms and provisions of this Interim Order as well as the DIP Protections granted pursuant to this Interim Order and the DIP Financing Agreements, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtors to the DIP Secured Parties pursuant to the DIP Financing Agreements and all obligations of the Debtors to the Pre-Petition Lender Party are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.  The Debtors shall not propose or support any Plan that is not conditioned upon the payment in full in cash

of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Commitment Termination Date.

(j)      **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Interim Order, the provisions of this Interim Order shall govern and control.

(k)      **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the filing of the DIP Motion immediately upon execution of the DIP Financing Agreement.

(l)      **Objections Overruled**.  All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(m)      **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent.

(n)      **Waiver of the Fourteen (14) Day Stay Under Bankruptcy Rule 6004(h)**. The fourteen (14) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to this Interim Order.

(o)      **Preservation of Rights Granted Under the Order**. No claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order to the

DIP Agent shall be granted or allowed while any portion of the DIP Obligations remain outstanding, and the New DIP Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estate under section 551 of the Bankruptcy Code or, except as set forth in this Interim Order, subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(1)    Unless all DIP Obligations shall have been indefeasibly paid in full in cash in accordance with the terms of the DIP Agreement (or, as appropriate, cash secured to the reasonable satisfaction of the DIP Agent), in the case of clause (i) below, the Debtors shall not seek, and in the case of clauses (i) and (ii) below, it shall constitute an Event of Default under the DIP Agreement and a termination of the right to use Collateral (including, without limitation, Cash Collateral) if the Debtors seek, or if there is entered, (i) any modification of this Interim Order without the prior written consent of the DIP Agent, as applicable, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent, or (ii) an order converting or dismissing any of these Cases.

(2)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall, to the extent provided in section 364(e) of the Bankruptcy Code, not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the effective

date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the New DIP Liens.   Notwithstanding any such reversal, stay, modification or vacatur, any use of the Collateral (including, without limitation, the Cash Collateral), any DIP Obligations incurred by the Debtors to the DIP Agent and the DIP Lenders prior to the effective date of such reversal, stay, modification or vacatur shall, to the extent provided in section 364(e) of the Bankruptcy Code, be governed in all respects by the original provisions of this Interim Order, and the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Financing Agreements (with respect to all DIP Obligations) and uses of the Collateral (including, without limitation, the Cash Collateral).

(3)      Except as expressly provided in this Interim Order or in the DIP Financing Agreements, the New DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Agent and the DIP Lenders granted by this Interim Order and the DIP Financing Agreements shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of these Cases to a case under chapter 7 of the Bankruptcy Code, dismissing these Cases, or (ii) the entry of an order confirming a plan of reorganization in these Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations.   The terms and provisions of this Interim Order and the DIP Financing

Agreements shall continue in these Cases or in any superseding chapter 7 cases or other cases under the Bankruptcy Code and/or following dismissal of this or any subsequent case, and the New DIP Liens, the DIP Obligations, and the Superpriority Claims, and all other rights and remedies of the DIP Agent and the DIP Lenders granted by this Interim Order and the DIP Financing Agreements shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash.

(p)     **Payments Free and Clear**.  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability.

(q)     **Information.**   The Debtors shall promptly provide to the DIP Agent and counsel to any committee appointed pursuant to section 1102 of the Bankruptcy Code written financial information or periodic reporting as required by the DIP Financing Agreement.

(j)     **Limitation of Liability**.  In determining to make any loan under the DIP Financing Agreement, permitting the use of Collateral (including Cash Collateral), or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Financing Agreements, the DIP Agent, the DIP Lenders and the Pre-Petition Lender Party shall, subject to and effective upon entry of the Final Order, not be deemed to be in control of the operations of the Debtors or to be acting as a

"responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Financing Agreements shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Pre-Petition Lender Party of any liability for any claims arising from the pre-petition or post-petition activities of the Debtors.

-- END OF ORDER –

## DESIGNATION OF PARTIES TO BE SERVED

       Service of the foregoing Order shall be served to the parties and in the manner designated below:

**By Electronic Service**:  I certify that the parties of the record in this case as identified below, are registered CM/ECF users and will be served notice of entry of the foregoing Order through the CM/ECF system:

- Troy J. Aramburu      taramburu@swlaw.com, jpollard@swlaw.com; docket_slc@swlaw.com
- Kenneth L. Cannon      kcannon@djplaw.com, khughes@djplaw.com
- George B. Hofmann      gbh@pkhlawyers.com, dh@pkhlawyers.com
- John T. Morgan tr      john.t.morgan@usdoj.gov, James.Gee@usdoj.gov; Lindsey.Huston@usdoj.gov; Rinehart.Peshell@usdoj.gov; Suzanne.Verhaal@usdoj.gov
- Steven C. Strong      scs@pkhlawyers.com, jh@pkhlawyers.com
- United States Trustee      USTPRegion19.SK.ECF@usdoj.gov

**By U.S. Mail**:  In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed R. Civ. P. 5(b):

       Robert J. Stark
       Brown Rudnick LLP
       Seven Tmes Square
       New York, NY 10036

       Infinia Corporation
       300 West 12th Street
       Ogden, UT 84404

       PowerPlay Solar I, LLC
       300 West 12th Street
       Ogden, UT 84404

       /s/ Steven C. Strong

## EXHIBIT A

(Budget)

**Infinia Corporation**
*Cash Budget from September 16, 2013 - December 16, 2013*

| | Week Beginning: | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 9/16/2013 | 9/23/2013 | 9/30/2013 | 10/7/2013 | 10/14/2013 | 10/21/2013 | 10/28/2013 | 11/4/2013 | 11/11/2013 | 11/18/2013 | 11/25/2013 | 12/2/2013 | 12/9/2013 |
| **Beginning Cash Balance** | $ 350,000 | $ 237,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| **Cash Inflows (Income)** | | | | | | | | | | | | | |
| DIP Financing | | 185,000 | 236,000 | 3,396,000 | 58,000 | 246,000 | 147,000 | 273,000 | 17,000 | 191,000 | 74,000 | 255,500 | 145,000 |
| Contract Revenue | | | 114,000 | | | | 75,000 | | | | 75,000 | | |
| **Total Cash Inflows** | - | 185,000 | 350,000 | 3,396,000 | 58,000 | 246,000 | 222,000 | 273,000 | 17,000 | 191,000 | 149,000 | 255,500 | 145,000 |
| **Cash Outflows (Expenses)** | | | | | | | | | | | | | |
| Payment of secured debt | | | | 3,090,000 * | | | | | | | | | |
| Payroll & benefits | | 194,000 | | 186,000 | | 178,000 | | 222,000 | | 135,000 | | 216,000 | |
| Administrative Professional Fees | | | | | | | | | | | | | |
| Investment Banker (Hamilton Clark) | | | | | 45,000 | | | | | 45,000 | | | 65,000 ** |
| Financial Advisor (RMA) | | | 15,000 | | | | 15,000 | | | | 15,000 | | 7,500 |
| Infinia Legal Counsel (PKH) | | | 20,000 | | | | 20,000 | | | | 20,000 | | 10,000 |
| Infinia Special Advisor (Fenwick) | | | 10,000 | | | | 10,000 | | | | 10,000 | | 5,000 |
| Atlas Legal Counsel (Brown Rudnick et al) | | | 175,000 | | | | 75,000 | | | | 50,000 | | |
| Atlas Legal Counsel (DJP) | | | 10,000 | | | | 10,000 | | | | 5,000 | | |
| Materials & Supplies | 42,000 | 32,000 | 41,000 | 73,000 | 24,000 | 7,000 | 20,000 | 15,000 | 2,000 | - | 3,000 | 18,000 | 2,000 |
| Subcontractors | 14,000 | 19,000 | 14,000 | 5,000 | 14,000 | 5,000 | 28,000 | 2,500 | 2,500 | 6,000 | 6,000 | 2,500 | 2,500 |
| Facilities | 26,000 | | | 26,000 | | | | 20,000 | | | | 10,000 | |
| Insurance | | | 30,000 | | | | 30,000 | | | | 30,000 | | |
| IT & Software Maintenance | 26,000 | | | 2,000 | 9,000 | 3,000 | 3,000 | 2,000 | 4,000 | 2,000 | 4,000 | 2,000 | 2,000 |
| Travel & Meals | | 15,000 | 18,000 | 6,000 | 6,000 | 4,000 | 4,000 | 4,000 | 4,000 | 1,000 | 1,000 | 1,000 | - |
| Utilities | | 45,000 | | 3,000 | | | 3,000 | | | 3,000 | | 5,000 | |
| Phone & Internet | | 12,000 | | 3,000 | | 2,000 | 1,000 | 3,000 | 500 | 500 | - | 1,000 | 1,000 |
| Freight & Postage | 5,000 | | 5,000 | 2,000 | 1,000 | 1,000 | 1,000 | | - | 5,000 | - | | |
| Property & Misc. Taxes | | | 5,000 | | 1,000 | 1,000 | 5,000 | | 1,000 | 1,000 | 5,000 | | |
| Other | | | 5,000 | | 1,000 | 1,000 | 1,000 | 1,000 | | | | | |
| **Total Cash Outflows** | 113,000 | 322,000 | 350,000 | 3,396,000 | 58,000 | 246,000 | 222,000 | 273,000 | 17,000 | 191,000 | 149,000 | 255,500 | 95,000 |
| **Net Cash Flow** | (113,000) | (137,000) | - | - | - | - | - | - | - | - | - | - | 50,000 |
| **Ending Cash Balance** | $ 237,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 150,000 |

\*   Payment amount is an estimate and is subject to change.  The Debtor is awaiting payoff information from Atlas.

\*\*  If there is no competing bid, a $200,000 minimum fee will be due, a $45,000 retainer was paid pre-petition.  Otherwise this amount will be paid from proceeds of the sale and would not be included as part of this budget

**Power Play Solar 1**
*Cash Budget from September 16, 2013 - December 16, 2013*

| | Week Beginning: 9/16/2013 | 9/23/2013 | 9/30/2013 | 10/7/2013 | 10/14/2013 | 10/21/2013 | 10/28/2013 | 11/4/2013 | 11/11/2013 | 11/18/2013 | 11/25/2013 | 12/2/2013 | 12/9/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 18,900 | 18,900 | 18,900 | 13,900 | 13,900 | 13,900 | 13,900 | 10,400 | 10,400 | 10,400 | 10,400 | 5,400 | 5,400 |
| Cash Inflows (Income) | | | | | | | | | | | | | |
|   Revenue - power generation | | | | | | | 1,500 | | | | | | |
| Total Cash Inflows | - | - | - | - | - | - | 1,500 | - | - | - | - | - | - |
| Cash Outflows (Expenses) | | | | | | | | | | | | | |
|   Adminstrative Professional Fees | | | | | | | | | | | | | |
|     PPS1 Legal Counsel (SW) | | | 5,000 | | | | 5,000 | | | | 5,000 | | 2,500 |
|     Property & Misc Taxes | | | | | | | | | | | | | 250 |
| Total Cash Outflows | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 2,750 |
| Net Cash Flow | - | - | (5,000) | - | - | - | (3,500) | - | - | - | (5,000) | - | (2,750) |
| Ending Cash Balance | 18,900 | 18,900 | 13,900 | 13,900 | 13,900 | 13,900 | 10,400 | 10,400 | 10,400 | 10,400 | 5,400 | 5,400 | 2,650 |